LATHAM & WATKINS LLP
Melanie M. Blunschi (Bar No. 234264)
 *melanie.blunschi@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Marissa Alter-Nelson (*pro hac vice*)
 *marissa.alter-nelson@lw.com*
1271 Avenue of the Americas
New York, NY 10020
Telephone: +1.212.906.1200

Margaret A. Upshaw (*pro hac vice*)
 *maggie.upshaw@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone: +1.202.637.2200

*Attorneys for Defendant*
*Meta Platforms, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| NATASSIA TIMOTHEE, TOMMY DIEP, ESPERANZA REYES, MARIAELENA BURCIAGA, and STACY PENNING on behalf of themselves, all others similarly situated, and the general public,<br><br>          Plaintiffs,<br><br>  v.<br><br>META PLATFORMS, INC., SACRAMENTO FOOD BANK AND FAMILY SERVICES, LOS ANGELES REGIONAL FOOD BANK, CENTRAL CALIFORNIA FOOD BANK, and SAN FRANCISCO FOOD BANK d/b/a SAN FRANCISCO-MARIN FOOD BANK,<br><br>          Defendants. | Case No.  3:25-cv-05106-LB<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Hearing: February 5, 2026<br>Time:   9:30 a.m.<br>Location: Courtroom B—15th Floor<br>Judge: Hon. Laurel Beeler |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on February 5, 2026 at 9:30 a.m., before the Honorable Laurel Beeler, United States District Court, Courtroom B, 15th Floor, 450 Golden Gate Ave., San Francisco, California, Defendant Meta Platforms, Inc. ("Meta") will and hereby does move for an order dismissing Plaintiffs Natassia Timothee, Tommy Diep, Esperanza Reyes, Mariaelena Burciaga, and Stacy Penning's ("Plaintiffs") complaint (Dkt. 1) for failure to state a claim under Rule 12(b)(6). This motion is based on this notice of motion; the memorandum of points and authorities in support thereof that follows; the proposed order filed concurrently herewith; the request for judicial notice and accompanying declaration; the pleadings, records, and papers on file in this action; oral argument; and any other matters properly before the Court.

## STATEMENT OF ISSUE TO BE DECIDED

Whether the Court should dismiss the complaint for failure to state any claim upon which relief can be granted under Rule 12(b)(6).

Dated: October 20, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By */s/ Melanie M. Blunschi*
 Melanie M. Blunschi (Bar No. 234264)
 *melanie.blunschi@lw.com*
 505 Montgomery St., Suite 2000
 San Francisco, CA 94111
 Telephone: +1.415.391.0600

 Marissa Alter-Nelson (*pro hac vice*)
 *marissa.alter-nelson@lw.com*
 1271 Avenue of the Americas
 New York, NY 10020
 Telephone: +1.212.906.1200

 Margaret A. Upshaw (*pro hac vice*)
 *maggie.upshaw@lw.com*
 555 Eleventh Street, NW, Suite 1000
 Washington, D.C. 20004-1304
 Telephone: +1.202.637.2200

*Attorneys for Defendant*
*Meta Platforms, Inc.*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    STATEMENT OF FACTS .................................................................................... 3

       A.    Meta's Pixel Code ..................................................................................... 3

       B.    Meta's Terms Of Service, Privacy Policy, And Cookies Policy ......................... 3

       C.    Meta's Business Tools Terms ........................................................................ 4

       D.    The Food Bank Defendants ......................................................................... 5

       E.    Plaintiffs' Complaint .................................................................................. 5

III.   LEGAL STANDARD ........................................................................................... 6

IV.    ARGUMENT ....................................................................................................... 7

       A.    All Of Plaintiffs' Claims Fail Because Plaintiffs Do Not
             Adequately Allege That Meta Received Their Information ................................ 7

       B.    All Of Plaintiffs' Claims Fail Because Plaintiffs Consented To
             Meta Receiving Their Information ................................................................. 9

       C.    All Of Plaintiffs' Claims Fail Because Plaintiffs Cannot Plausibly
             Allege That Meta Intended To Acquire Their Information Or
             Affirmatively Acted To Do So ...................................................................... 13

       D.    Plaintiffs' Claims Each Fail For Additional, Independent Reasons ..................... 16

             1.    The Federal Wiretap Act Claim Fails ................................................... 16

             2.    The CIPA Section 631 Claim Fails ...................................................... 19

             3.    The CIPA Section 632 Claim Fails ...................................................... 20

             4.    The CIPA Section 635 Claim Fails ...................................................... 22

             5.    The CIPA Section 638.51 Claim Fails .................................................. 23

             6.    The Invasion Of Privacy Claims Fail ................................................... 24

             7.    The Unjust Enrichment Claim Fails ..................................................... 25

V.     CONCLUSION ................................................................................................... 25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

# TABLE OF AUTHORITIES

## CASES

*Adams v. Johnson*,
355 F.3d 1179 (9th Cir. 2004) ............................................................................................... 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................... 7

*B.K. v. Desert Care Network*,
2024 WL 1343305 (C.D. Cal. Feb. 1, 2024) ....................................................................... 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................... 6

*Belluomini v. Citigroup Inc.*,
2013 WL 5645168 (N.D. Cal. Oct. 16, 2013) ..................................................................... 24

*Boulton v. Community.com, Inc.*,
2025 WL 314813 (9th Cir. Jan. 28, 2025) .......................................................................... 22

*Caraccioli v. Facebook, Inc.*,
167 F. Supp. 3d 1056 (N.D. Cal. 2016) ............................................................................... 15

*Cody v. Ring LLC*,
718 F. Supp. 3d 993 (N.D. Cal. 2024) ................................................................................. 20

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) .............................................................................. 8, 9

*Davis v. Fresno Unified Sch. Dist.*,
14 Cal. 5th 671 (2023) ......................................................................................................... 21

*Doe I v. Google LLC*,
2025 WL 1616720 (N.D. Cal. June 6, 2025) ....................................................................... 13

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024) .......................................................................... passim

*Doe v. Eating Recovery Ctr.*,
No. 3:23-cv-05561-VC (N.D. Cal. Oct. 17, 2025) ......................................................... 7, 20

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ............................................................................... 15

*Durell v. Sharp Healthcare*,
183 Cal. App. 4th 1350 (2010) ............................................................................................ 25

*F.B.T. Prods., LLC v. Aftermath Recs.*,
    621 F.3d 958 (9th Cir. 2010) ................................................................................................. 12

*Flanagan v. Flanagan*,
    27 Cal. 4th 766 (2002) ........................................................................................................... 22

*Gonzalez v. Uber Techs., Inc.*,
    305 F. Supp. 3d 1078 (N.D. Cal. 2018) ................................................................................. 20

*Graham v. Noom, Inc.*,
    533 F. Supp. 3d 823 (N.D. Cal. 2021) ............................................................................ 19, 24

*Hammerling v. Google LLC*,
    615 F. Supp. 3d 1069 (N.D. Cal. 2022) ................................................................................. 25

*Hammerling v. Google, LLC*,
    2024 WL 937247 (9th Cir. Mar. 5, 2024)..................................................................... 9, 12, 25

*Hernandez v. Hillsides, Inc.*,
    47 Cal. 4th 272 (2009) ..................................................................................................... 13, 24

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ............................................................................................... 10

*In re Google Assistant Priv. Litig.*,
    457 F. Supp. 3d 797 (N.D. Cal. 2020) ................................................................................... 15

*In re Google Location History Litig.*,
    428 F. Supp. 3d 185 (N.D. Cal. 2019) ................................................................................... 17

*In re iPhone Application Litig*,
    844 F. Supp. 2d 1040 (N.D. Cal. 2012) ................................................................................. 25

*In re Meta Pixel Healthcare Litig.*,
    647 F. Supp. 3d 778 (N.D. Cal. 2022) ................................................................................... 12

*In re Zynga Priv. Litig.*,
    750 F.3d 1098 (9th Cir. 2014) ............................................................................................... 19

*Johnson v. Blue Nile, Inc.*,
    2021 WL 1312771 (N.D. Cal. Apr. 8, 2021) ......................................................................... 19

*Katz-Lacabe v. Oracle Am., Inc.*,
    2024 WL 1471299 (N.D. Cal. Apr. 3, 2024) .................................................................... 16, 17

*Katz-Lacabe v. Oracle Am., Inc.*,
    668 F. Supp. 3d 928 (N.D. Cal. 2023) ................................................................................... 17

*Khamooshi v. Politico LLC*,
    786 F. Supp. 3d 1174 (N.D. Cal. 2025) ................................................................................. 24

*Kishnani v. Royal Caribbean Cruises Ltd.*,
  2025 WL 1745726 (N.D. Cal. June 24, 2025)......................................................................... 24

*Konop v. Hawaiian Airlines, Inc.*,
  302 F.3d 868 (9th Cir. 2002) ................................................................................................. 18

*Lakes v. Ubisoft, Inc.*,
  777 F. Supp. 3d 1047 (N.D. Cal. 2025), *appeal pending*, No. 25-2857 (9th Cir.
  2025) .............................................................................................................................. 11, 13

*Lau v. Gen Digital Inc.*,
  2023 WL 10553772 (N.D. Cal. Sept. 13, 2023) ...................................................................... 3

*Lloyd v. Facebook, Inc.*,
  2023 WL 1802415 (N.D. Cal. Feb. 7, 2023), *aff'd in relevant part*, 2024 WL
  3325389 (9th Cir. Jul. 8, 2024).......................................................................................... 10, 11

*M.D. v. Google LLC*,
  2025 WL 2710095 (N.D. Cal. Sept. 23, 2025) .................................................................. 10, 11

*Marden v. LMND Med. Grp.*,
  2024 WL 4448684 (N.D. Cal. July 3, 2024)........................................................................... 25

*Martinez v. Choose Your Horizon, Inc.*,
  2025 WL 2498138 (N.D. Cal. Sept. 1, 2025) ........................................................................... 9

*Meta Platforms, Inc. v. Nguyen*,
  2023 WL 8686924 (N.D. Cal. Nov. 21, 2023) ....................................................................... 10

*Moreno v. San Francisco Bay Area Rapid Transit Dist.*,
  2017 WL 6387764 (N.D. Cal. Dec. 14, 2017).................................................................. 17, 18

*People v. Braden*,
  14 Cal. 5th 791 (2023) ........................................................................................................... 21

*People v. Drennan*,
  84 Cal. App. 4th 1349 (2000) ................................................................................................ 21

*People v. Hyatt*,
  109 Cal. App. 5th 735 (2025) ................................................................................................... 7

*People v. Nakai*,
  183 Cal. App. 4th 499 (2010) ................................................................................................ 22

*Planned Parenthood Fed'n of Am. Inc. v. Newman*,
  51 F.4th 1125 (9th Cir. 2022) ................................................................................................ 16

*Popa v. Microsoft Corp.*,
  2025 WL 2448824 (9th Cir. Aug. 26, 2025)............................................................................. 7

*Price v. Headspace*,
2025 WL 1237977 (Cal. Sup. Ct. Apr. 1, 2025) ......................................................................... 24

*R.C. v. Sussex Publishers, LLC*,
2025 WL 948060 (N.D. Cal. Mar. 28, 2025) ............................................................................. 19

*Ramos v. Gap, Inc.*,
2025 WL 2144837 (N.D. Cal. July 29, 2025) ...................................................................... 19, 23

*Rodriguez v. Google LLC*,
2021 WL 2026726 (N.D. Cal. May 21, 2021) ..................................................................... 16, 22

*Russell v. Walmart, Inc.*,
680 F. Supp. 3d 1130 (N.D. Cal. 2023) .................................................................................... 25

*Silver v. Stripe, Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) ............................................................................ 10

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) ....................... 13

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ................................................................................... 10, 11, 13

*Smith v. LoanMe, Inc.*,
11 Cal. 5th 183 (2021) .............................................................................................................. 21

*Stevens v. TD Bank, N.A.*,
2025 WL 1779164 (D.N.J. June 27, 2025) .................................................................................. 9

*Sussman v. Am. Broad. Cos.*,
186 F.3d 1200 (9th Cir. 1999) .................................................................................................. 16

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012) .................................................................................................................. 18

*Torres v. Prudential Fin., Inc.*,
2025 WL 1135088 (N.D. Cal. Apr. 17, 2025), *appeal pending* No. 25-3203
(9th Cir.) .................................................................................................................................... 20

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) ........................................................................................ 13, 14, 15

*United States v. Millis*,
621 F.3d 914 (9th Cir. 2010) ...................................................................................................... 7

*United States v. Schweihs*,
569 F.2d 965 (5th Cir. 1978) .................................................................................................... 23

*Valenzuela v. Keurig Green Mountain, Inc.*,
674 F. Supp. 3d 751 (N.D. Cal. 2023) ................................................................ 18, 20

*Washington v. Flixbus, Inc.*,
2025 WL 1592961 (S.D. Cal. June 5, 2025) ........................................................ 10, 11

*Weston v. Lefiti*,
2024 WL 4579237 (9th Cir. Oct. 25, 2024) ......................................................... 10, 17

*Williams v. DDR Media, LLC*,
757 F. Supp. 3d 989 (N.D. Cal. 2024) ..................................................................... 20

*Yale v. Clicktale, Inc.*,
2021 WL 1428400 (N.D. Cal. Apr. 15, 2021) ...................................................... 19, 22

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (N.D. Cal. 2021) ................................................................... 23

## STATUTES

18 U.S.C. § 2510(4) ............................................................................................. 17, 19

18 U.S.C. § 2510(5) ............................................................................................. 17, 18

18 U.S.C. § 2510(5)(b) ............................................................................................. 18

18 U.S.C. § 2511(1)(a) .............................................................................................. 13

18 U.S.C. § 2511(1)(b)(i) .......................................................................................... 18

18 U.S.C. § 2511(2)(d) ........................................................................................... 9, 16

18 U.S.C. § 2512(1)(a) .............................................................................................. 18

18 U.S.C. § 2520(a) .................................................................................................. 18

Cal. Civ. Code § 3515 ............................................................................................... 10

Cal. Penal Code § 631(a) .................................................................................... passim

Cal. Penal Code § 632(a) .................................................................................... passim

Cal. Penal Code § 632(c) ........................................................................................... 22

Cal. Penal Code § 635(a) ................................................................................. 13, 22, 23

Cal. Penal Code § 637.2 ........................................................................................... 9, 23

Cal. Penal Code § 638.50(b) ................................................................................ 23, 24

Cal. Penal Code § 638.50(c) ................................................................................ 23, 24

Cal. Penal Code § 638.51 ............................................................................................... 24

Cal. Penal Code § 638.51(a) ..................................................................................... 13, 23

**RULES**

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 6

**OTHER AUTHORITIES**

*Address*, https://www.merriam-webster.com/dictionary/address ................................... 24

*Apparatus*, Cambridge Dictionary,
   https://dictionary.cambridge.org/us/dictionary/english/apparatus (last visited
   Sept. 25, 2025) ...................................................................................................... 17

*Device*, Merriam-Webster Online (https://www.merriam-
   webster.com/dictionary/device) (2017) ................................................................. 17

LATHAM&WATKINSLLP
ATTORNEYS AT LAW

## I.    INTRODUCTION

Plaintiffs' claims in this case turn on allegations that four California food banks incorporated a snippet of software code (the "Meta Pixel" or "Pixel") on their websites and used that code to send certain information about Plaintiffs to Meta.

Meta makes its Pixel code publicly available to web developers so they can improve their services and better understand and reach their users, including through advertising. Before incorporating Meta Pixel code into their websites, developers must agree to Meta's Business Tools Terms. In doing so, developers agree to provide, "on each web page where [Meta's] pixels are used," "robust and sufficiently prominent notice" that Meta may receive information from the website and to obtain all rights to disclose the data that they send to Meta. Ex. 11 at 2. Developers also "represent and warrant that" they "will not share Business Tool Data with [Meta] that [they] know or reasonably should know" includes "sensitive information." *Id.* at 1-2. Website developers alone choose whether and how to incorporate the Meta Pixel code into their websites, and they have full control over what data to send to Meta (if any), subject to these contractual requirements. As for consumers, Facebook and Instagram users—including Plaintiffs—agree to Meta's Terms of Service and policies when they sign up for an account. Those Terms inform users that Meta "use[s] your personal data to help determine which personalized ads to show you," Ex. 2 at 1, and Meta's Privacy Policy discloses that websites can use Meta Pixel code and that when they do, the information collected may be shared with Meta. The Privacy Policy explains, for example, that Meta "receive[s] information" from third parties "about a variety of your information and activities"—including "[w]ebsites you visit" and "[h]ow you use [third parties'] products and services." Ex. 4 at 5-6.

Despite Plaintiffs' broad consent and the restrictions Meta places on developers, Plaintiffs attempt to stretch decades-old criminal wiretapping statutes and other laws far beyond their intended scope to hold Meta liable for the actions of third parties who were undoubtedly only trying to help those in need. Plaintiffs allege that they visited four nonprofit food banks' websites and provided information (like their addresses) on various pages, and that the food banks used Meta's Pixel code to send that information to Meta. On that basis, in addition to suing the food

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

META'S MOT. TO DISMISS COMPLAINT
CASE NO. 3:25-cv-05106-LB

banks themselves, Plaintiffs assert a host of claims against Meta under the federal Wiretap Act, California Invasion of Privacy Act (CIPA), and for invasion of privacy and unjust enrichment. But there is "nothing inherently unlawful" about the Meta Pixel, *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 841 (N.D. Cal. 2024) ("*Google Pixel*") (dismissing wiretapping and other claims against Google), and Plaintiffs' claims fail as a matter of law and should be dismissed.

*First*, Plaintiffs fail to plausibly allege that their information was actually transmitted to Meta. Plaintiffs rely on the blanket assertion that the Pixel transmits "any action on a webpage" a user takes, Compl. ¶ 68—but that assertion is contradicted by the source Plaintiffs cite. And Plaintiffs fail to otherwise allege facts that plausibly show that Meta received *their* personal information from the food bank websites. That pleading failure dooms each of their claims.

*Second*, Plaintiffs' claims are independently barred by consent. Plaintiffs all concede they are Facebook or Instagram users. *Id*. ¶ 23. As the Ninth Circuit has held, Meta's Terms of Service and Privacy Policy clearly disclose Meta's receipt and use of third-party data for advertising and analytics. Because all users must agree to these policies to use Meta's products, Plaintiffs consented to the conduct about which they now complain.

*Third*, Plaintiffs fail to allege that Meta acted with the requisite intent to intercept any information sent without their consent. Plaintiffs' claims require purposeful and deliberate conduct, not mere inadvertence or passive receipt. Yet Plaintiffs allege, at most, that Meta made its Pixel code generally available and received information the food banks chose to send. And Meta's Business Tools Terms—which prohibit developers from sending any "sensitive" information, including "health" or "financial" information, or any other information the food banks lacked the right to send—underscore that Meta "purposefully acted so as *not* to receive" such information. *Google Pixel*, 741 F. Supp. 3d at 840.

*Fourth*, each of Plaintiffs' claims fails for a host of additional, independent reasons that reflect a fundamental disconnect between the criminal statutes and common-law principles Plaintiffs seek to invoke and the conduct actually alleged here. Plaintiffs' Wiretap Act and CIPA Section 632 and 635 claims, for example, require use or manufacture of a "device"—a term that does not encompass intangible source code like the Meta Pixel. And Plaintiffs' Wiretap Act and

CIPA Section 631 and 632 claims all require real-time acquisition of Plaintiffs' communications, but Plaintiffs' own cited source—which is incorporated by reference—shows that web developers configure code from the Meta Pixel to send *separate* "events" *after* a user's communication is received. These and the remaining claims also suffer from a number of other deficiencies. The complaint should be dismissed with prejudice.

## II.     STATEMENT OF FACTS[1]

### A.      Meta's Pixel Code

The Meta Pixel is a snippet of code that many businesses and organizations choose to incorporate into their websites. It allows those organizations to "measure the effectiveness of [their] advertising" and understand actions people take on their websites. Compl. ¶ 3. Website developers may use the code to generate "events" when a user takes a particular action on a website. *See id.* ¶¶ 54, 78. Developers, not Meta, decide whether to incorporate source code from the Meta Pixel into their website code, *e.g., id.* ¶¶ 3, 6, and select what user actions to measure through events and what events to send to Meta. Meta explains how developers can configure the Pixel to capture different events or to capture events at different times. *See* "Conversion Tracking," Ex. 1 at 1 (cited at Compl. ¶ 72 n.7). For the events that developers do choose to send to Meta, web developers may view that information on an "Events Manager" page, and use it to better understand and engage with their users. Compl. ¶¶ 72, 78.

### B.      Meta's Terms Of Service, Privacy Policy, And Cookies Policy[2]

When Facebook or Instagram users—including Plaintiffs, *id.* ¶ 23—sign up for an account, they agree to Meta's Terms of Service and incorporated Privacy Policy and Cookies Policy. The Terms and Policies disclose the data Meta receives, including from third-party websites, and how Meta uses it. Meta's Terms of Service explain that Meta does not "sell [users'] personal data to

---

[1] Unless otherwise indicated, the facts recited herein are based on the allegations of the complaint and are accepted as true only for purposes of this motion.

[2] Plaintiffs do not identify when they used the food banks' websites, and they request a class period limited to one year from the filing of the complaint. *See* Compl. ¶ 109. This motion quotes the versions of Meta's policies in effect at the time the complaint was filed. These policies contained materially identical language throughout the past two years from the filing of the complaint—the longest statute of limitations for any of Plaintiffs' claims. *See Lau v. Gen Digital Inc.*, 2023 WL 10553772, at *2 (N.D. Cal. Sept. 13, 2023); Exs. 2-10.

advertisers." Ex. 2 at 1. But "businesses and organizations, and other persons pay us to show you ads for their products," and Meta "use[s] your personal data to help determine which personalized ads to show you." *Id.* In exchange for using Meta's products for free, users "agree that [Meta] can show you ads that [it] think[s] may be relevant to you and your interests." *Id.*

The Privacy Policy explains that third parties "collect your information when you visit their site or app or use their services." Ex. 4 at 6. Meta discloses that it "collect[s] and receive[s] information" from those third parties "about a variety of your information and activities on and off [Meta's] Products," including "device information," "[p]urchases and transactions you make," "[h]ow you use [third parties'] products and services," and "[w]ebsites you visit and cookie data." *Id.* at 5-6; *see id.* at 7 (Meta "receive[s] information using cookies and … the Meta Pixel"). Meta also discloses that it receives identifying information like "advertising device ID" and "cookies" that "helps [Meta] match your activities with your account," and that Meta may "connect information from partners to your account." *Id.* at 6. The Privacy Policy explains that businesses can use tools like the Meta Pixel to "advertise or support their products" and "understand and measure how people are using their [] services and how well their ads are working." *Id.* at 13. And it further explains that Meta uses "activity on and off our Products, including information we receive through cookies and similar technologies," to "show you ads." *Id.* at 16.

Meta's Cookies Policy reiterates that third parties may use "Meta Pixel" code to share information about "your interactions with them." Ex. 9 at 10. The policy also explains that Meta "use[s] cookies" "to store and receive identifiers" if a user "ha[s] a Facebook or Instagram account" or "visit[s] other websites and apps that use the Meta Products," including Meta's Pixel code. *Id.* at 1. The Cookies Policy, like the Privacy Policy, discloses that Meta "use[s] cookies" to "deliver ads to people who have previously visited a business's website … to recommend products and services based on that activity." *Id.* at 5.

## C.    Meta's Business Tools Terms

Meta separately sets forth restrictions on how the Meta Pixel may be used through its Business Tools Terms, which bind the third-party web developers and organizations that choose to use Meta's Pixel code. *See* Business Tools Terms, Ex. 11 at 1 (explaining that the "Business

Tools Terms govern the use of" the data web developers send to Meta).

Meta's Business Tools Terms provide that organizations using Meta's Pixel code "represent and warrant that [they] have provided robust and sufficiently prominent notice" "on each web page where [Meta's] pixels are used." *Id.* at 2. The Business Tools Terms also require organizations to represent that they "have all of the necessary rights and permissions and a lawful basis (in compliance with applicable laws, regulations and industry guidelines) for the disclosure and use" of any data they share. *Id.* at 1. And the Business Tools Terms specifically prohibit developers from sending sensitive data to Meta, requiring developers to "represent and warrant that" they "will not share Business Tool Data with us that [they] know or reasonably should know … includes health, financial information or other categories of sensitive information." *Id.*

### D.   The Food Bank Defendants

The Food Bank Defendants are four California non-profit organizations: Sacramento Food Bank & Family Services ("SFBFS"), Los Angeles Regional Food Bank ("LAFB"), Central California Food Bank ("CCFB"), and San Francisco-Marin Food Bank ("SFMFB"). Compl. ¶¶ 32-35. Each food bank operates a website to connect users with nutrition assistance programs and provide information about becoming a donor or volunteer. *Id.* ¶¶ 36-37, 41-42, 46-47, 56-57. Each of the food banks has allegedly "incorporated the Pixel onto their websites." *Id.* ¶ 6.

### E.   Plaintiffs' Complaint

Each of the five Plaintiffs is an individual with a Facebook or Instagram account, who claims to have visited a website operated by one of the food banks. Compl. ¶¶ 23-28. Plaintiffs also allege they provided the following information when using the food banks' websites:

- Plaintiff Timothee alleges she entered her "home address" on the SFBFS site "to access the 'Find Food' map." *Id.* ¶ 24.

- Plaintiff Diep alleges he entered his "home address" on the LAFB website to "access the 'Find Food' map." *Id.* ¶ 25. He also alleges he "entered his personal information into" the LAFB website "to receive emails" from LAFB. *Id.*

- Plaintiffs Reyes and Burciaga both allege they "enter[ed] [their] home address" on the CCFB website "to access the 'Find Food' map." *Id.* ¶¶ 26, 27. Plaintiff Burciaga

also alleges that she "answer[ed] multiple questions to determine the severity of her financial hardship" and eligibility for CalFresh on the CCFB website. *Id.* ¶ 27.

- Plaintiff Penning alleges that he "answer[ed] multiple questions related to his location, age, disability status, mobility status, and urgency of his need for food assistance" when using the "Find Food" map on the SFMFB website. *Id.* ¶ 28.

Plaintiffs contend that "[t]he Food Bank Defendants' inclusion of" code from the "Pixel on their websites caused Plaintiffs' … information to be intercepted by and sent to Meta." *Id.* ¶ 6.[3] Plaintiffs further allege that they were logged into their Facebook or Instagram accounts when they visited the food banks' websites, *id.* ¶ 79, and that Meta can match information sent by websites to Meta users through certain cookies, *id.* ¶ 73. Plaintiffs assert that all four of the food banks failed to obtain proper consent to this information sharing. *See id.* ¶¶ 38, 43, 48, 58.

Plaintiffs also summarily allege that Meta sells the data it obtains, *id.* ¶¶ 83, 153, but do not provide any facts to support those allegations or to show that *their* information was sold. And Plaintiffs include allegations that "predatory" ads may be directed to low-income individuals, but they do not allege that they received any of the types of ads they describe. *E.g. id.* ¶¶ 99, 108. Instead, Plaintiffs generically allege that they saw "advertisements related to their sensitive financial information or status," *id.* ¶ 30, without specifying content.

Plaintiffs bring claims against Meta under Sections 631, 632, 635, and 638.51 of the California Invasion of Privacy Act (CIPA) (Count I) and under the federal Wiretap Act (Count II), and for common-law intrusion upon seclusion (Count III), invasion of privacy under the California constitution (Count IV), and unjust enrichment (Count VII).[4]

## III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

---

[3] Plaintiffs include various allegations about other information a user *could* share, but do not allege that any of the Plaintiffs here did so. *See, e.g., id.* ¶ 84 (describing CalFresh inquiry form on SFBFS website and separate website mRelif.com), *id.* ¶ 55 (alleging CCFB website allows users to share "their personal experience[s]" with food assistance).

[4] Plaintiffs also bring a negligence claim (Count V) against all of the food banks and a claim under the California Consumer Privacy Act (Count XI) against SFMFB.

"[C]onclusory allegations of law and unwarranted inferences" do not suffice. *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004). A court must "draw on its judicial experience and common sense" to evaluate whether a complaint states a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## IV.     ARGUMENT

Plaintiffs urge this Court to adopt an expansive interpretation of the criminal wiretapping statutes and other laws to hold Meta liable for the actions of third parties who were only trying to help people in need. That effort should be rejected. Because these statutes carry criminal penalties as well as civil, they must be limited "to the clear import of [their] text," *United States v. Millis*, 621 F.3d 914, 916-17 (9th Cir. 2010) (citation omitted), with any ambiguity construed "as favorably to [Meta] as its language and the circumstances of its application may reasonably permit." *People v. Hyatt*, 109 Cal. App. 5th 735, 793-94 (2025); *see* Order (Dkt. 167) at 1, *Doe v. Eating Recovery Ctr.*, No. 3:23-cv-05561-VC (N.D. Cal. Oct. 17, 2025) ("*ERC*") (applying rule of lenity and dismissing Section 631 claim). And Plaintiffs' attempt to impose liability under inapt common-law principles fares no better.

Plaintiffs' claims share three fundamental deficiencies. *First*, Plaintiffs fail to allege a plausible factual basis from which to conclude that their information was transmitted by the food banks' websites to Meta in the first place. *Second*, to the extent any such transmission occurred, Plaintiffs consented to Meta's receipt of data about them from third-party websites and use of that data for advertising. *Third*, Plaintiffs' claims all fail because their allegations that the food banks purportedly misused the Pixel to send certain sensitive data to Meta fail to show that *Meta* acted intentionally to receive this data. Each claim also suffers additional defects that warrant dismissal.

### A.     All Of Plaintiffs' Claims Fail Because Plaintiffs Do Not Adequately Allege That Meta Received Their Information

Plaintiffs' complaint fails at the threshold because Plaintiffs do not plausibly allege a factual basis for asserting that *their* information was actually sent to Meta through code from the Pixel and so fail to support the core premise of their claims.

As an initial matter, Plaintiffs cannot state any claim based solely on visiting the food banks' websites, *see* Compl. ¶¶ 24-28, because the collection of general browsing information on

a public website does not inflict any cognizable privacy injury. *E.g.*, *Popa v. Microsoft Corp.*, 2025 WL 2448824, at *5 (9th Cir. Aug. 26, 2025) (no standing based on monitoring of interactions on public website); *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1123-24 (S.D. Cal. 2023) (same for alleged sharing of plaintiffs' "browsing activity" on "publicly facing website").

Plaintiffs therefore contend the information they provided on the websites "communicated their intent to receive nutrition assistance." Compl. ¶ 29. But even assuming that is true, and that such intent alone could be considered sufficiently private for Article III standing, Plaintiffs fail to plausibly allege that information was actually transmitted to Meta. Plaintiffs' contention that the information they entered on the food banks' websites was transmitted turns on the assertion that developers using Meta's Pixel code send "*any* action on a webpage" that a user takes to Meta—in other words, that web developers necessarily sent to Meta *all* information Plaintiffs entered on every page of the food bank websites. *Id.* ¶¶ 68, 72 (emphasis added). But Plaintiffs' own cited source shows otherwise. *See* "Conversion Tracking," Ex. 1 (cited at Compl. ¶ 72). It explains that developers choose which events to send, "report[ing]" events by "calling a Pixel function." *Id.* at 1. A web developer must "install[]" the "Pixel's base code … on every page" where the developer wishes to track anything; a web page that does not contain this base code would not send data to Meta. *Id.* Beyond the base code, it states that a developer must "call" a particular function in order for that action to be transmitted to Meta as an event. *Id.* And how a developer "call[s] the Pixel[]" may change what information is sent. *See id.* at 1-2 (explaining that web developers can track purchases "after a visitor has completed the purchase" or "when the visitor clicks a purchase button" depending on the page where the event is added).

Accordingly, the mere presence of Pixel code on the website is insufficient to allege that Plaintiffs' information was actually sent to Meta. And Plaintiffs' complaint is devoid of any factual allegations that would show that Pixel code was incorporated and configured to send any particular data (e.g., addresses) from any food bank website to Meta. Instead, Plaintiffs fall back on assertions about hypothetical information that Pixel code *could* be used to transmit. *E.g.*, Compl. ¶ 72 ("You can use the Meta Pixel to track your website visitors' actions" (quoting Ex. 1)). But this speculation does not plausibly plead that the food banks in this case actually used Pixel code to improperly

share any data with Meta, let alone the particular data that Plaintiffs allegedly provided. *See Stevens v. TD Bank, N.A.*, 2025 WL 1779164, at *4 (D.N.J. June 27, 2025) ("Plaintiff's case cannot ride solely on the general or theoretical capabilities of the Pixel."). This gap is fatal to Plaintiffs' claims. *See id.* (dismissing complaint where "Plaintiff must—but fails to—connect the Pixel's functionality in the abstract to him individually"); *see also, e.g., Cousin*, 681 F. Supp. 3d at 1123.

Plaintiffs try to fill this gap by alleging that they "received several targeted advertisements related to their sensitive financial" status. Compl. ¶ 30. But nothing plausibly links those alleged ads to Meta or the Pixel at all. Plaintiffs do not allege they saw the advertisements on Facebook or Instagram. *Cf. Martinez v. Choose Your Horizon, Inc.*, 2025 WL 2498138, at *2 (N.D. Cal. Sept. 1, 2025) (Beeler, J.) (granting motion to compel arbitration in case where plaintiffs alleged they "received advertisements …*via Facebook*" (emphasis added)). And the complaint does not specify who served these ads or whether they were based on data allegedly collected from the food bank sites (as opposed to, for example, pages Plaintiffs might have liked). Indeed, Plaintiffs do not even allege what the supposedly targeted advertisements *were*, saying only that the ads "related to their sensitive financial information or status." Compl. ¶ 30.[5] That is far too vague to support the key premise of their claims—that data they shared was actually transmitted to Meta.

**B.      All Of Plaintiffs' Claims Fail Because Plaintiffs Consented To Meta Receiving Their Information**

Even if Plaintiffs had sufficiently alleged that the food bank websites actually sent Meta any data about them, their claims would still fail because they consented to Meta's receipt of information about their activity on third-party websites that use Meta's Business Tools, including Pixel code. That consent defeats all of Plaintiffs' claims. *See* 18 U.S.C. § 2511(2)(d) (no liability where "one of the parties to the communication has given prior consent"); Cal. Penal Code §§ 631(a), 632(a) (imposing liability for wiretapping and eavesdropping only "without the consent of all parties"); *id.* § 637.2(a) (plaintiff may only bring action under CIPA if they have been "injured by a violation"); *Hammerling v. Google, LLC*, 2024 WL 937247, at *3 (9th Cir. Mar. 5,

---

[5] Plaintiffs offer hypothetical examples of "predatory" ads that *could* be served—e.g., "payday loans, gambling, for-profit education," Compl. ¶ 99—but do not describe any ads they personally saw, or allege that they saw the types of ads they list. *See id.* ¶ 100 (alleging only that "Plaintiffs and class members" saw ads "directed at exploiting their financial hardships").

2024) (dismissing invasion of privacy claim on consent grounds for lack of reasonable expectation of privacy); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 n.6 (9th Cir. 2018) (consent defeated unjust enrichment claim); *see also* Cal. Civ. Code § 3515 ("A person who consents to an act is not wronged by it."). Moreover, because "lack of consent is an element" of Plaintiffs' CIPA Section 631 and 632 claims, Plaintiffs must affirmatively allege facts showing lack of consent. *Silver v. Stripe, Inc.,* 2021 WL 3191752, at *2, 4-5 (N.D. Cal. July 28, 2021) (dismissing CIPA claims where "terms plainly disclose[d]" data collection); *see M.D. v. Google LLC*, 2025 WL 2710095, at *4 (N.D. Cal. Sept. 23, 2025) (holding that plaintiffs "must plausibly allege that the complained-of interception occurred without consent," and dismissing claims); *Washington v. Flixbus, Inc.*, 2025 WL 1592961, at *5-6 (S.D. Cal. June 5, 2025) (similar). Even where consent is an affirmative defense, dismissal is appropriate where consent is "obvious on the face of a complaint" and from judicially noticeable documents. *Weston v. Lefiti*, 2024 WL 4579237, at *2 (9th Cir. Oct. 25, 2024); *see Washington*, 2025 WL 1592961, at *3, *5.

Plaintiffs contend that they did not consent to any data sharing with Meta because none of the *food bank defendants* obtained sufficient consent to transmit information about their activities on the websites. *E.g.*, Compl. ¶¶ 38, 43, 48, 58. But regardless of whether that is right, *Meta* obtained consent from its Facebook and Instagram users to receive information from third parties about their activity on other websites and to use that information to serve ads. *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) (rejecting argument "that Facebook could not have gained consent because the healthcare websites' privacy policies promised not to share data with third parties" because "Facebook's Terms and Policies make no such assurance, and Facebook is not bound by promises it did not make"). That bars Plaintiffs' claims.

Plaintiffs all allege that they are Facebook or Instagram users. Compl. ¶ 23. Like "all users," they were therefore required to "agree" to the Terms of Service (and incorporated policies) "to create a Facebook [or Instagram] account." *Lloyd v. Facebook, Inc.*, 2023 WL 1802415, at *1 (N.D. Cal. Feb. 7, 2023), *aff'd in relevant part*, 2024 WL 3325389 (9th Cir. Jul. 8, 2024); *see also Meta Platforms, Inc. v. Nguyen*, 2023 WL 8686924, at *2 (N.D. Cal. Nov. 21, 2023) ("All Facebook users must agree to its Terms of Service[.]"). Those contracts clearly disclose the

practices of which Plaintiffs now complain. The Terms of Service explain that Meta "use[s] your personal data to help determine which personalized ads to show you." Ex. 2 at 1. The Privacy Policy further explains that Meta "receive[s] information" from third-party websites, including through code from the Meta Pixel, "about a variety of your information and activities on and off [Meta's] Products." Ex. 4 at 5. That information includes "device information" and "[h]ow you use [third parties'] products and services," and the Privacy Policy discloses that Meta may "match" that activity "with your [Meta] account." *Id.* The Cookies Policy reiterates that businesses may use the "Meta Pixel" to share information about "your interactions with them"; that Meta "receive[s] identifiers" through cookies when users visit websites that "incorporate Meta technologies" like Pixel code; and that Meta uses those cookies to "deliver ads to people who have previously visited a business's website." Ex. 9 at 1, 5, 10.

These broad disclosures clearly encompass the conduct alleged in Plaintiffs' complaint: that Meta received information from websites about Plaintiffs' activities on those sites and used that information for advertising. *See, e.g.*, Compl. ¶¶ 69-80. Plaintiffs thus consented to policies with "disclosures [that] 'explicitly notify' users of the practice at issue." *Lakes v. Ubisoft, Inc.*, 777 F. Supp. 3d 1047, 1055 (N.D. Cal. 2025), *appeal pending*, No. 25-2857 (9th Cir. 2025) (dismissing based on consent); *see M.D.*, 2025 WL 2710095, at *5; *Washington*, 2025 WL 1592961, at *5-6.

Indeed, the Ninth Circuit has already twice concluded that "Facebook's data policy gives clear notice that third party partners may share data with Facebook." *Lloyd*, 2024 WL 3325389, at *2; *see also Smith*, 745 F. App'x at 8-9. In *Smith*, the Ninth Circuit recognized that Meta's policies disclose the precise conduct at issue here: a "reasonable person viewing [Facebook's] disclosures would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes." 745 F. App'x at 8-9. The court thus held that the plaintiffs there had consented to "collect[ion] and us[e] [of] their browsing data from various healthcare-related websites" and affirmed dismissal of CIPA and privacy claims. *Id.* Similarly, in *Lloyd*, the Ninth Circuit affirmed dismissal of a privacy claim where the plaintiff had alleged that Meta "impermissibly track[ed] her online activity," "because Facebook's data policy gives clear notice" that such data will be shared from third parties. 2024 WL 3325389, at *2.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

META'S MOT. TO DISMISS COMPLAINT
CASE NO. 3:25-cv-05106-LB

11

As in *Smith* and *Lloyd*, Meta's policies confirm that Plaintiffs consented to Meta's receipt of data reflecting their activity on third-party websites and use of that data for advertising purposes. Those disclosures should be given full effect. While some courts have held that disclosures must "specifically indicate" the particular types of data at issue to establish consent where "sensitive" data is involved, *see, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022), the information Plaintiffs allege they provided here is not the kind of highly personal, statutorily protected information that courts have deemed "sensitive." *E.g.*, *id.* at 783 (claims based on "personally identifiable medical information" covered by HIPAA). Multiple Plaintiffs allege only that they entered their addresses, which are not "sensitive." Compl. ¶¶ 24-26; *see id.* ¶ 27.[6] Plaintiff Burciaga does not allege what information she provided when answering "questions to determine the severity of her financial hardship," so there is no way to determine whether that information was sensitive. *Id.* ¶ 27. And Plaintiff Penning likewise alleges he answered questions related to his "disability status" and "mobility status" without specifying what information he actually provided. *Id.* ¶ 28.

Regardless of whether any of this information could be considered sensitive, however, Meta's Privacy Policy *did* specifically disclose that it would obtain information on "[h]ow [users] use [third parties'] products and services" and "match [those] activities with [a user's] account"—exactly what Plaintiffs allege Meta did here. Ex. 4 at 6. Requiring more specific disclosures would be inconsistent with Ninth Circuit precedent: Courts must look to the plain terms of a contract and cannot "reject [those terms] simply because [they] may deviate from [the court's] expectations." *Hammerling*, 2024 WL 937247 at *2. In *Hammerling*, the Ninth Circuit rejected a narrow reading of Google's privacy policy where the policy broadly "disclose[d] Google's collection of user activity data in third-party apps." *Id.*; *see also F.B.T. Prods., LLC v. Aftermath Recs.*, 621 F.3d 958, 964 (9th Cir. 2010) ("[a] contractual term is not ambiguous just because it is broad"). Similarly, the Ninth Circuit in *Smith* explained that even if browsing activity on health-related websites could be deemed sensitive, "many other kinds of [web-browsing data] are equally

---

[6] Plaintiffs also fail to allege how Meta would know those addresses were *theirs*, as opposed to those of a friend or family member.

sensitive" and "the practice complained of" nevertheless "falls within the scope of Plaintiffs' consent to Facebook's Terms and Policies." 745 F. App'x at 8-9. The same is true here.

Plaintiffs' claims thus fail because they cannot allege lack of consent. And because "[n]o further allegations could allow Plaintiffs to bring claims arising out of conduct which they consented to," amendment "would be futile." *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 956 (N.D. Cal. 2017) (citation omitted), *aff'd*, 745 F. App'x 8 (9th Cir. 2018); *see Lakes*, 777 F. Supp. 3d at 1060. Plaintiffs' claims should therefore be dismissed with prejudice.

### C.    All Of Plaintiffs' Claims Fail Because Plaintiffs Cannot Plausibly Allege That Meta Intended To Acquire Their Information Or Affirmatively Acted To Do So

In addition to obtaining broad consent from its users, Meta simultaneously obtains representations and warranties from—and places restrictions on—developers that use its Business Tools. In particular, Meta's Business Tools Terms specifically require businesses to obtain proper consent from users to send any data to Meta and *prohibit* businesses from sending it sensitive, health, or financial information. Consistent with that prohibition, Plaintiffs' wiretapping, eavesdropping, and privacy claims all fail because Plaintiffs' allegations that the food banks improperly disclosed information without proper consent do not plausibly allege that Meta *intentionally* or *willfully* obtained that information, as their claims require.[7]

To establish intent, Plaintiffs must allege that Meta acquired the data "purposefully and deliberately and not as a result of accident or mistake." *United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015); *see Google Pixel*, 741 F. Supp. 3d at 840 (applying *Christensen* to CIPA Section 631 and 632 claims). Meta must have "intended to collect the kinds of communications at issue in this lawsuit." *Doe I v. Google LLC*, 2025 WL 1616720, at *2 (N.D. Cal. June 6, 2025). That is, Plaintiffs must allege facts showing that Meta "acted consciously and deliberately with

---

[7] *See* 18 U.S.C. § 2511(1)(a) (imposing liability for "intentional[]" wiretapping); Cal. Penal Code § 631(a) ("intentional[]" or "willful[]" conduct); *id.* § 632(a) ("intentional[]" eavesdropping); *id.* § 635(a) (prohibiting manufacture of devices "designed" or "intended for eavesdropping"); *id.* § 638.51(a) (prohibiting affirmative "install[ation] or use" of a pen register or trap and trace device); *Google Pixel*, 741 F. Supp. 3d at 844 (intent "is a necessary element of an invasion of privacy claim"); *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286, 295 (2009) (requiring an "intentional[] intru[sion]" for invasion of privacy). Plaintiffs' unjust enrichment claim fails if their other claims all fail. *See Google Pixel*, 741 F. Supp. 3d at 848-49.

the *goal* of intercepting" purportedly sensitive information or information shared without proper consent. *Christensen*, 828 F.3d at 791 (emphasis added).

Plaintiffs' allegations here fall far short. Plaintiffs make only conclusory assertions that Meta "intentionally" or "willfully" acquired Plaintiffs' information. Compl. ¶¶ 135-36, 150, 152, 165, 172, 184. But Plaintiffs admit that the food banks—not Meta—"incorporated the Pixel onto their websites." *Id.* ¶ 6; *see id.* ¶ 63 (alleging food bank "intentionally incorporated the Pixel into its website"). And it was the *food banks'* "inclusion of the … Pixel on their websites"—not Meta's action or intent—which "caused Plaintiffs' … information to be intercepted by and sent to Meta." *Id.* ¶ 6. Meanwhile, Plaintiffs fail to allege *any* affirmative act by Meta to obtain data from the food banks, much less any "purposeful[] and deliberate[]" acts in violation of law. *Christensen*, 828 F.3d at 790. Plaintiffs do not allege that Meta had any hand in choosing whether or how to install its publicly available code from the Pixel, which webpages to incorporate that code on, or what events to send to Meta. Instead, the complaint alleges, at most, that Meta made the Pixel generally available and received the information the food banks elected to send.

Nor do Plaintiffs allege any facts showing that Meta intended to receive any "confidential communications, PII, and sensitive financial information," Compl. ¶ 6, or even data collected without proper consent. Plaintiffs allege that Meta uses "personal information" to "creat[e] customized audiences for its advertising business." *Id.* ¶ 71. But the mere use of data for advertising generally does not suggest a desire (much less a "conscious[] and deliberate[]" act, *Christensen*, 828 F.3d at 791) to obtain sensitive information. And Plaintiffs do not connect their more inflammatory allegations regarding other actors' potential downstream use of low-income consumers' data, Compl. ¶¶ 99, 106-108, to Meta, so those allegations cannot show *Meta's* intent.

On the contrary, as Plaintiffs themselves acknowledge, "Meta has policies in place for website owners to *restrict* the sharing of sensitive data." *Id.* ¶ 82 (emphasis added). Meta's Business Tools Terms expressly instruct developers that they must have "all of the necessary rights and permissions and a lawful basis" to collect and use the data they share. Ex. 11 at 1. Meta also goes further and prohibits the sharing of certain sensitive information, requiring businesses that incorporate Meta Pixel code to "represent and warrant that [they] will not share Business Tool

Data with [Meta] that [they] know or reasonably should know … includes health, financial," or "sensitive" information. *Id*. Accordingly, to the extent any food bank integrated Pixel code on its website in a way that sent health, financial, or sensitive information, *see* Compl. ¶¶ 36-65, doing so violated Meta's Business Tools Terms. But any alleged failure to comply with Meta's terms cannot demonstrate *Meta*'s intent. Indeed, by placing those restrictions on developers, Meta "purposefully acted so as *not* to receive any personal health information" or other sensitive information. *Google Pixel*, 741 F. Supp. 3d at 840 (finding no intent by Google in similar circumstances). In other words, the Business Tools Terms show that "Meta either had no intention of receiving the data at issue or had some alternative mens rea not rising to the level of intentionality." *B.K. v. Desert Care Network*, 2024 WL 1343305, at *7 (C.D. Cal. Feb. 1, 2024) (dismissing aiding-and-abetting CIPA claim for failure to allege predicate violation by Meta); *cf. Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056, 1063 (N.D. Cal. 2016) (allegation that Facebook failed to remove offensive content did not plausibly allege intentional conduct).

Plaintiffs try to discount these contracts by asserting that Meta "knows" that websites "are sharing potentially sensitive information" and "usually" does not take enforcement action. Compl. ¶ 82; *see id.* ¶¶ 83, 137, 167 (similar, alleging "no remedial action"). Those vague assertions do not demonstrate intent. As Judge Chhabria explained in analogous circumstances, allegations of "awareness that an interception might occur" "set the legal bar too low" for the intent required for wiretapping claims. *Google Pixel*, 741 F. Supp. 3d at 840.[8] The same reasoning applies here: Plaintiffs' assertions that Meta was "aware" of the possibility that developers might misconfigure the Pixel, that Meta did not affirmatively police every third-party implementation, or even that Meta profited from data generally, do not demonstrate that Meta acted "purposefully and

---

[8] Some district courts have held that an interception may be "considered intentional where a defendant is aware of the defect causing the interception but takes no remedial action." *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) (citation omitted). But that contradicts Ninth Circuit precedent holding that "intentionally" means "purposefully and deliberately." *Google Pixel*, 741 F. Supp. at 840 (quoting *Christensen*, 828 F.3d at 790). At minimum, that reasoning is limited to cases involving a *defect* in a defendant's own product where it may be possible to *infer* intent from a defendant's failure to remedy a known issue, *see, e.g., In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020) (accidental triggering of Google assistant), not *third-party* misuse of a common tool.

deliberately" to obtain Plaintiffs' sensitive information. In fact, *Plaintiffs* admit that, in at least some circumstances, Meta *does* take "enforcement actions" for violations of its policies. *See* Compl. ¶ 82. And again, Plaintiffs' allegations that *other parties* might use other, similar data for predatory purposes are too generalized to say anything about *Meta's* intent. *Id.* ¶ 99. Plaintiffs' claims should accordingly be dismissed.

### D.    Plaintiffs' Claims Each Fail For Additional, Independent Reasons

Apart from those cross-cutting deficiencies, Plaintiffs' claims all fail for other reasons.

### 1.    The Federal Wiretap Act Claim Fails

Plaintiffs fail to state their Wiretap Act claim because (1) the food banks consented to Meta's receipt of data from their websites, which establishes one-party consent; (2) Plaintiffs fail to allege that their communications were intercepted *during transmission*; (3) the Act prohibits only "interception" with a "device," but software code like the Pixel does not qualify as a "device"; and (4) some information Plaintiffs allege Meta received is not the "contents" of communications.

***The food banks' consent.***    Plaintiffs cannot state their Wiretap Act claim because the Wiretap Act requires only "one of the parties to the communication" to consent to an interception to render it lawful. 18 U.S.C. § 2511(2)(d). Here, in addition to Plaintiffs' consent, the food banks necessarily consented to Meta's receipt of data when they "incorporated the Pixel onto their websites." Compl. ¶ 6; *see Katz-Lacabe v. Oracle Am., Inc.*, 2024 WL 1471299, at *4 (N.D. Cal. Apr. 3, 2024) (websites "necessarily" consented where they chose "to deploy Oracle's tools"); *Rodriguez v. Google LLC*, 2021 WL 2026726, at *5 (N.D. Cal. May 21, 2021) (similar).

Moreover, the Wiretap Act's "crime-tort" exception to consent does not apply. That exception provides that a party's consent does not defeat a wiretapping claim where a communication "is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). The "criminal or tortious purpose must be separate and independent from the act of the recording," *Planned Parenthood Fed'n of Am. Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022)—that is, it must be done "for the purpose of facilitating some further impropriety, such as blackmail," *Sussman v. Am. Broad. Cos.*, 186 F.3d 1200, 1202 (9th Cir. 1999).

Plaintiffs allege no facts suggesting that Meta had any independent criminal or tortious

purpose. Rather, Plaintiffs allege Meta obtained Plaintiffs' communications for the allegedly "improper purpose of creating customized audiences for [Meta's] advertising business," Compl. ¶ 71, and to make a "profit," *id.* ¶ 4; *see also id.* ¶ 7 (similar). But the crime-tort exception does not apply where a defendant's "motivation in collecting and selling data about internet users [is] … to generate revenue." *Katz-Lacabe*, 2024 WL 1471299, at *3; *see also Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 945 (N.D. Cal. 2023) (defendant's "purpose" was "plainly" not "to perpetuate torts on millions of Internet users, but to make money"). And to the extent Plaintiffs contend those actions were improper because Meta should not have obtained the data in the first place, those allegations "stem from the mere act of recording," and thus do not allege a "criminal or tortious purpose" of "facilitating some further impropriety." *Weston*, 2024 WL 4579237, at *2.

***Not a "device."*** Plaintiffs' claim also fails because the Wiretap Act defines "intercept" to mean the acquisition of communications through "the use of any electronic, mechanical, or other *device*." 18 U.S.C. § 2510(4) (emphasis added). And the Wiretap Act expressly defines a "device" as a "device or apparatus." *Id.* § 2510(5). But Meta Pixel code is not a "device" or "apparatus"— it is an intangible "snippet of code," Compl. ¶ 68, that can be incorporated into any website.

Both the plain meaning of the term and the statutory context demonstrate that a "device" must be *tangible* equipment. As one court explained in interpreting a provision of CIPA, software code is not a "device" under the plain meaning of that term. *See Moreno v. San Francisco Bay Area Rapid Transit Dist.*, 2017 WL 6387764, at *5 (N.D. Cal. Dec. 14, 2017). Rather, dictionaries define "device" to mean a specialized piece of *physical* equipment. For example, "Merriam-Webster defines 'device' in relevant part as 'a piece of equipment or a mechanism designed to serve a special purpose or perform a special function,' for example, 'smartphones and other electronic devices' or a 'hidden recording device.'" *Id.* (citing Device, Merriam-Webster Online, (https://www.merriam-webster.com/dictionary/device) (2017)); *see also In re Google Location History Litig.*, 428 F. Supp. 3d 185, 193 (N.D. Cal. 2019) (agreeing that software is not a "device"). The Wiretap Act's definition of "device" as "device or apparatus" reinforces this, because like device, "apparatus" naturally refers to something tangible: "a set of equipment or tools or a machine that is used for a particular purpose." Cambridge Dictionary,

https://dictionary.cambridge.org/us/dictionary/english/apparatus (last visited Sept. 25, 2025).

The statutory context further confirms this reading. The "normal rule of statutory construction" is that "identical words used in different parts of the same act are intended to have the same meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 571 (2012) (citation omitted). Here, in neighboring provisions, the Wiretap Act uses "device" to refer to tangible things—for example, it prohibits intercepting communications when "such device is affixed to" wires, 18 U.S.C. § 2511(1)(b)(i), or "send[ing] through the mail" "any electronic, mechanical, or other device," *id.* § 2512(1)(a); *see also, e.g.*, *id.* § 2510(5)(b) (exempting "a hearing aid or similar device"). Those phrases clearly contemplate objects that can be "affixed" or mailed. *Cf. Moreno*, 2017 WL 6387764, at *5 (noting that unlike a device, "software" cannot be "attached to" a moveable object). "Device" in Section 2510(5) should be construed consistently.

***No plausible allegations of interception of Plaintiffs' communications, much less "during transmission."*** A party only "'intercept[s]' in violation of the Wiretap Act" if it "acquire[s]" (1) the plaintiff's communication, (2) "during transmission." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 878 (9th Cir. 2002); *see* 18 U.S.C. § 2520(a) (affording cause of action for person whose *own* communication is intercepted). Plaintiffs do not meet either requirement.

Plaintiffs assert that Meta "contemporaneously intercept[ed]" Plaintiffs' communications. Compl. ¶¶ 2, 44. But the Meta webpage Plaintiffs cite explains that the Pixel allows a web developer to generate "events" in response to user actions, such as the click of a button. Ex. 1; *see supra* at 7-8. Plaintiffs do not allege facts explaining why such "events" qualify as *their* communications with the websites. Further, that same source suggests that Meta would receive event data from the websites *after* the events are generated in response to user actions, not "during transmission," as required. Plaintiffs' allegation that Meta receives information "before the website owner receives it," Compl. ¶ 69, does not show otherwise because it merely "restate[s] the pleading requirement of real time interception." *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 758 (N.D. Cal. 2023).

***Non-"contents" information***.  Plaintiffs' Wiretap Act claim also fails to the extent it is predicated on Meta's receipt of non-content information. The Wiretap Act prohibits only the

acquisition of "contents" of communications. *See* 18 U.S.C. § 2510(4). "Contents" under the statute means "the intended message conveyed by the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). The term "does not include record information regarding the characteristics of the message that is generated in the course of the communication." *Id.*

Plaintiffs reference several types of information, like "IP addresses," Compl. ¶ 159, "clicks to … food map[s]," *id.* ¶ 84, and clicks through to "the CalFresh website," *id.* ¶ 26, that are not "contents." *See Johnson v. Blue Nile, Inc.*, 2021 WL 1312771, at *2 (N.D. Cal. Apr. 8, 2021) (Beeler, J.) ("IP addresses, locations, browser types, and operating systems" are "not content"); *Ramos v. Gap, Inc.*, 2025 WL 2144837, at *4 (N.D. Cal. July 29, 2025) (rejecting "theory" that "any 'click' on a URL would be a communication that the user is interested in the information linked in the URL"). Accordingly, the Court should "dismiss[] the claim to the extent that it is predicated on non-content information." *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823, 833 (N.D. Cal. 2021) (Beeler, J.); *see Yale v. Clicktale, Inc.*, 2021 WL 1428400, at *3 (N.D. Cal. Apr. 15, 2021) (Beeler, J.) (same).

### 2.    The CIPA Section 631 Claim Fails

Plaintiffs' CIPA Section 631 claim suffers from defects similar to their federal Wiretap Act claim. Section 631 prohibits "willfully and without consent" "read[ing]" or "learn[ing]" the "contents" of any communication "while the same is in transit." Cal. Penal Code § 631(a). But Plaintiffs fail to sufficiently allege that Meta obtained Plaintiffs' communications at all, let alone "while" "in transit," or that Meta "read or "learn[ed]" the contents of those communications in transit. Plaintiffs' claim also fails to the extent it rests on (1) non-content information and (2) the first clause of Section 631(a), which applies only to telephone communications. *Id.*

***No plausible allegations that Meta "read or learned" the contents of any communications "while the same [were] in transit."*** Like the federal Wiretap Act, Section 631 requires that a plaintiff's communications be acquired while "in transit," but it goes further—requiring that the defendant have "*read*" or "*learn[ed]*" the contents of communications while those communications were in transit. Cal. Penal Code § 631(a) (emphasis added); *R.C. v. Sussex Publishers, LLC*, 2025 WL 948060, at *7 (N.D. Cal. Mar. 28, 2025). "[R]ead" and "learn" connote

an effort to "understand the meaning of a communication." *Torres v. Prudential Fin., Inc.*, 2025 WL 1135088, at *6 (N.D. Cal. Apr. 17, 2025), *appeal pending* No. 25-3203 (9th Cir.); *see* Order at 10, *ERC* (similar). The reading "must occur contemporaneous[ly] with the sending or receipt of the message." *Valenzuela*, 674 F. Supp. 3d at 759; *see Gonzalez v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1086-87 (N.D. Cal. 2018).

Plaintiffs cannot satisfy those requirements. First, as discussed, Plaintiffs' own key source in describing how the Pixel functions states that separate *events* are generated that the web developer sends to Meta. *Supra* at 18. Plaintiffs thus do not plausibly allege that Meta itself obtained users' communications at all, much less while they were in "transit." Second, and independently, Plaintiffs do not allege that Meta *read or learned—i.e.*, substantively understood— the data while it was in transit. *See Torres*, 2025 WL 1135088, at *6. Plaintiffs allege that Meta "processe[s]" data, Compl. ¶ 78; *see id.* ¶ 74 (Meta "scours the data it receives"), but they do not allege that this "process[ing]" happens while Plaintiffs' communications are *in transit* from Plaintiffs to the food bank websites. Nor is automated "processing" enough to show that a defendant read or learned the contents of a communication in any event. *Williams v. DDR Media, LLC*, 757 F. Supp. 3d 989, 994–95 (N.D. Cal. 2024). That too is fatal to their claim.

***Non-"contents" information.*** Like the federal Wiretap Act claim, Plaintiffs' CIPA § 631 claim fails insofar as it is predicated on non-contents information, because Section 631 only prohibits obtaining the "contents" of a communication. *Supra* at 18-19.

***First clause of Section 631.*** Although Plaintiffs briefly invoke the first clause of Section 631(a), Compl. ¶ 135, that clause prohibits tapping "any telegraph or telephone wire, line, cable, or instrument" and "does not apply to the internet," *Cody v. Ring LLC*, 718 F. Supp. 3d 993, 999 (N.D. Cal. 2024) (citation omitted) (citing cases). Here, Plaintiffs allege only that they communicated with the food banks via the internet. *See* Compl. ¶¶ 24-28.

### 3.    The CIPA Section 632 Claim Fails

CIPA Section 632 prohibits a "person" from intentionally "us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication" without consent. Cal. Penal Code § 632(a). Plaintiffs do not plausibly allege that Meta engaged in that conduct.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

***Not a "device."*** Similar to the federal Wiretap Act, Section 632 applies only to "use[] [of] an electronic amplifying or recording *device*." Cal. Penal Code § 632(a) (emphasis added). And as explained, the plain meaning of "device" refers to a tangible object. *Supra* at 17-18. Section 632's statutory context reinforces that meaning. For example, that provision refers to "a telegraph, telephone, or other *device*, except a radio." Cal. Penal Code § 632 (emphasis added). Under the *noscitur a sociis* canon, which provides that "a specific item in a statutory list of items is qualified by the overall type or subject matter characterizing the list," *Davis v. Fresno Unified Sch. Dist.*, 14 Cal. 5th 671, 689 (2023), "device" should be construed in line with its surrounding terms to refer to tangible instruments. And it should be given "the same meaning" as in other parts of CIPA—where, as *Moreno* explained, it cannot be read to include intangible code. *People v. Braden*, 14 Cal. 5th 791, 806 (2023) (courts "generally presume the Legislature intended [a] word … to have the same meaning each time it is used" in statutory scheme (citation omitted)).

***No "use" of device to "eavesdrop upon" or "record" Plaintiffs' communications in real time.*** Plaintiffs' claim also fails because they cannot allege that Meta "use[d]" the Pixel, much less to "eavesdrop upon" or "record" Plaintiffs' communications. Meta itself does not "use" code from the Pixel; it makes Pixel code publicly available for third parties to integrate into their websites if they choose to do so. Further, "eavesdrop upon" and "record" are actions that, by their plain meaning, must occur in real time as the communication is occurring. The statute thus reaches only "simultaneous dissemination" of a plaintiff's communication, not the "secondhand repetition of [] contents." *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 191, 200 (2021); *see People v. Drennan*, 84 Cal. App. 4th 1349, 1356 (2000) ("records" prohibits "'real time' interception" or "mechanical recording" of a communication). As explained, a developer incorporates the code into their website and may use that integrated code to track certain user activity and then transmit "events" to Meta. *Supra* at 7-8, 18, 20.  Meta thus receives only "events" (not Plaintiffs' communications), and does so only "secondhand." That does not violate Section 632.

***No "confidential" communication under Section 632.*** Plaintiffs' Section 632 claim also fails because that statute applies only to "confidential communications," which are statutorily defined to "exclude[] a communication made … in any … circumstance in which the parties to the

communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal Code § 632(c). To qualify as confidential, a "party to the conversation must carry 'an objectively reasonable expectation that the conversation is not being overheard *or* recorded'"— including by the other party to the conversation. *Rodriguez*, 2021 WL 2026726, at *7 (emphasis added) (quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 776-77 (2002)).

Here, Plaintiffs do not, and cannot, allege an "objectively reasonable expectation" that their actions were not being recorded. Even aside from Meta's disclosures, *supra* at 10-13, information entered into forms on a website is, by definition, recorded. *See Boulton v. Community.com, Inc.*, 2025 WL 314813, at *2 (9th Cir. Jan. 28, 2025) (text messages "are by nature recorded and so cannot be 'confidential communications'"). And users would expect as much when seeking to obtain services, like "apply[ing] to [assistance] programs such as CalFresh." Compl. ¶ 42. Indeed, Plaintiffs allege that the food banks' policies stated that the food banks "store" and "collect[]" information from website users. *E.g.*, *id.* ¶¶ 51, 60. And Plaintiffs' allegation that they expected that their communications "would be kept private," *id*. ¶ 145, does not suffice because it "does not reasonably give rise to the expectation that *nobody* (including the [website]) would record the communications." *Rodriguez*, 2021 WL 2026726, at *7 (dismissing Section 632 claim). Where, as here, "the circumstances reflect that the communications could have easily been shared or viewed," those communications are not "confidential" under Section 632. *People v. Nakai*, 183 Cal. App. 4th 499, 518 (2010) (internet chat communications not "confidential").

### 4.    The CIPA Section 635 Claim Fails

CIPA Section 635 imposes liability on a "person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another." Cal. Penal Code § 635(a). On Plaintiffs' theory, Meta is liable merely for "design[ing]" and "furnish[ing]" pixel code, Compl. ¶ 153—a common technology offered by numerous companies. That cannot be right. As courts have held, there is "nothing inherently unlawful" about offering pixel code. *Google Pixel*, 741 F. Supp. 3d at 841. In any event, Plaintiffs cannot state their Section 635 claim because they do "not plausibly plead wiretapping," *Yale*, 2021

WL 1428400, at *3; *see Ramos*, 2025 WL 2144837, at *8 (similar), and for several other reasons.

***No qualifying injury or private cause of action.*** Plaintiffs allege they were injured by the food banks' "*use*" of code from the Meta Pixel, "not directly injured" by Meta's "manufacture" or "furnishing" of the code. *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1085 (N.D. Cal. 2021). Without direct injury, "CIPA § 637.2 does not provide" Plaintiffs "with a private right of action to enforce CIPA § 635 against" a software provider like Meta. *Id.*

***Not a "device."*** Section 635 applies only to a "device." As discussed, a snippet of source code like the Meta Pixel is not a "device." *Supra* at 17-18. Section 635's text makes that particularly clear by referring to a "device" that can be "manufacture[d], assemble[d], … transport[ed], [or] import[ed]"—all of which imply a tangible object. Cal. Penal Code § 635(a).

***Not "primarily or exclusively designed for eavesdropping."*** Pixel code is not "primarily or exclusively designed or intended for eavesdropping," as required. *Id*. Plaintiffs themselves allege that Pixel code is used to "measure the effectiveness of advertising," Compl. ¶ 3, and the Pixel was intended for use in accordance with Meta's Business Tools Terms, which require businesses to provide prominent notice and "have all of the necessary rights and permissions" to send data using Pixel code. Ex. 11 at 1. That defeats any allegation that it was primarily intended for eavesdropping. *Cf. United States v. Schweihs*, 569 F.2d 965, 968 (5th Cir. 1978) (emphasizing, in interpreting federal analogue, that statute does not cover a device "merely because it … *may* be used for wiretapping and eavesdropping" (emphasis added)).

### 5.    The CIPA Section 638.51 Claim Fails

CIPA Section 638.51(a) prohibits installation or use of "a pen register or a trap and trace device," defined as a "device or process" that collects "dialing, routing, addressing, or signaling information," "*but not the contents* of a communication," *id.* § 638.50(b), (c) (emphasis added). Plaintiffs fail to allege that Meta installed or used a device that meets the statutory requirements.

***Meta did not "install or use" the Pixel.*** Section 638.51 applies only to those who take an affirmative action to "install or use" a covered device. Cal. Penal Code § 638.51(a). But Plaintiffs themselves admit that the *food banks*, not Meta, "incorporated the Pixel into [their] website[s]." Compl. ¶¶ 6, 63; *supra* at 14. These allegations show that *Meta* did not "install or use" the Pixel.

***The Pixel is not a pen register or trap and trace device.*** A pen register or trap and trace device (1) collects "dialing, routing, addressing, or signaling information," (2) "but not the contents of a communication." Cal. Penal Code § 638.50(b), (c). Plaintiffs fail on both counts.

First, Plaintiffs allege developers use code from the Pixel to collect "addressing information (such as IP addresses, PII and sensitive financial information)." Compl. ¶ 159. But "PII" and "sensitive financial information" are not "addressing information." *See, e.g.*, *Address*, https://www.merriam-webster.com/dictionary/address ("directions for delivery"). And Plaintiffs cannot state a cognizable claim based on IP addresses alone. *See Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1182 (N.D. Cal. 2025) (no standing based on disclosure of IP addresses).

Second, a device or process that allegedly *does* capture "contents" is explicitly excluded from Section 638.51's scope. *See Kishnani v. Royal Caribbean Cruises Ltd.*, 2025 WL 1745726, at *4-5 (N.D. Cal. June 24, 2025) (Section 638.51 "ceases to apply" where software is alleged to collect "contents"); *Price v. Headspace*, 2025 WL 1237977, at *3 (Cal. Sup. Ct. Apr. 1, 2025) (pixel that captures "contents" of communications is "definitionally not a trap and trace device"). Plaintiffs allege that developers use Pixel code to "gather[] data, including addressing information [*and*] contents of users' communications." Compl. ¶ 159. That precludes Plaintiffs' claim.

### 6.    The Invasion Of Privacy Claims Fail

To state their privacy claims, Plaintiffs must allege a reasonable expectation of privacy and an intrusion "so serious as to constitute an egregious breach of social norms such that the breach is highly offensive." *Graham*, 533 F. Supp. 3d at 835 (citations omitted); *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 287 (2009). As discussed above, Plaintiffs fail to allege any intentional intrusion at all, and Plaintiffs' consent to Meta's Terms and policies precludes any reasonable expectation of privacy in the data Meta allegedly received. *Supra* at 9-16.

Plaintiffs also fail to allege that any intrusion was "highly offensive"—a standard that "set[s] a high bar." *Belluomini v. Citigroup Inc.*, 2013 WL 5645168, at *3 (N.D. Cal. Oct. 16, 2013). At most, Plaintiffs allege that Meta *received* data that the food banks chose to send. Plaintiffs do not allege that Meta had any hand in the food banks' choices to install publicly available Pixel code, and Meta's *receipt* of information is hardly an egregious breach of social

LATHAM&WATKINS LLP
ATTORNEYS AT LAW

META'S MOT. TO DISMISS COMPLAINT
CASE NO. 3:25-cv-05106-LB

24

norms, even if that information were sensitive. *See In re iPhone Application Litig*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012); *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022). Nor do Plaintiffs allege any deceptive conduct by Meta. In fact, Plaintiffs themselves allege that "[a]ccording to Meta's own disclosures, [Meta's] primary function is to deliver personalized advertisements to users," like Plaintiffs, "by analyzing their browsing patterns and interactions." Compl. ¶ 67. And Plaintiffs' speculative assertions that Meta sells data likewise fall short—Plaintiffs allege no factual basis for those assertions, much less any basis to conclude their *own* data was sold.[9] Plaintiffs thus fail to state their privacy claims.

### 7.     The Unjust Enrichment Claim Fails

Plaintiffs' unjust enrichment claim fails because their other claims all fail, and Plaintiffs thus do not allege Meta "committed some predicate actionable wrong." *Hammerling*, 2024 WL 937247, at \*3 n.3; *see Google Pixel*, 741 F. Supp. 3d at 848-49 (dismissing unjust enrichment claim "because the plaintiffs ha[d] not stated a claim against Google for any unlawful conduct").

The claim also fails because Plaintiffs have express contracts with Meta regarding Meta's receipt of their information from third-party websites, and an unjust enrichment claim "does not lie where the parties have an enforceable express contract." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010). Further, because Plaintiffs consented to Meta's receipt of their information, they cannot allege that Meta was "*unjustly* enriched at [their] expense," *id.* (emphasis added), through "mistake, fraud, coercion, or request,'" *Russell v. Walmart, Inc.*, 680 F. Supp. 3d 1130, 1133 (N.D. Cal. 2023) (citation omitted). Plaintiffs allege no misrepresentation, fraud, or coercion by Meta. *Supra* at 24-25. Nor do Plaintiffs allege any expectation that they would be compensated for their data. Their general allegation that there is an "economic market" for "personal data," Compl. ¶ 102, does not show that Plaintiffs retained any stake in Meta's profits. *See Marden v. LMND Med. Grp.*, 2024 WL 4448684, at \*5 (N.D. Cal. July 3, 2024).

## V.     CONCLUSION

Meta respectfully requests that the Court dismiss the complaint with prejudice.

---

[9] That is no surprise. As Meta's Terms of Service and Privacy Policy make clear, Meta does *not* sell information. Ex. 2 at 1 ("We don't sell your personal data to advertisers."); Ex. 4 at 33 ("We don't sell any of your information to anyone, and we never will").

Dated: October 20, 2025

Respectfully submitted,

LATHAM & WATKINS LLP

By */s/ Melanie M. Blunschi*
  Melanie M. Blunschi (Bar No. 234264)
  *melanie.blunschi@lw.com*
  505 Montgomery St., Suite 2000
  San Francisco, CA 94111
  Telephone: +1.415.391.0600

  Marissa Alter-Nelson (*pro hac vice*)
  *marissa.alter-nelson@lw.com*
  1271 Avenue of the Americas
  New York, NY 10020
  Telephone: +1.212.906.1200

  Margaret A. Upshaw (*pro hac vice*)
  *maggie.upshaw@lw.com*
  555 Eleventh Street, NW, Suite 1000
  Washington, D.C. 20004-1304
  Telephone: +1.202.637.2200

*Attorneys for Defendant*
*Meta Platforms, Inc.*