**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR FLYNN (SBN 253362)
*tflynn@fmfpc.com*
ALLISON FERRARO (SBN 351455)
*aferraro@fmfpc.com*
DANIEL E. SACHS (SBN 361027)
*dsachs@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiffs***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

NATASSIA TIMOTHEE, TOMMY DIEP, ESPERANZA REYES, MARIAELENA BURCIAGA, and STACY PENNING on behalf of themselves, all others similarly situated, and the general public,

Plaintiffs,

v.

META PLATFORMS, INC., SACRAMENTO FOOD BANK AND FAMILY SERVICES, LOS ANGELES REGIONAL FOOD BANK, CENTRAL CALIFORNIA FOOD BANK, and SAN FRANCISCO FOOD BANK d/b/a SAN FRANCISCO-MARIN FOOD BANK,

Defendants.

Case No. 3:25-cv-05106-LB

**PLAINTIFFS' OPPOSITION TO DEFENDANT SACRAMENTO FOOD BANK AND FAMILY SERVICES' MOTION TO DISMISS THE COMPLAINT AND REQUEST FOR JUDICIAL NOTICE**

**[Dkt. No. 43]**

Judge: Hon. Laurel Beeler
Date: March 26, 2026
Time: 9:30 a.m.
Dept.: Courtroom B, 15th Floor

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES ..... ii

STATEMENT OF ISSUES TO BE DECIDED ..... 1

INTRODUCTION ..... 1

FACTS ..... 2

ARGUMENT ..... 5

I. THE COURT SHOULD DENY DEFENDANT'S REQUEST FOR JUDICIAL NOTICE ..... 5

II. THE COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS ..... 9

A. Defendant Has Not Shown Plaintiff Consented to Its Use of the Pixel ..... 9

B. Plaintiff Has Standing to Assert Her CIPA Claims ..... 12

C. Plaintiff Plausibly Alleges Defendant Violates CIPA Section 631(a) ..... 13

D. Plaintiff Adequately Alleges a Reasonable Expectation of Privacy ..... 16

E. Plaintiff Plausibly Alleges Defendant Was Negligent ..... 18

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Cases**

*Application of U.S. of Am. for an Order Authorizing Use of a Pen Reg. Device*, 407 F. Supp. 398 (W.D. Mo. 1976) .......... 15

*Augustine v. Lenovo (U.S.), Inc.*, 2023 WL 4938050 (S.D. Cal. Aug. 2, 2023) .......... 11

*Balestrieri v. SportsEdTV, Inc.*, 2025 WL 2776356 (N.D. Cal. Sep. 16, 2025) .......... 7, 8

*Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024 (N.D. Cal. 2019) .......... 18

*Baton v. Ledger SAS*, 740 F. Supp. 3d 847 (N.D. Cal. 2024) .......... 18

*Brown v. Google LLC*, 2021 WL 6064009 (N.D. Cal. Dec. 22, 2021) .......... 20

*Calhoun v. Google LLC*, 526 F. Supp. 3d 605 (N.D. Cal. 2021) .......... 9, 10

*Campbell v. Facebook, Inc.*, 77 F. Supp. 836 (N.D. Cal. 2014) .......... 9

*Cappello v. Walmart Inc.*, 2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) .......... 7

*Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974 (N.D. Cal. 2010) .......... 8

*Doe v. Eating Recovery Ctr. LLC*, --- F. Supp. 3d ----, 2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) .......... 13, 14, 15, 19

*Doe v. GoodRx Holdings, Inc.*, 2025 WL 2052302 (N.D. Cal. July 22, 2025) .......... 10

*Doe v. Kaiser Found. Health Plan, Inc.*, 2024 WL 1589982 (N.D. Cal. Apr. 11, 2024) .......... 18

*Doe v. Post Acute Med., LLC*, 2025 WL 511069 (M.D. Pa. Feb. 14, 2025) .......... 14, 15

*Gabrielli v. Haleon US Inc.*, 2025 WL 2494368 (N.D. Cal. Aug. 29, 2025) .......... 16

*Garcia v. Bandai Namco Entm't Am. Inc.*,
2025 WL 2451033 (C.D. Cal. Aug. 7, 2025) ........ 6

*Gershzon v. Meta Platforms, Inc.*,
2023 WL 5420234 (N.D. Cal. Aug. 22, 2023) ........ 11

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ........ 16

*Hesse v. Godiva Chocolatier, Inc.*,
463 F. Supp. 3d 453 (S.D.N.Y. 2020) ........ 7

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ 10, 13, 17

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ........ 11

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) ........ 13, 16

*In re Google Location Hist. Litig.*,
428 F. Supp. 3d 185 (N.D. Cal. 2019) ........ 8, 9

*In re Google Location Hist. Litig.*,
514 F. Supp. 3d 1147 (N.D. Cal. 2021) ........ 16

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ........ 9, 10

*In re Path Network, Inc.*,
703 F. Supp. 3d 1046 (N.D. Cal. 2023) ........ 15

*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003) ........ 14

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ........ 13, 14, 15

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
146 F.3d 66 (2d Cir. 1998) ........ 7

*Javier v. Assurance IQ, LLC*,
2021 WL 940319 (N.D. Cal. Mar. 9, 2021) ........ 9

*Javier v. Assurance IQ, LLC*,
2022 WL 1744107 (9th Cir. May 31, 2022) ........ 11

*Jones v. Tonal Sys., Inc.*,
751 F. Supp. 3d 1025 (S.D. Cal. 2024) ........ 8

*Kent v. Microsoft Corp.*,
2013 WL 3353875 (C.D. Cal. July 1, 2013) ........ 11

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ........ 5, 6, 7, 8

*Knell v. FIA Card Servs., N.A.*,
2013 WL 12121237 (S.D. Cal. Feb. 21, 2013) ........ 18

*Lee v. City of L.A.*,
250 F.3d 668 (9th Cir. 2001) ........ 5

*Lee v. Springer Nature Am., Inc.*,
769 F. Supp. 3d 234 (S.D.N.Y. 2025) ........ 7

*Matera v. Google Inc.*,
2016 WL 5339806 (N.D. Cal. Sep. 23, 2016) ........ 17

*Nguyen v. Barnes & Nobles, Inc.*,
763 F.3d 1171 (9th Cir. 2014) ........ 11

*Nguyen v. Elsevier Inc.*,
2025 WL 2901059 (N.D. Cal. Oct. 7, 2025) ........ 8

*Opperman v. Path, Inc.*,
205 F. Supp. 3d 1064 (N.D. Cal. 2016) ........ 9

*Perkins v. LinkedIn Corp.*,
53 F. Supp. 3d 1190 (N.D. Cal. 2014) ........ 10

*Plotsker v. Envato Pty Ltd.*,
2025 WL 2481422 (C.D. Cal. Aug. 26, 2025) ........ 5, 8

*Price v. Carnival Corp.*,
2024 WL 221437 (S.D. Cal. Jan. 19, 2024) ........ 13, 14

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) ........ 19

*Romero v. Securus Techs., Inc.*,
216 F. Supp. 3d 1078 (S.D. Cal. 2016) ........ 17

*Sanchez v. Cnty. of San Diego*,
2003 WL 25655642 (S.D. Cal. Mar. 10, 2003) ........ 18

*Sanchez v. Cnty. of San Diego*,
464 F.3d 916 (9th Cir. 2006) .......... 18

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
2019 WL 4859099 (N.D. Cal. Oct. 2, 2019) .......... 7

*Shah v. Capital One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) .......... 18, 19

*Shah v. Fandom, Inc.*,
754 F. Supp. 3d 924 (N.D. Cal. 2024) .......... 9

*Shleffar v. Super. Ct.*,
178 Cal. App. 3d 937 (1986) .......... 18

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) .......... 11

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) .......... 11

*Smith v. Flagstar Bank, FSB*,
2019 WL 631537 (N.D. Cal. Feb. 14, 2019) .......... 5

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 17

*Sys. Prods. & Sols., Inc. v. Scramlin*,
2014 WL 3894385 (E.D. Mich. Aug. 8, 2014) .......... 14

*Thornton v. Mindvalley, Inc.*,
2025 WL 877714 (N.D. Cal. Feb. 14, 2025) .......... 7, 8

*Threshold Enters. Ltd. v. Pressed Juicery, Inc.*,
445 F. Supp. 3d 139 (N.D. Cal. 2020) .......... 5

*Victaulic Co. v. Tieman*,
499 F.3d 227 (3d Cir. 2007) .......... 7

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) .......... 16

*Wiley v. Universal Music Grp., Inc.*,
2025 WL 3654085 (N.D. Cal. Dec. 17, 2025) .......... 13, 15

*Zarif v. Hwareh.com, Inc.*,
789 F. Supp. 3d 880 (S.D. Cal. 2025) .......... 15

**Statutes**

18 U.S.C. § 2510(8) .......... 13, 15

Cal. Penal Code § 631(a) .......... 1, 19

Cal. Welf. & Inst. Code § 10850 .......... 18

Cal. Welf. & Inst. Code § 10850(b) .......... 18, 19

**Rules**

Fed. R. Evid. 201 .......... 5, 7, 8

Fed. R. Evid. 201(f) .......... 5

**Other Authorities**

2 U.S. Code Cong. & Admin. News, 90th Cong., 2d Sess. (1968) .......... 15

Cal. Evid. Code § 453, Law Revision Commission Comments .......... 6

Fed. R. Evid. 201, advisory committee notes, 1972 Proposed Rules, Note to Subdivisions (c) and (d) .......... 6

Webster's Third New International Dictionary (1981) .......... 15

**STATEMENT OF ISSUES TO BE DECIDED**

1. Whether the Court should take judicial notice of unauthenticated, undated screenshots of Defendant's website to resolve disputed issues of fact on the pleadings.

2. Whether Defendant has proven Plaintiff Natassia Timothee consented to the specific practices she challenges, such that the Court should find her privacy-based claims barred.

3. Whether Plaintiff has sufficiently alleged an injury flowing from her use of Defendant's website so as to have standing to assert a claim under the California Invasion of Privacy Act ("CIPA").

4. Where Plaintiff alleges Meta captures sufficient information to determine her food insecurity and sensitive financial status, whether Plaintiff adequately alleges Meta has captured the contents of her communications with Defendant so as to state a claim for its violation of the fourth clause of CIPA Section 631(a) (*i.e.*, for aiding and abetting Meta's intrusion), Cal. Penal Code § 631(a).

5. Where Plaintiff alleges Meta captures information about her food insecurity and sensitive financial condition, whether Plaintiff adequately alleges a reasonable expectation of privacy to sustain her invasion of privacy claims.

6. Where Plaintiff alleges Meta captures information about her food insecurity and sensitive financial condition, in violation of Defendant's Privacy Policy and state law protecting that information, and alleges that disclosure caused her harm, whether Plaintiff states a negligence claim against Defendant.

**INTRODUCTION**

The Court should deny Defendant Sacramento Food Bank and Family Services' Request for Judicial Notice and Motion to Dismiss. Defendant's Request for Judicial Notice does not provide the court adequate information—just unauthenticated, out-of-context screenshots. From these, Defendant asks the Court to resolve disputed issues of fact on the pleadings. That request is improper and should be denied.

Based on the Privacy Policy over which it requests judicial notice, Defendant asserts Plaintiff consented to the challenged practices. Even if the Court were to consider it, the Policy contradicts Defendant's claims, and no one ever had to agree to it anyway. Defendant also argues Plaintiff has not adequately detailed her use of its website to allege an injury for standing, but that ignores many facts alleged in the Complaint. The same goes for its assertion that Plaintiff cannot state a claim under CIPA Section 631(a) because she does not allege Meta captured the "contents" of her communications. And because

information about food insecurity and the use of social services is highly personal and sensitive, protected under state law, and promised by Defendant's Privacy Policy, Plaintiff adequately alleges she had a reasonable expectation of privacy to sustain her claims. Plaintiff has also adequately pleaded that Defendant's violation is sufficiently serious to state claims for invasion of her privacy. And because state law protects—and Defendant's Privacy Policy purports to protect—information about Plaintiff's use of social services, and because she was foreseeably harmed by Defendant's behavior, Plaintiff has adequately alleged a duty of care so as to state a plausible claim for negligence against Defendant.

Accordingly, the Court should deny Defendant's motion.

## FACTS

Defendant "is a non-profit organization founded in 1976 that serves over 300,000 people in Sacramento County each month." Dkt. No. 1, Compl. ¶ 36. "Its primary customers are those who are in vulnerable and hard-to-reach groups and facing food insecurity, often including those who are single mothers, elderly, or disabled." *Id.* (internal quotation marks and footnote omitted).

"In connection with providing access to food," Defendant operates a website providing resources, "including eligibility forms and maps to locate local food banks and distribution centers, links to apply for CalFresh, and screeners to determine a user's eligibility for CalFresh benefits." *Id.* ¶ 37. "In violation of" several privacy laws, however, Defendant "incorporate[s] Meta's tracking technology, the Meta Tracking Pixel ('Pixel'), on [its] website[]," which it "know[s] allows Meta to contemporaneously intercept, and subsequently sell, vast quantities of users' sensitive financial and personal information . . . without their knowledge or consent." *Id.* ¶ 2; *see also id.* ¶ 6 (Defendant "ha[s] incorporated the Pixel onto [its] website[]," which has "caused Plaintiff['s] and other Class Members' confidential communications, [personally identifying information ('PII')], and sensitive financial information to be intercepted by and sent to Meta," and Defendant "knew that by embedding [its] website[] with the Pixel, [it] w[as] permitting Meta to intercept and use Plaintiff['s] and other Class Members' PII, including sensitive financial information."); *id.* ¶ 40 ("[T]he Pixel on the [Defendant's] website . . . contemporaneously links . . . users' sensitive communications, PII, and sensitive financial information.").

Meta's "primary function is to deliver personalized advertisements to users by analyzing their browsing patterns and interactions." *Id.* ¶ 67. Thus, "[t]he vast majority of Meta's revenue, approximately

98%, comes from advertising." *Id.* ¶ 66. Pixel "is a snippet of code that Meta offers for free which is then embedded on a third-party website" and "tracks a user's activity in real-time," *id.* ¶ 68. "As soon as a user takes any action on a webpage" embedded with Pixel, its code "re-directs the contents of the user's communication to Meta while the communication between the user and website provider is still occurring." *Id.* As a result, "Meta receives the content of website communications as the website user enters or generates the information, but before the website owner receives it." *Id.* ¶ 69.

With Pixel, "Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website, and what they searched," sending "each of these pieces of information to Meta in real time with users' PII." *Id.* ¶ 72. And "if a user is logged into their Facebook or Instagram account when they visit a Food Bank Defendant's website, Meta receives third-party cookies allowing Meta to link the data . . . to the specific Facebook or Instagram user." *Id.* ¶ 73. The data is then "used to create 'custom audiences' to target the user, as well as other Facebook and Instagram users who match that audience's criteria." *Id.* ¶ 78.

Before filing the Complaint, Plaintiff Natassia Timothee "visited the Sacramento Food Bank and Family Services website on many occasions and used the website to access the 'Find Food' map," including "entering her home address." *Id.* ¶ 24. In doing so, she "communicated [her] intent to receive nutrition assistance with only [Defendant] as the intended recipient[] of such communications." *Id.* ¶ 29.

On Defendant's website, Pixel "tracks and intercepts user interactions, for example, clicks to its food map, often collecting users' home address and current locations." *Id.* ¶ 84. Defendant "also uses the Pixel on the page containing its CalFresh inquiry form, asking for, tracking and transmitting the user's full name, address, phone number, email address, the number of people the user purchases and prepares food for, as well as how many people in the user's household are U.S. citizens." *Id.* And the form "requires the user to make additional comments, further personalizing and matching the data to the user." *Id.*

It was "[u]nbeknownst to" Ms. Timothee, however, that Defendant "allowed Meta to intercept this data, revealing [her] sensitive financial condition[]," and allowing Meta to "associate[] the data with [her] Meta account[] and other personal information to target [her] with advertisements." *Id.* ¶ 30. As a result of this intrusion, "after visiting [Defendant's] website[]," Ms. Timothee "received several targeted advertisements related to [her] sensitive financial information or status." *Id.*

"An individual who is food insecure is more likely to experience poor emotional health, including depression, anxiety, and stress," which can cause the individual "to face social stigma and shame," putting such persons "in uniquely vulnerable positions within wider society, which is why those facing food insecurity are often suggested by behavioral health professionals to be treated with special dignity and discretion." *Id.* ¶ 99 (footnote citation omitted). But Ms. Timothee "w[as] reminded of [her] hardship and further stigmatized when [she] w[as] repeatedly targeted with ads directed at exploiting [her] financial hardship[] after visiting [Defendant's] website[]." *Id.* ¶ 100.

Defendant's website "does not use a banner consent form or any other mechanism for a user to accept or reject tracking cookies, such as the Pixel," which "starts transmitting data to Meta the instant a user navigates to the website, without notifying the user." *Id.* ¶ 38. Defendant did not require Plaintiff or others to "opt-in or opt-out for the Pixel's data collection . . . before it began tracking and intercepting user data." *Id.* ¶ 90. And Plaintiff "had no way of knowing" Defendant was "disclosing, and Meta was intercepting, [her] user data including sensitive financial . . . information, when [she] engaged with" Defendant's "website[], including using the food locator maps . . . because the software is . . . inconspicuously incorporated in the background." *Id.* ¶ 91.

Moreover, Defendant's Privacy Policy "states in large font that [Defendant] 'is intent on protecting the privacy and security of your personal information,'" and "represents users 'can use the [Defendant's] website without telling [it] who you are or revealing any personal information.'" *Id.* ¶ 39 (quotation omitted). "This representation, however, is false, due to the Pixel's presence on [Defendant's] website. Further, the Privacy Policy materially misrepresents and omits information related to how [Defendant] transmits users' PII . . . ." *Id.* These "representations and omissions reinforced Plaintiff['s] and other Class Members' reasonable belief and expectation that their data related to their personal and sensitive financial information would remain confidential." *Id.* ¶ 40; *see also id.* ¶ 93 ("Plaintiff[] and other Class Members would not expect this information to be disclosed or intercepted without their consent," especially "[g]iven [Defendant's] representations that this information would remain private and confidential.").

///

///

///

## ARGUMENT

### I. THE COURT SHOULD DENY DEFENDANT'S REQUEST FOR JUDICIAL NOTICE

"Generally, district courts may not consider materials outside the pleadings when assessing the sufficiency of a complaint under FRCP 12(b)(6)." *Smith v. Flagstar Bank, FSB*, 2019 WL 631537, at *2 (N.D. Cal. Feb. 14, 2019) (citing *Lee v. City of L.A.*, 250 F.3d 668, 688 (9th Cir. 2001)). However, an "exception[] to this rule" is "judicial notice under Federal Rule of Evidence 201." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Here, Defendant asks the Court, "[p]ursuant to Federal Rule of Evidence 201," to take judicial notice of its website "and the Website's policies covering cookies, pixels, and data sharing, submitted in support of [Defendant's] Motion to Dismiss." Dkt. No. 43, SFBFS's Mot. to Dismiss ("Mot.") at 1.

Federal Rule of Evidence 201 allows a court to take judicial notice of "a *fact* that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201 (emphasis added); *see also Khoja*, 899 F.3d at 999 ("Judicial notice under Rule 201 permits a court to notice *an adjudicative fact*" (emphasis added and citation omitted)). But courts "cannot take judicial notice of disputed facts contained in . . . public records." *Khoja*, 899 F.3d at 999 (citing *Lee*, 250 F.3d at 689). Indeed, the Ninth Circuit has cautioned against "exploiting [judicial notice] procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." *Id.* at 998 (

> The overuse and improper application of judicial notice . . . can lead to unintended and harmful results. Defendants face an alluring temptation to pile on numerous documents to their motions to dismiss to undermine the complaint, and hopefully dismiss the case at an early stage. Yet the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery.).

"Once a *fact* is judicially noticed, the court 'must instruct the jury to accept the noticed fact as conclusive.'" *Plotsker v. Envato Pty Ltd.*, 2025 WL 2481422, at *2 (C.D. Cal. Aug. 26, 2025) (emphasis added) (quoting Fed. R. Evid. 201(f)). Thus, taking judicial notice of facts is weighty. Defendant's Request for Judicial Notice muddies the issue because it seeks judicial notice of two webpage printouts and a privacy policy, rather than any facts. *See Threshold Enters. Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) ("[D]umping large swaths of material into a request for judicial notice has become

commonplace. This catch-all approach to requesting judicial notice, however, is not consistent with the law's requirements." (citing *Khoja*, 899 F.3d at 999 ("A court must also consider—and identify—which fact or facts it is noticing from [a document].")).

Here, rather than seeking judicial notice of any specific facts, Defendant attaches as naked exhibits to its motion, three unauthenticated, undated screenshots of limited portions of its website, not even providing the relevant URLs. On this basis, it asks the Court to take judicial notice of its entire website, and how the website functions, "so that the Court obtains a complete picture of the user's journey, what the user consents to, and the policies the user is provided with and agrees to when visiting the Website." Mot. at 1 (citations omitted). For example, with respect to Exhibit C, an unauthenticated, undated screenshot of Defendant's "Find Food" page, Defendant asks the Court to take judicial notice, and accept as fact that "[u]sers can filter results by criteria such as open today, radius, and days open, making it easy to identify convenient options." *Id.* at 4 (citation omitted). Defendant continues, asking the Court to take judicial notice that "the map is designed for proximity-based searching only" and "does not verify or store personal details beyond what is needed to generate results." *Id.* Nothing about Exhibit C demonstrates any of that, which is just bald attorney assertion.

The Court should deny Defendant's Request. Defendant has not adequately authenticated its exhibits. They do not contain URLs, and are undated, so it is not even clear these are the versions that were in effect when Ms. Timothee used the website. Defendant certainly makes no such showing. Without proper authentication and context, Defendant's exhibits are of limited use and relevance at this stage. *See Garcia v. Bandai Namco Entm't Am. Inc.*, 2025 WL 2451033, at *3 (C.D. Cal. Aug. 7, 2025) (declining on a Rule 12 motion to use "exhibits depict[ing] screenshots from Defendant's websites" to "resolve factual disputes about how Plaintiff interacted with the website or whether valid consent was obtained," where the court "cannot verify that the Exhibits match what Plaintiff viewed when he allegedly browsed Defendant's websites"); *see also* Fed. R. Evid. 201, advisory committee notes, 1972 Proposed Rules, Note to Subdivisions (c) and (d) ("Uniform Rule 10(3) . . . directs the judge to decline to take judicial notice if available information fails to convince him that the matter falls clearly within Uniform Rule 9 or is insufficient to enable him to notice it judicially. Substantially the same approach is found in California Evidence Code §§ 451-453 . . . ."); *cf.* Cal. Evid. Code § 453, Law Revision Commission Comments ("Under Section 453, the court is not required to

resort to any sources of information not provided by the parties. If the party requesting that judicial notice be taken . . . fails to provide the court with 'sufficient information,' the judge may decline to take judicial notice.").

Moreover, "that the exhibits may be 'publicly available' on [Defendant's] website does not make them subject to judicial notice under Rule 201 as matters of public record or as facts whose accuracy can be readily determined." *See Thornton v. Mindvalley, Inc.*, 2025 WL 877714, at *2 (N.D. Cal. Feb. 14, 2025). "The simple act of posting something publicly on the Internet is insufficient assurance of an exhibit's accuracy." *Id.* (quoting *Cappello v. Walmart Inc.*, 2019 WL 11687705, at *3 (N.D. Cal. Apr. 5, 2019) (denying judicial notice of the purchase confirmation page, Terms of Use, Privacy Policy, and Notices on Walmart's website because the facts in the exhibits "cannot be accurately and readily determined from sources whose accuracy cannot reasonably be questioned")). Because "[f]acts stated on a website are not inherently more accurate than facts stated elsewhere[,] [a] defendant may not short-circuit the summary judgment process by introducing disputable facts on a Rule 12(b)(6) motion, simply because they are stated on a website." *Lee v. Springer Nature Am., Inc.*, 769 F. Supp. 3d 234, 248 (S.D.N.Y. 2025) ["*Springer Nature Am.*"] (citing *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)); *see also Balestrieri v. SportsEdTV, Inc.*, 2025 WL 2776356, at *2 (N.D. Cal. Sep. 16, 2025) ("[I]t is not appropriate to take judicial notice of the contents of [a] website for their truth when those contents are in dispute." (citing *Khoja*, 899 F.3d at 999)); *cf. SEB Inv. Mgmt. AB v. Symantec Corp.*, 2019 WL 4859099, at *7 (N.D. Cal. Oct. 2, 2019) (noting "defendants use the exhibits to improperly ask for judicial notice of the truth of the matter asserted" and "tak[ing] judicial notice of the existence of the documents and the fact that such statements were made, but not the truth of the matter").

In addition, "[d]efendants may rely on judicially noticed documents to show that something was stated or that someone was put on notice, but cannot rely on them to prove the truth of their contents." *Springer Nature Am.*, 769 F. Supp. 3d at 247 (internal quotation marks omitted) (quoting *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 462 (S.D.N.Y. 2020)). "Although the fact that a website contains certain text 'cannot reasonably be questioned,' Fed. R. Evid. 201, assertions made on a website do not enjoy the same privilege and frequently may be disputed." *Id.* at 248 (citing *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), *as amended* (Nov. 20, 2007) ("[P]rivate corporate websites, particularly when describing

their own business, generally are not the sorts of 'sources whose accuracy cannot reasonably be questioned'" (quoting Fed. R. Evid. 201))); *see also Plotsker*, 2025 WL 2481422, at *3 ("Publicly available documents, including websites, are judicially noticeable 'for the fact that they exist' and not for the truth of the matter asserted therein." (quoting *Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 984 (N.D. Cal. 2010))).

Here, Defendant is not asking the Court to take judicial notice that certain text appeared, but asking it to accept the truth of matters asserted to resolve disputed facts in its favor. The cases it cites are thus distinguishable. *See In re Google Location Hist. Litig.*, 428 F. Supp. 3d 185, 189-90 (N.D. Cal. 2019) ["*Google Location*"] ("Defendant is not asking the Court to judicially notice the truth of the statements contained in Exhibit 1. Rather, Defendant requests for this Court to notice that: (1) Exhibit 1 was in the public realm as of May 25, 2019 and (2) that Google publicly disclosed, as of May 25, 2019, to users that Location History is an 'opt-in only' feature," which "Plaintiffs d[id] not dispute . . . ."); *Jones v. Tonal Sys., Inc.*, 751 F. Supp. 3d 1025, 1031 (S.D. Cal. 2024) ("Plaintiff has not opposed Tonal's judicial notice request as to these exhibits or contested the authenticity of the pages.").

For example, based on the materials over which it seeks judicial notice, and in contradiction of the Complaint, Defendant asks the Court to accept as true, and to make a factual finding now, that "Plaintiff[] w[as] fully informed of [Defendant's] use of data analytics on the Website," thereby "defeat[ing] all three [privacy-based] claims." Mot. at 6. "Defendant cannot use requests for judicial notice to present its 'own version of the facts at the pleadings stage.'" *See Balestrieri*, 2025 WL 2776356, at *2 (quoting and citing *Khoja*, 899 F.3d at 998-99); *see also Nguyen v. Elsevier Inc.*, 2025 WL 2901059, at *3 (N.D. Cal. Oct. 7, 2025) ("Defendant is asking the Court to use the Privacy Policy to accept as true their proffer that all subscribers, including Plaintiffs, had to agree to the Privacy Policy to register for Osmosis . . . and affirmatively decide their consent defense. 'This is not permissible at the pleading stage . . . .'" (quoting *Thornton*, 2025 WL 877714, at *3)).

In sum, the Court should deny Defendant's Request for Judicial Notice.

///

///

///

## II. THE COURT SHOULD DENY DEFENDANT'S MOTION TO DISMISS

### A. Defendant Has Not Shown Plaintiff Consented to Its Use of the Pixel

Defendant argues Plaintiff's privacy-based claims against it (Counts I, III, and IV) should be dismissed because they "turn on . . . a lack of consent," whereas "matters which the Court can take judicial notice of . . . establish that Plaintiffs were fully informed of [Defendant's] use of data analytics on the Website." Mot. at 6. Because the Court should not take judicial notice of the Privacy Policy screenshot Defendant attached, it should reject Defendant's argument that the policy establishes consent, *see id.* at 6-7, and thus reject Plaintiff's purported consent as a basis for dismissing her claims. But even if the Court considered Defendant's Exhibit B, it does not establish Plaintiff's, or anyone's consent—far from it.

Defendant's consent defense fails for several reasons. First, Defendant does not assert, and its screenshots do not demonstrate, that a website user is ever required to agree to, or even review Defendant's Privacy Policy, nor that reviewing the policy constitutes consent. The Privacy Policy is not an agreement or terms of service to which users must agree, but simply Defendant's voluntary description of the protocol it claims to follow. Thus, as Plaintiff alleges, Defendant's "website does not use a banner consent form or any other mechanism for a user to accept or reject tracking cookies, such as the Pixel," which "starts transmitting data to Meta the instant a user navigates to the website, without notifying the user." Compl. ¶ 38; *see also id.* ¶ 90 (Defendant did not "require[] an opt-in or opt-out for the Pixel's data collection . . . before it began tracking and intercepting user data."); c*f.* Mot. at 2 ("A user can easily locate [Defendant's] 'Privacy Policy' by scrolling to the bottom of any page . . . .").

Even if users were required to agree to the Privacy Policy in Defendant's Exhibit B, it does not disclose, as it must, the "specific conduct" challenged here. *See Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 931-32 (N.D. Cal. 2024) ("[C]onsent is 'generally limited to the specific conduct authorized.'" (quoting *Javier v. Assurance IQ, LLC*, 2021 WL 940319, at *2 (N.D. Cal. Mar. 9, 2021))); *see also Google Location*, 428 F. Supp. 3d at 190 ("Consent is only effective if the person alleging harm consented to 'the particular conduct, or to substantially the same conduct' and if the alleged tortfeasor did not exceed the scope of that consent." (quoting *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1072-73 (N.D. Cal. 2016) (citation modified))). "[G]eneralized notice is not sufficient to establish consent." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022). Rather, "'for consent to be actual, the disclosures must

"explicitly notify" users of the practice at issue.'" *Id.* (quoting *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 620 (N.D. Cal. 2021) (internal quotation omitted); citing *Campbell v. Facebook, Inc.*, 77 F. Supp. 836, 847-78 (N.D. Cal. 2014) (to find consent, the disclosures must have given users notice of the "specific practice" at issue)). Here, "[t]he test is whether a reasonable user who viewed [Defendant's] disclosures would have understood that Meta was collecting the information at issue." *See In re Meta Healthcare Litig.*, 647 F. Supp. 3d at 793 (citing *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1212 (N.D. Cal. 2014)). Defendant "has the burden to show consent." *See id.* (citing *Calhoun*, 526 F. Supp. 3d at 620).

Defendant claims its "Privacy Policy clearly informs users that certain information and data may be collected and shared with third parties for marketing purposes[.]" Mot. at 3. That is not what the policy says. Rather, it says: "*This website* uses data analytics . . . for marketing purposes. The data collected from this analytics program does not include personally identifiable information." *Id.* (emphasis added) (depicting Ex. B). As relates to third-parties, Defendant makes no mention of marketing. Instead, it says it "uses third-party vendors to provide services *on this website and in offline business operations*," and that the "information you submit . . . may be provided to those vendors *on a confidential basis* so that those vendors *can provide services* (such as maintaining our database, sending mail, sending email, making phone calls, sending text messages, facilitating fundraising activities or processing credit card transactions) on our behalf." *Id.* (emphases added). Nowhere does the policy mention or suggest third parties using personally identifiable data for targeted advertising. Moreover, Exhibit B bolsters Plaintiff's allegation that Defendant's Privacy Policy "represents users 'can use the [Defendant's] website without telling [it] who you are or revealing any personal information." *Compare* Compl. ¶ 39 *with* Mot. at 3 (depicting Ex. B). Thus, the Privacy Policy's language does not show consent. *Cf. In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 602 (9th Cir. 2020) ["*Facebook Tracking Litig.*"] (asking "whether a user would reasonably expect that Facebook would have access to the users' individual data after the user logged out," analyzing language in Facebook's Statement of Rights and Responsibilities, Data Use Policy, and Help Center, and concluding "Facebook set an expectation that logged-out user data would not be collected, but then collected it anyway"); *Doe v. GoodRx Holdings, Inc.*, 2025 WL 2052302, at *9 (N.D. Cal. July 22, 2025) (

> A reasonable user reading these broad disclosures . . . about the general use of the tracking technologies on the GoodRx Platform, when reading them together with the portions . . . that specifically state that GoodRx will not share that data, and . . . promises . . . that

> GoodRx would not share its users' health information . . . would reasonably think they were not consenting to the sharing and interception of sensitive medical information. (citations omitted)).

The cases Defendant cites are thus distinguishable. In *Kent v. Microsoft Corp.*, the plaintiff "granted [Microsoft's] request to remotely enter Plaintiff's computer," 2013 WL 3353875, at *1 (C.D. Cal. July 1, 2013), which precluded a claim for "intentional tort" based on "conversion or trespass to personal property," *see id.*, at *6 (header capitalization omitted). In *Silver v. Stripe Inc.*, there was "no dispute" that the defendant "utilized a 'sign-in wrap' agreement" that "required plaintiffs to agree to [its] terms of service and privacy policy whenever they placed an order." 2021 WL 3191752, at *3 (N.D. Cal. July 28, 2021). Here, Defendant does not require anyone to agree to its Privacy Policy, and certainly not in a manner that "put a website user on actual or inquiry notice of its terms." *See id.* (citing *Nguyen v. Barnes & Nobles, Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)). In *Smith v. Facebook, Inc.*, the plaintiffs did "not dispute that their acceptance of Facebook's Terms and Policies 'constitutes a valid contract.'" 745 F. App'x 8, 8 (9th Cir. 2018) (Mem.). Moreover, "[t]hose Terms and Policies contain[ed] numerous disclosures related to information collection on third-party websites," so that "[a] reasonable person . . . would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes." *Id.* at 8-9. Defendant's Privacy Policy looks nothing like the one described in *Smith*.

Finally, Defendant argues Plaintiff's allegations of non-consent are conclusory. Mot. at 7. But Plaintiff clearly alleges she "did not consent to the interception or disclosure of [her] confidential communications, including sensitive financial . . . information[] to Meta," Compl. ¶ 89, and explains in detail how and why this is so, including that Defendant had no mechanism to seek consent anyway, *see id.* ¶¶ 38, 88-94; *see also id.* ¶¶ 2, 6-7, 84, 125, 135-37, 145, 147, 150, 160, 166, 172, 185, 190-91, 199, 201, 204, 206 (additional allegations of lack of consent). "These allegations are plausible and sufficient at this stage of litigation." *See Gershzon v. Meta Platforms, Inc.*, 2023 WL 5420234, at *9 (N.D. Cal. Aug. 22, 2023); *see also Augustine v. Lenovo (U.S.), Inc.*, 2023 WL 4938050, at *2 (S.D. Cal. Aug. 2, 2023) (plaintiff "sufficiently pleads that she did not consent to the recording" (citing *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022) (plaintiff met his pleading burden by alleging "he did not provide express prior consent"))). Defendant's reliance on *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797 (N.D. Cal. 2020), is misplaced. *See* Mot. at 7. That court explained it "need not address Defendants'

additional argument that Plaintiffs 'have not alleged facts showing that the parties did not consent to the alleged recording.'" *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 828 (record quotation omitted).

### B. Plaintiff Has Standing to Assert Her CIPA Claims

Defendant argues Ms. Timothee lacks standing to assert a CIPA claim based on her purported "fail[ure] to plead any basic facts from which the Court could infer a concrete injury[.]" *See* Mot. at 8. While this is more of a Rule 8 argument than a standing argument, the facts Defendant claims are missing are either pleaded or irrelevant. First, it is not relevant "how many times Ms. Timothee visited [Defendant]'s Website," *see id.*, so long as she visited once and was injured by unlawful practices, but she nonetheless alleges she "has visited the . . . website on many occasions," Compl. ¶ 24.

As for "what information was allegedly captured," Mot. at 8, Ms. Timothee alleges that on Defendant's website, "Pixel . . . tracks and intercepts user interactions, for example, clicks to its food map," Compl. ¶ 84. She thus alleges that when she "access[ed] the 'Find Food' map, which included entering her home address," *id.* ¶ 24, she "communicated [her] intent to receive nutrition assistance with only [Defendant] as the intended recipient[]," *id.* ¶ 29, though "[u]nbeknownst to Plaintiff[], [Defendant] allowed Meta to intercept this data, revealing [her] sensitive financial condition[]," *id.* ¶ 30.

Moreover, Plaintiff alleges she has a Meta account and "accessed [her] account[] from the same browser [she] used to access the [Defendant's] website[]." *Id.* ¶ 23; *see also id.* ¶ 79. She alleges that "if a user is logged into their . . . [Meta] account when they visit [Defendant's] website, Meta receives third-party cookies allowing Meta to link the data collected by the Pixel to the specific . . . user." *Id.* ¶ 73. She thus alleges Meta "associated [her] data with [her] Meta account[] and other personal information to target [her] with advertisements," such that "after visiting [Defendant's] website[], Plaintiff[] received several targeted advertisements related to [her] sensitive financial information or status." *Id.* ¶ 30.

Accordingly, contrary to Defendant's assertion, Ms. Timothee does allege her information was not anonymous. *See* Mot. at 8; *see also* Compl. ¶ 3 ("the Pixel tracks each user's activity . . . linking this information with the users' personal identities"). Also contrary to Defendant's assertion, *see* Mot. at 8, she alleges repeatedly that she was unaware of Defendant's tracking practices, Compl. ¶¶ 6, 30, 38-40, 88-94, 160.

### C. Plaintiff Plausibly Alleges Defendant Violates CIPA Section 631(a)

Defendant argues CIPA "Section 631(a) . . . does not cover the conduct Plaintiff has alleged against" it. Mot. at 8. In particular, Defendant argues the "allegations about information obtained by Meta's Pixel do not show that Meta violated Section 631(a), let alone that [Defendant] agreed to aid Meta in doing so." *Id.* at 9. It asserts there are "two reasons" Plaintiff's CIPA Section 631(a) claim fails: that the information it shared with Meta "does not constitute the 'contents' of those communications," and that Plaintiff "consented to the use of cookies." *Id.* at 10. Both are wrong.[1]

Defendant's consent argument is wrong for the reasons discussed above. Defendant's "contents" argument is also wrong. "Contents" means "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8).[2] Thus, while "contents" generally "does not include record information, such as the name, address, and subscriber number or identity of a subscriber or customer, when such information is merely generated in the course of the communication," what might otherwise be "record information may constitute 'contents' where 'the record is the subject of a communication . . . ." *Price v. Carnival Corp.*, 2024 WL 221437, at *6 (S.D. Cal. Jan. 19, 2024) (citation modified and record quotation omitted) (quoting *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014) ["*Zynga*"]); *see also In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 137 (3d Cir. 2015) ("If an address, phone number, or URL is . . . part of the substantive information conveyed to the recipient, then by definition it is 'content.'"). For example, "detailed URLs that reveal the specific document, product, or service that a user is viewing count as contents of communications." *Eating Recovery Ctr.*, 2025 WL 2971090, at *4 (citations omitted); *see also Wiley v. Universal Music Grp., Inc.*, 2025 WL 3654085, at *7 (N.D. Cal. Dec. 17, 2025) ("the alleged tracking of 'website interactions,' 'user input data,' 'shopping behaviors,' and potentially 'referring URLs' could convey, among other things, what users were searching for or what they

---

[1] Defendant argues "Plaintiff[] fail[s] to allege that [Defendant] violated the first three clauses of Section 631(a)," *id.* at 9, but Plaintiff does not assert any such claims against Defendant. Rather, her claim against Defendant arises under the *fourth* clause of Section 631(a), for "aid[ing]" Meta's violation of the second and third clauses. *See* Compl. ¶¶ 127, 138. Plaintiff also does not assert claims against Defendant under Sections 632(a) or 635, rendering its related arguments superfluous. *See* Mot. at 12-14.

[2] "According to the Ninth Circuit, the term 'contents' of a communication under CIPA has the same meaning as the parallel term in the federal Wiretap Act." *Doe v. Eating Recovery Ctr. LLC*, --- F. Supp. 3d ----, ----, 2025 WL 2971090, at *4 (N.D. Cal. Oct. 17, 2025) ["*Eating Recovery Ctr.*"] (citing *Facebook Tracking Litig.*, 956 F.3d at 607).

wanted to do on UMG's websites," which "would likely entail queries or clicks from users and as a result involve the 'contents' of users' communications with UMG's websites" (citation omitted)).

Here, Ms. Timothee alleges "Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website, and what they searched." Compl. ¶ 72. She alleges she "used [Defendant's] website to access the 'Find Food' map, which included entering her home address." *Id.* ¶ 24.[3] Because Ms. Timothee was communicating this information directly to Defendant—it was not just stored record information "generated in the course of the communication," *see Price*, 2024 WL 221437, at *6 (quotation omitted), akin to "[m]etadata associated with electronic communications," *see Sys. Prods. & Sols., Inc. v. Scramlin*, 2014 WL 3894385, at *8 (E.D. Mich. Aug. 8, 2014)—the information was "contents" within the meaning of CIPA. *Cf. Zynga*, 750 F.3d at 1106 ("[T]he term 'contents' refers to the intended message conveyed by the communication, and does not include record information *regarding the characteristics of the message* that is *generated in the course of the communication*." (emphasis added)); *Doe v. Post Acute Med., LLC*, 2025 WL 511069, at *5 (M.D. Pa. Feb. 14, 2025) ["*Post Acute Med.*"] ("When assessing claims under wiretapping statutes, many courts distinguish between the 'contents of' a communication—*i.e.*, the 'intended message conveyed by the communication'—and metadata (sometimes called 'record information' or 'routing information'), which describe the characteristics of the message." (citations omitted)).

In *In re Pharmatrak, Inc.*, 329 F.3d 9 (1st Cir. 2003), for example, "the First Circuit correctly concluded that the defendant was disclosing the contents of a communication," where the allegation was that "an entity intercepted the content of the sign-up information customers provided to pharmaceutical websites, which included their 'names, addresses, telephone numbers, email addresses, dates of birth,'" and other information that might otherwise qualify as record information. *See Zynga*, 750 F.3d at 1107 ("the users had communicated with the website by entering their personal medical information into a form provided by a website" (citing *In re Pharmatrak, Inc.*, 329 F.3d at 15, 18-19)).

Here, Plaintiff alleges that, "[t]hrough the Pixel, Meta collects information such as visited websites

[3] If necessary, Plaintiffs could amend the Complaint to allege that the URL of Defendant's "Find Food" page, www.sacramentofoodbank.org/find-food, "reveal[s] enough information to be deemed contents of communications," *see Eating Recovery Ctr.*, 2025 WL 2971090, at *4.

*and user interaction with content* . . . ." Compl. ¶ 4 (emphasis added); *see also id.* ¶ 5 ("Pixel can track and log each page a user visits, what buttons they click, and the specific information they input into the website, such as user-generated inputs into forms"). "The pixel *contemporaneously* takes each of these pieces of information and sends it to Meta . . . ." *Id.* ¶ 5 (emphasis added). "Meta's interceptions . . . occurred concurrently as Plaintiff[] . . . used the [Defendant's] website[]." *Id.* ¶ 166. "These allegations plausibly state the interception element." *See Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 894 (S.D. Cal. 2025) (citations omitted) ("Plaintiff alleges the tracking software . . . intercepted her electronic communications 'contemporaneously' and 'simultaneously' and redirected them to third-parties, including Meta." (record citation omitted)). Moreover, even Meta's capture of a pageview is contents "when it 'conveys far more than basic identification and address information,'" *see Wiley*, 2025 WL 3654085, at *7 (quoting *Eating Recovery Ctr.*, 2025 WL 2971090, at *4).

In addition, "the definition [of 'contents'] broadly includes 'the communication or reception of knowledge or intelligence' that is 'relating to' 'a person's intended message to another (i.e., the "essential part" of the communication, the "meaning conveyed," and the "thing one intends to convey").'" *In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1069 (N.D. Cal. 2023) (construing "any information" in 18 U.S.C. § 2510(8) (citing *Webster's Third New International Dictionary* 470, 1160 (1981))); *cf. Application of U.S. of Am. for an Order Authorizing Use of a Pen Reg. Device*, 407 F. Supp. 398, 406 (W.D. Mo. 1976) (Noting the legislative history of § 2510(8) states:

> Paragraph (8) defines "contents" in reference to wire and oral communication to include all aspects of the communication itself. No aspect, including the identity of the parties, the substance of the communication between them, or the fact of the communication itself, is excluded. The privacy of the communication to be protected is intended to be comprehensive. (quoting 2 U.S. Code Cong. & Admin. News, 90th Cong., 2d Sess. (1968) p. 2179)).

Thus, the statute is violated—not just when a third party intercepts a communication—but also when they obtain knowledge or intelligence about the communication. And "[t]he context of the definition of 'content' . . . indicates that there exists an indiscriminate number of classes or varieties of 'information' that constitute 'content' so long as that 'information' 'concerns' or 'relates to' a 'person's intended message to another.'" *In re Path Network, Inc.*, 703 F. Supp. 3d at 1069 (quoting *Zynga*, 750 F.3d at 1105-106). Where, as here, Plaintiff alleges she communicated her personal information to Defendant in filling out a "Find Food" form,

information relating to that message—such as the nature of the form she was filling out—is also "content" within the statute. *Cf. Post Acute Med.*, 2025 WL 511069, at *5 ("the line between contents and metadata is not abstract but contextual with respect to each communication," making "the 'content' inquiry a[n] inherently relative and a case-specific one," where "categories of content and non-content overlap and are not mutually exclusive," and "the acquisition of at least some 'content' may be properly inferred from a complaint . . . plausibly demonstrating a broad scheme in which defendants generally acquired and tracked the plaintiffs' internet usage" (citation modified) (citing *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d at 136-39)).

### D. Plaintiff Adequately Alleges a Reasonable Expectation of Privacy

Defendant argues that "[b]ecause Plaintiff[] w[as] informed of the sharing of [her] data analytics, there was no reasonable expectation of privacy, no intrusion of privacy, and no violation of the California constitutional right to privacy." Mot. at 15. This is just a variation of its misguided consent argument. *See id.* ("Plaintiff['s] demonstrable awareness of the Website's use of data analytics through the Website's conspicuous Privacy Policy undermines [her] ability to plausibly allege [she] had a reasonable expectation of privacy . . . ."); *id.* at 16 ("Because Plaintiff[] w[as] aware of and agreed to the Website's use of data analytics, [she] had no reasonable expectation of privacy."). Because, as discussed above, Plaintiff never agreed to the Privacy Policy, nor did the policy disclose Defendant's conduct, the Court should reject Defendant's assertion that Plaintiff fails to allege a reasonable expectation of privacy in her food insecurity and sensitive financial condition.

In addition, "[c]ourts have held that plaintiffs have a reasonable expectation of privacy where data is collected without their consent," *Walsh v. Dollar Tree Stores, Inc.*, 2025 WL 2939229, at *14 (N.D. Cal. Oct. 16, 2025) (quoting *In re Google Location Hist. Litig.*, 514 F. Supp. 3d 1147, 1156 (N.D. Cal. 2021)), and "conduct is more likely to be 'highly offensive' where the defendant 'surreptitious[ly]' collects sensitive information," *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022) (quotation omitted); *see also Gabrielli v. Haleon US Inc.*, 2025 WL 2494368, at *8-9 (N.D. Cal. Aug. 29, 2025) (finding "highly offensive" invasion plausible where, "even after [Plaintiff] rejected all cookies, [Defendant] continued to . . . . permit[] the Third Parties to track and collect Plaintiff's private communications as Plaintiff browsed the websites" (record citation omitted; citation modified)). That is the allegation here, that

Defendant "does not use a banner consent form or any other mechanism for a user to accept or reject tracking cookies, such as the Pixel," which "starts transmitting data to Meta the instant a user navigates to the website, without notifying the user." Compl. ¶ 38. Ultimately, whether Defendant's "tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage," but "Plaintiff[] ha[s] identified sufficient facts to survive a motion to dismiss." *See Facebook Tracking Litig.*, 956 F.3d at 606.

Moreover, courts that have carefully considered the issue and analyzed it under *Spokeo* have held that "CIPA violations, without more, constitute injury in fact." *See Romero v. Securus Techs., Inc.*, 216 F. Supp. 3d 1078, 1088 (S.D. Cal. 2016) (citing *Matera v. Google Inc.*, 2016 WL 5339806 (N.D. Cal. Sep. 23, 2016) (Koh, J.)). In *Romero*, following the analysis set forth in *Spokeo*, the court held that, "[r]ather than being a 'bare procedural violation,' a CIPA violation is 'the violation of a procedural right granted by statute . . . sufficient . . . to constitute injury in fact.'" 216 F. Supp. 3d at 1089 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016)).

In a footnote, Defendant argues Plaintiff's invasion of privacy claims also fail because "the conduct alleged . . . was not highly offensive" since "[n]o reasonable person would view disclosure of the address used to find nearby food resources as 'highly offensive' conduct." Mot. at 16 n.2. The Court should ignore this undeveloped argument relegated to a footnote, but if it addresses the argument, the Court should reject it. Plaintiff does not just allege Meta intercepted her address. She alleges that by intercepting page clicks and associating her data with her Meta account, Defendant assisted Meta in learning of her "intent to receive nutrition assistance with only [Defendant] as the intended recipient[] of such communications," Compl. ¶ 29, and that "[u]nbeknownst to" her, Defendant "allowed Meta to intercept this data, revealing [her] sensitive financial condition[]," including by "assocat[ing] the data with [her] Meta account[] and other personal information," *id.* ¶ 30. Such information indicating food insecurity has long been considered personal and sensitive.

"[T]hose facing food insecurity," like Ms. Timothee, often "face social stigma and shame" and are "targeted with predatory ads related to their financial status," Compl. ¶ 99; *see also id.* ¶ 100 (Ms. Timothee was "reminded of [her] hardship and further stigmatized when [she] w[as] repeatedly targeted with ads directed at exploiting [her] financial hardships"). To help protect against such consequences, California's

Welfare and Institutions Code establishes comprehensive confidentiality protections for information concerning individuals receiving public social services. With limited exceptions that maintain the confidentiality of the information, "a person shall not publish or disclose or permit or cause to be published or disclosed a list of persons receiving public social services." Cal. Welf. & Inst. Code § 10850(b). Disclosure of Ms. Timothee's efforts in seeking food assistance is thus precisely the type of information traditionally protected against disclosure. *Cf. Sanchez v. Cnty. of San Diego*, 2003 WL 25655642, at *15 (S.D. Cal. Mar. 10, 2003) ("a person's identity as a welfare applicant constitutes confidential information under § 10850"), *aff'd*, 464 F.3d 916 (9th Cir. 2006); *Shleffar v. Super. Ct.*, 178 Cal. App. 3d 937, 944 n.6 (1986) ("welfare benefits" are "confidential records protected from scrutiny" (citing Cal. Welf. & Inst. Code § 10850)). Additionally, Defendant's intrusion "can be considered 'highly offensive' because personal financial information was disclosed," *see Knell v. FIA Card Servs., N.A.*, 2013 WL 12121237, at *8 (S.D. Cal. Feb. 21, 2013) (citation omitted); *cf. Baton v. Ledger SAS*, 740 F. Supp. 3d 847, 875 (N.D. Cal. 2024) (it is "highly offensive to a reasonable person to have one's PII in conjunction with one's confidential financial information (as indicated by Mr. Seirafi's ownership of the wallet and thus his ownership in crypto wealth) disclosed"). Accordingly, if the Court considers Defendant's undeveloped argument that the intrusion is not highly offensive, it should reject it.

### E. Plaintiff Plausibly Alleges Defendant Was Negligent

Defendant argues Plaintiff's negligence claim fails "for two reasons: (1) Plaintiff[] ha[s] failed to demonstrate that [Defendant] owed any legal duty to Plaintiff[]; and (2) Plaintiff[] ha[s] failed to allege a nonspeculative, present injury." Mot. at 17. The Court should reject both arguments.

First, Plaintiff adequately alleges a duty of care. To determine whether a valid duty exists:

> California courts turn to several factors, including "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."

*Shah v. Capital One Fin. Corp.*, 768 F. Supp. 3d 1033, 1045-46 (N.D. Cal. 2025) ["*Capital One*"] (quoting *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019)). Given the complexity and need to weigh these factors, many of which are highly fact-dependent, it is a poor time to resolve this question. But

Plaintiff plausibly alleges such a duty since CIPA establishes Defendant's duty not to aid Meta's eavesdropping and subsequent use of confidential communications. *See* Cal. Penal Code § 631(a); *Doe v. Kaiser Found. Health Plan, Inc.*, 2024 WL 1589982, at *22-23 (N.D. Cal. Apr. 11, 2024) (denying motion to dismiss negligence claim based on violation of "state wiretapping laws"). Further, California law prohibits Defendant from "publish[ing] or disclos[ing] or permit[ting] or caus[ing] to be published or disclosed a list of persons receiving public social services." Cal. Welf. & Inst. Code § 10850(b). *Cf. R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 897 (C.D. Cal. 2024) ("a duty may arise from HIPAA and serve as the basis for a negligence claim under California law"). Transmitting to Meta user behavior on its website, such as entering information to seek out food assistance, "conveys a significant possibility that [Ms. Timothee] had [public assistance] at the time [she] visited the [Defendant's] website." *See Eating Recovery Ctr.*, 2025 WL 2971090, at *4.

Plaintiff further alleges Defendant "employed Meta's Pixel to intercept Plaintiff['s] and other Class Members' sensitive financial information and PII . . . and gave substantial assistance to Meta in violating Plaintiff['s] and other Class Members' privacy rights," Compl. ¶ 138, thereby "breach[ing] . . . its duty to Plaintiff Timothee and other Class Members because of affirmative misrepresentations and omissions made within its Privacy Policy that none of these unlawful acts would occur," *id.* ¶ 139. The Court should thus find Plaintiff adequately pleads a plausible duty of care for her negligence claim. *See Capital One*, 768 F. Supp. 3d at 1046 ("Defendant's alleged lack of reasonable care in handling Plaintiffs' personal information caused foreseeable harm to Plaintiffs," who "therefore alleged a valid duty of care by alleging that they placed trust in Defendant to protect their personal information, which Defendant the[n] disclosed." (citation omitted)).

Second, Plaintiff alleges that, as a result of Defendant's negligence, she "sustained foreseeable harm and damages in a sum to be determined at trial." Compl. ¶ 192. She backs this up with allegations regarding the economic value of the information Defendant allowed Meta to steal from her. *See id.* ¶¶ 102-108. In particular, Plaintiff alleges that in the EU, where data access is more restricted, "Meta considered charging up to €192 per year for an ad-free version of Facebook and Instagram—effectively assigning a price to the cost of leveraging user data." *Id.* ¶ 105. Plaintiff further alleges that "the cost of personal data for those with very low incomes . . . may be uniquely valuable, and may be uniquely exploitable at users' detriment," *id.*

¶ 106. For example, "data-driven systems, like those fed by the data intercepted by Meta from [Defendant's] website[], might contribute to a widening of the income equality gap in the U.S. by providing a ready avenue to prey on the vulnerabilities of low-income people, or to exclude them from opportunities due to biases entrenched in algorithmic decision-making tools." *Id.* ¶ 108. The Court should find, at this juncture, that Plaintiff has adequately pleaded damages to state a negligence claim against Defendant. *Cf. Brown v. Google LLC*, 2021 WL 6064009, at *17 (N.D. Cal. Dec. 22, 2021) (finding that, by obtaining and selling plaintiffs' data to advertisers, defendants had "diminished" plaintiffs' "future property interest").

## CONCLUSION

The Court should deny Defendant's motion, but if the Court is inclined to grant the motion in any respect, Plaintiff requests dismissal be without prejudice and with leave to amend.

Dated: January 7, 2026

Respectfully Submitted,

/s/ Melanie R. Monroe

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE
*mmonroe@fmfpc.com*
TREVOR FLYNN
*tflynn@fmfpc.com*
ALLISON FERRARO
*aferraro@fmfpc.com*
DANIEL E. SACHS
*dsachs@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiffs***