**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD (SBN 257370)
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE (SBN 275423)
*mmonroe@fmfpc.com*
TREVOR FLYNN (SBN 253362)
*tflynn@fmfpc.com*
ALLISON FERRARO (SBN 351455)
*aferraro@fmfpc.com*
DANIEL E. SACHS (SBN 361027)
*dsachs@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiffs***

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATASSIA TIMOTHEE, TOMMY DIEP, ESPERANZA REYES, MARIAELENA BURCIAGA, and STACY PENNING on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., SACRAMENTO FOOD BANK AND FAMILY SERVICES, LOS ANGELES REGIONAL FOOD BANK, CENTRAL CALIFORNIA FOOD BANK, and SAN FRANCISCO FOOD BANK d/b/a SAN FRANCISCO-MARIN FOOD BANK,<br><br>Defendants. | Case No. 3:25-cv-05106-LB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT CENTRAL CALIFORNIA FOOD BANK'S MOTION TO DISMISS THE COMPLAINT**<br><br>**[Dkt. No. 49]**<br><br>Judge: Hon. Laurel Beeler<br>Date: March 26, 2026<br>Time: 9:30 a.m.<br>Dept.: Courtroom B, 15th Floor |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

STATEMENT OF ISSUES TO BE DECIDED ..... 1

INTRODUCTION ..... 1

FACTS ..... 2

ARGUMENT ..... 5

I. PLAINTIFFS HAVE ARTICLE III STANDING ..... 5

II. PLAINTIFFS PLAUSIBLY STATE CLAIMS ..... 9

A. Plaintiffs Plausibly Allege Defendant Violated CIPA Section 631 ..... 9

i. Plaintiffs Adequately Allege a Predicate CIPA Violation by Meta ..... 9

ii. Plaintiffs Adequately Allege Defendant's Intent ..... 12

B. Plaintiffs Plausibly Allege Defendant Violated CIPA Section 638 ..... 14

C. Plaintiffs Plausibly Allege Claims for Violation of Their California Common Law and Constitutional Privacy Rights ..... 15

D. Plaintiffs Plausibly Allege Defendant was Negligent ..... 17

i. Plaintiffs Adequately Allege Defendant Owed a Duty of Care ..... 17

ii. Plaintiffs Adequately Alleged They Suffered Damages as a Result of Defendant's Breach ..... 18

iii. The Economic Loss Rule Does Not Bar Plaintiffs' Negligence Claim ..... 19

CONCLUSION ..... 19

# TABLE OF AUTHORITIES

**Cases**

*Application of U.S. of Am. for an Order Authorizing Use of a Pen Reg. Device*,
407 F. Supp. 398 (W.D. Mo. 1976) .......... 13

*Balestrieri v. SportsEdTV, Inc.*,
2025 WL 2776356 (N.D. Cal. Sep. 16, 2025) .......... 16

*Bass v. Facebook, Inc.*,
394 F. Supp. 3d 1024 (N.D. Cal. 2019) .......... 21

*Brown v. Google LLC*,
2021 WL 6064009 (N.D. Cal. Dec. 22, 2021) .......... 22

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) .......... 9

*Byars v. Sterling Jewelers, Inc.*,
2023 WL 2996686 (C.D. Cal. Apr. 5, 2023) .......... 7

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) .......... 9

*Camplisson v. Adidas Am., Inc.*,
--- F. Supp. 3d ----, 2025 WL 3228949 (S.D. Cal. Nov. 18, 2025) .......... 17

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
631 F.3d 939 (9th Cir. 2011) .......... 8, 9

*Corales v. Bennett*,
567 F.3d 554 (9th Cir. 2009) .......... 20

*D'Angelo v. FCA US, LLC*,
726 F. Supp. 3d 1179 (S.D. Cal. 2024) .......... 8, 9

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) .......... 8

*Dent v. Nat'l Football League*,
902 F.3d 1109 (9th Cir. 2018) .......... 20

*Doe v. Eating Recovery Ctr. LLC*,
--- F. Supp. 3d ----, 2025 WL 2971090 (N.D. Cal. Oct. 17, 2025) .......... 11, 12

*Doe v. Kaiser Found. Health Plan, Inc.*,
2024 WL 1589982 (N.D. Cal. Apr. 11, 2024) .......... 20

*Doe v. Post Acute Med., LLC*,
2025 WL 511069 (M.D. Pa. Feb. 14, 2025) .......... 12, 14

*Gabrielli v. Haleon US Inc.*,
2025 WL 2494368 (N.D. Cal. Aug. 29, 2025) .......... 19

*Hill v. Nat'l Collegiate Athletic Ass'n*,
7 Cal. 4th 1 (1994) .......... 18

*I.C. v. Zynga, Inc.*,
600 F. Supp. 3d 1034 (N.D. Cal. 2022) .......... 7

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 11, 19

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) .......... 21, 22

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) .......... 11, 14

*In re Google Location Hist. Litig.*,
514 F. Supp. 3d 1147 (N.D. Cal. 2021) .......... 18

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) .......... 21, 22

*In re Meta Pixel Tax Filing Cases*,
793 F. Supp. 3d 1147 (N.D. Cal. 2025) .......... 17

*In re Path Network, Inc.*,
703 F. Supp. 3d 1046 (N.D. Cal. 2023) .......... 13, 14

*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003) .......... 13

*In re San Francisco 49ers Data Breach Litig.*,
2024 WL 3849336 (N.D. Cal. Aug. 15, 2024) .......... 20

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) .......... 11, 12, 13

*J'Aire Corp. v. Gregory*,
24 Cal. 3d 799 (1979) .......... 20, 22

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) .......... 15, 16

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) .......... 7, 18

*M.H. Done Glob. Inc.*,
2025 WL 629613 (N.D. Cal. Feb. 26, 2025) .......... 16

*Matera v. Google Inc.*,
2016 WL 5339806 (N.D. Cal. Sep. 23, 2016) .......... 8, 9

*Mikulsky v. Noom, Inc.*,
682 F. Supp. 3d 855 (S.D. Cal. 2023) .......... 7

*Moody v. C2 Educ. Sys. Inc.*,
742 F. Supp. 3d 1072 (C.D. Cal. 2024) .......... 17

*Popa v. Microsoft Corp.*,
153 F.4th 784 (9th Cir. 2025) .......... 5, 6, 7

*Price v. Carnival Corp.*,
2024 WL 221437 (S.D. Cal. Jan. 19, 2024) .......... 11, 12

*R.C. v. Walgreen Co.*,
733 F. Supp. 3d 876 (C.D. Cal. 2024) .......... 20

*Romero v. Securus Techs., Inc.*,
216 F. Supp. 3d 1078 (S.D. Cal. 2016) .......... 8

*Sanchez v. Cnty. of San Diego*,
2003 WL 25655642 (S.D. Cal. Mar. 10, 2003) .......... 6

*Sanchez v. Cnty. of San Diego*,
464 F.3d 916 (9th Cir. 2006) .......... 6

*Shleffar v. Super. Ct.*,
178 Cal. App. 3d 937 (1986) .......... 6

*Smith v. Rack Room Shoes, Inc.*,
2025 WL 1085169 (N.D. Cal. Apr. 4, 2025) .......... 16

*Smith v. YETI Coolers, LLC*,
2024 WL 4539578 (N.D. Cal. Oct. 21, 2024) .......... 14, 16

*Spokeo, Inc. v. Robbins*,
578 U.S. 330 (2016) .......... 8

*Stasi v. Inmediata Health Grp. Corp.*,
501 F. Supp. 3d 898 (S.D. Cal. 2020) .......... 22

*Sys. Prods. & Sols., Inc. v. Scramlin*, 2014 WL 3894385 (E.D. Mich. Aug. 8, 2014) .......... 12

*Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969 (C.D. Cal. 2023) .......... 13

*Walsh v. Dollar Tree Stores, Inc.*, 2025 WL 2939229 (N.D. Cal. Oct. 16, 2025) .......... 16, 18

*Wiley v. Universal Music Grp., Inc.*, 2025 WL 3654085 (N.D. Cal. Dec. 17, 2025) .......... 11

**Statutes**

18 U.S.C. § 2510(8) .......... 10, 11

Cal. Penal Code § 631(a) .......... 1, 17

Cal. Penal Code § 638.50(b) .......... 14

Cal. Penal Code § 638.50(c) .......... 14

Cal. Penal Code § 638.51 .......... 1

Cal. Welf. & Inst. Code § 10850 .......... 6, 17

**Other Authorities**

2 U.S. Code Cong. & Admin. News, 90th Cong., 2d Sess. (1968) .......... 12

Webster's Third New International Dictionary (1981) .......... 11

**STATEMENT OF ISSUES TO BE DECIDED**

1. Whether Plaintiffs Esperanza Reyes and Mariaelena Burciaga have alleged a sufficient privacy interest for standing and to state claims against Defendant Central California Food Bank where they allege Meta intercepted sensitive information in the form of their financial vulnerability, food insecurity, and use of social services.

2. Whether Plaintiffs have alleged a real and immediate threat of future injury sufficient for standing to seek injunctive relief.

3. Whether the Complaint pleads a plausible violation of clause four of Section 631(a) of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631(a), because it adequately alleges Defendant aided Meta's interception and use of the contents of Plaintiffs' communications with Defendant.

4. Whether the Complaint pleads a plausible violation of CIPA Section 638, Cal. Penal Code § 638.51, because it adequately alleges Defendant installed a pen register or trap and trace device on its website without first obtaining a court order.

5. Whether the Complaint adequately pleads a serious intrusion so as to state plausible claims for common law invasion of privacy.

6. Where state law requires Defendant to maintain the confidentiality of Plaintiffs' information and where Defendant has further promised to maintain its confidentiality, whether Plaintiffs have sufficiently alleged a duty of care and resulting injury from Defendant's breach of that duty so as to state a plausible claim for negligence against Defendant.

**INTRODUCTION**

Defendant provides no salient reason for dismissal. Because they allege information about their sensitive financial condition, food insecurity, and need for public assistance was intercepted, Plaintiffs Esperanza Reyes and Mariaelena Burciaga allege a sufficient expectation of privacy for standing and to state their various statutory and common law privacy claims. Because they allege a real threat of future injury, they also have standing to seek injunctive relief. Plaintiffs also allege sufficient facts to support the substantive elements of their claims against Defendant. For their Section 631(a) claim, Plaintiffs adequately allege a predicate violation by Meta and Defendant's scienter. For their Section 638.51 claim, they adequately allege Pixel is a pen register. In addition to alleging a reasonable expectation of privacy, for their

common law and constitutional privacy claims, Plaintiffs adequately allege a sufficiently serious intrusion, given that it was without consent and involved sensitive personal information.

## FACTS

Defendant "is a non-profit organization founded in 1992 that serves over 300,000 people each month in Fresno, Madera, Kings, Kern, and Tulare counties." Compl. ¶ 46. "In connection with providing access to food," Defendant operates a website providing "resources, including maps and calendars to locate local food banks and food distribution information," and "links for users to apply to nutritional assistance programs for low-income individuals . . . ." *Id.* ¶ 47. "In violation of" several privacy laws, however, Defendant "incorporate[s] Meta's tracking technology, the Meta Tracking Pixel ('Pixel'), on [its] website[]," which Defendant "know[s] allows Meta to contemporaneously intercept, and subsequently sell, vast quantities of users' sensitive financial and personal information . . . without their knowledge or consent." *Id.* ¶ 2; *see also id.* ¶ 6 (Defendant "ha[s] incorporated the Pixel onto [its] website[]," which has "caused Plaintiffs' and other Class Members' confidential communications, [personally identifying information ('PII')], and sensitive financial information to be intercepted by and sent to Meta," and Defendant "knew that by embedding [its] website with the Pixel, [it] w[as] permitting Meta to intercept and use Plaintiff['s] and other Class Members' PII, including sensitive financial information."); *id.* ¶ 55 (Defendant "know[s] that the Pixel is contemporaneously tracking and intercepting . . . events and associating them with users' personal identity").

Meta's "primary function is to deliver personalized advertisements to users by analyzing their browsing patterns and interactions." *Id.* ¶ 67. Thus, "[t]he vast majority of Meta's revenue, approximately 98%, comes from advertising." *Id.* ¶ 66. Pixel "is a snippet of code that Meta offers for free which is then embedded on a third-party website" and "tracks a user's activity in real-time," *id.* ¶ 68. "As soon as a user takes any action on a webpage" embedded with Pixel, its code "re-directs the contents of the user's communication to Meta while the communication between the user and website provider is still occurring." *Id.* As a result, "Meta receives the content of website communications as the website user enters or generates the information, but before the website owner receives it." *Id.* ¶ 69.

With Pixel, "Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website, and what they searched," sending "each of these pieces of

information to Meta in real time with users' PII." *Id.* ¶ 72. And "if a user is logged into their Facebook or Instagram account when they visit a Food Bank Defendant's website, Meta receives third-party cookies allowing Meta to link the data . . . to the specific Facebook or Instagram user." *Id.* ¶ 73. "Once data intercepted through the Pixel is processed," it "can be used to create 'custom audiences' to target the user, as well as other Facebook and Instagram users who match that audience's criteria." *Id.* ¶ 78.

Before filing the Complaint, Plaintiff Esperanza Reyes "visited the Central California Food Bank website on many occasions and used the website to access the 'Find Food' map, which included entering her home address. Ms. Reyes has also visited the CalFresh website through the Central California Food Bank website." *Id.* ¶ 26. Before filing the Complaint, Plaintiff Mariaelena Burciaga also "visited the Central California Food Bank website on many occasions and used the website to access the 'Find Food' map, which included entering her home address. Ms. Burciaga also used the website to help determine her eligibility for CalFresh, which included answering multiple questions to determine the severity of her financial hardship." *Id.* ¶ 27. In doing so, Plaintiffs "communicated their intent to receive nutrition assistance with only [Defendant] as the intended recipient[] of such communications." *Id.* ¶ 29.

On Defendant's website, Pixel "intercepts user interactions, such as with the 'Find Food' map, the food distribution calendar, and pages that help users receive financial support, such as the 'Enroll in CalFresh' page," which "reveal sensitive information about the user," along with PII including "users' full names, zip codes, and phone numbers or email addresses." *Id.* ¶ 86. "For example, whenever a user clicks to make an appointment to determine their eligibility for, or to enroll in, programs for financially vulnerable individuals via [Defendant's] website (*i.e.*, via Groceries2Go, CalFresh, or EBT Sun Bucks), Meta intercepts these events." *Id.* ¶ 54. Defendant "even encourages users to . . . shar[e] their personal experience with CalFresh/SNAP programs, programs specifically used by the financially vulnerable, despite its knowledge that the Pixel is contemporaneously tracking and intercepting these events and associating them with users' personal identity as they type out their stories." *Id.* ¶ 55.

It was "[u]nbeknownst to Plaintiffs" that "Defendant[] allowed Meta to intercept this data, revealing their sensitive financial conditions," and allowing Meta to "associate[] the data with Plaintiffs' Meta accounts and other personal information to target them with advertisements." *Id.* ¶ 30. As a result of this

intrusion, "after visiting [Defendant's] website[]," Plaintiffs "received several targeted advertisements related to their sensitive financial information or status." *Id.*

"An individual who is food insecure is more likely to experience poor emotional health, including depression, anxiety, and stress," which can cause the individual "to face social stigma and shame," putting such persons "in uniquely vulnerable positions within wider society, which is why those facing food insecurity are often suggested by behavioral health professionals to be treated with special dignity and discretion." *Id.* ¶ 99 (citation omitted). But Plaintiffs "were reminded of their hardship and further stigmatized when they were repeatedly targeted with ads directed at exploiting their financial hardships after visiting [Defendant's] website[]." *Id.* ¶ 100.

Defendant's website "does not include a cookie consent banner, pop-up, or any other means of providing information and obtaining consent from users pertaining to the website's use of tracking cookies, including the Pixel." *Id.* ¶ 48. Rather, "the only means of disclosing to users what [Defendant] does with their sensitive information is its Privacy Policy, to which users must affirmatively navigate through a link at the bottom of the webpage." *Id.* Defendant's "Privacy Policy states that, '[w]e take precautions to protect your information. When you submit sensitive information via the website, your information is protected both online and offline.' It further states, '[w]hile we use encryption to protect sensitive information transmitted online, we also protect your information offline." *Id.* ¶ 51 (alteration in original).

Defendant "also has a Code of Ethics, which states that it 'safeguard[s] the privacy and confidentiality of [its] clients, volunteers, donors and partners,' and 'will not take unfair advantage of any professional relationship or exploit others to further [its] personal . . . or business interests.'" *Id.* ¶ 49 (alterations in original; citation omitted). The "great lengths to which [Defendant] goes to protect users' data demonstrates that the type of PII its website collects, from users in vulnerable financial situations, is highly sensitive, and reinforces Plaintiffs' and other Class Members' reasonable expectations and belief that their data . . . would remain confidential." *Id.* ¶ 52.

But Defendant's Privacy Policy, while "creat[ing] the false impression that it is being forthcoming with its treatment of users' PII . . . instead materially misstates how user information is treated," claiming its "Usage of a cookie is in no way linked to any personally identifiable information on our site." *Id.*¶ 50 (emphasis and citation omitted). Defendant "makes the further false statement in its Privacy Policy that

'[w]e are the sole owners of the information collected on this site,' and 'will not sell or rent this information to anyone.'" *Id.* ¶ 53. "This omits that [Defendant] shares users' private information with Meta, in real time, via the Pixel; and further omits Meta's contemporaneous interception of user actions and exploitation of that data to sell targeted advertisements." *Id.*

Defendant did not require Plaintiffs or others to "opt-in or opt-out for the Pixel's data collection . . . before it began tracking and intercepting user data." *Id.* ¶ 90. And Plaintiffs "had no way of knowing" Defendant was "disclosing, and Meta was intercepting, their user data including sensitive financial . . . information, when they engaged with" Defendant's website, "including using the food locator maps . . . and entering their information into qualification forms, because the software is . . . inconspicuously incorporated in the background." *Id.* ¶ 91.

## ARGUMENT

### I. PLAINTIFFS HAVE ARTICLE III STANDING

Despite acknowledging Plaintiffs allege an invasion of their privacy and a risk of future harm absent an injunction, *see* Mot. at 4-7, Defendant argues "Plaintiffs' alleged harms are not concrete, and therefore cannot support an injury-in-fact sufficient to confer standing," *id.* at 4. Defendant's argument fails for two reasons. First, Defendant's disclosure of Plaintiffs' visits to a food-assistance website reveals sensitive information about their financial hardships—precisely the type of information historically protected by common law and statute. Second, Plaintiffs face an imminent risk of repeated injury because Defendant continues to deploy invisible tracking technology, preventing them from safely using the website absent injunctive relief.

Whether an alleged privacy invasion is actionable depends on whether "plaintiff has suffered a harm that has traditionally been actionable in our nation's legal system." *See Popa v. Microsoft Corp.*, 153 F.4th 784, 791 (9th Cir. 2025). This occurs where the "kind of harm" alleged is "similar to the 'highly offensive' interferences or disclosures that were actionable at common law," though "an 'exact duplicate' is not required"; rather "a match only in the kind of harm and not the degree" is required. *Id.* A plaintiff carries this burden by alleging the disclosure of "embarrassing, invasive, or otherwise private information collected by" a tracking cookie. *See id.* ("To the extent Microsoft's tracking software *could* be offensive in particular

circumstances (e.g., involving sensitive medical or financial information), Popa does not plausibly allege the infringement of any such privacy interest.").

Relying on cases standing for the unremarkable proposition that "basic contact information" is not a protected privacy interest, Defendant argues "Plaintiffs conspicuously fail to identify any protectable privacy interest violated by [Defendant]." Mot. at 4-6. This, however, ignores Plaintiffs' allegations that "those facing food insecurity," often "face social stigma and shame" and are "targeted with predatory ads related to their financial status," Compl. ¶ 99; *see also id.* ¶ 100 ("Plaintiffs . . . were reminded of their hardship and further stigmatized when they were repeatedly targeted with ads directed at exploiting their financial hardships after visiting [CCFB's] website[].").[1]

To help protect against this, California's Welfare and Institutions Code establishes comprehensive confidentiality protections for information concerning individuals receiving public social services. With limited exceptions that maintain the confidentiality of the information, "a person shall not publish or disclose or permit or cause to be published or disclosed a list of persons receiving public social services." Cal. Welf. & Inst. Code § 10850(b). Disclosure of Plaintiffs' efforts in seeking food assistance is thus precisely the type of information that is traditionally protected. *Cf. Sanchez v. Cnty. of San Diego*, 2003 WL 25655642, at *15 (S.D. Cal. Mar. 10, 2003) ("a person's identity as a welfare applicant constitutes confidential information under § 10850"), *aff'd*, 464 F.3d 916 (9th Cir. 2006); *Shleffar v. Super. Ct.*, 178 Cal. App. 3d 937, 944 n.6 (1986) ("welfare benefits" are "confidential records protected from scrutiny" (citing Cal. Welf. & Inst. Code § 10850)). The Legislature's decision to prohibit disclosure of this information confirms that the harm Plaintiffs allege is concrete rather than abstract.

Because Defendant ignores the true premise of Plaintiffs' complaint, the cases on which it relies are easily distinguished. *See* Mot. at 4-6. Each case Defendant cites involves the browsing of innocuous consumer products, the disclosure of generic identifiers, or vague allegations devoid of context. None involves the disclosure of stigmatizing information about financial hardship, food insecurity, or participation in public assistance. In *Mikulsky v. Noom, Inc.*, for example, the plaintiff merely browsed a commercial

[1] Ignoring these and other allegations, *see*, *e.g. id.* ¶¶ 26-27, 29, Defendant asserts Plaintiffs complain only that their home addresses were intercepted. *See* Mot. at 5. But even a home address may constitute protected information. *See*, *e.g.*, *Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1354 & n.3 (S.D. Cal. 2024) (finding Article III standing where the intercepted information included a home address).

website without selecting or seeking any product that could reveal sensitive personal circumstances. 682 F. Supp. 3d 855, 860 (S.D. Cal. 2023). Likewise, *Popa* concerned the interception of browsing activity related to pet products, which "reveal[ed] nothing more than the products that interested" the plaintiff and therefore did not implicate a historically protected privacy interest. 153 F.4th at 787. *I.C. v. Zynga, Inc.* involved only the disclosure of basic contact information (such as email addresses and usernames) "designed to be exchanged to facilitate communication" and thus readily available through ordinary inquiry. 600 F. Supp. 3d 1034, 1049 (N.D. Cal. 2022). In *Khamooshi v. Politico LLC*, the plaintiffs failed to identify any sensitive content, alleging only the disclosure of IP addresses and undefined "browser and device data," which the court found too vague to support a protectable privacy interest. 786 F. Supp. 3d 1174, 1179 (N.D. Cal. 2025). And in *Byars v. Sterling Jewelers, Inc.*, the plaintiff expressly disclaimed providing any personal or sensitive information and did not allege any meaningful interaction with the defendant's website beyond visiting it for litigation-monitoring purposes. 2023 WL 2996686, at *1-3 (C.D. Cal. Apr. 5, 2023).

Unlike those cases, Plaintiffs here allege the disclosure of information revealing their efforts to obtain food assistance—conduct that communicates financial vulnerability, carries social stigma, and is affirmatively protected from disclosure under California law—placing this case squarely within the category of privacy harms that courts have long recognized as concrete. Moreover, courts that have carefully considered the issue and analyzed it under *Spokeo* have held that "CIPA violations, without more, constitute injury in fact." *See Romero v. Securus Techs., Inc.*, 216 F. Supp. 3d 1078, 1088 (S.D. Cal. 2016) (citing *Matera v. Google Inc.*, 2016 WL 5339806 (N.D. Cal. Sep. 23, 2016) (Koh, J.)). In *Romero*, following the analysis set forth in *Spokeo*, as interpreted by Judge Koh in *Matera*, the court held that, "[r]ather than being a 'bare procedural violation,' a CIPA violation is 'the violation of a procedural right granted by statute . . . sufficient . . . to constitute injury in fact.'" *Id.* at 1089 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016)).

Plaintiffs also have Article III standing to seek injunctive relief because they allege a concrete risk of prospective harm. To have standing "[f]or injunctive relief, which is a prospective remedy, the threat of injury must be actual and imminent, not conjectural or hypothetical." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (citation modified; quotation omitted). "A plaintiff must demonstrate 'real and immediate threat of repeated injury in the future.'" *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179,

1194 (S.D. Cal. 2024) (quoting *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946 (9th Cir. 2011)). As Defendant acknowledges, Plaintiffs allege they are "unable to use the Food Bank's website in the future." Mot. at 7. More specifically, Plaintiffs allege they "would like to use the [Defendant's] website[] again in the future as access to local, affordable food assistance is critical to them but, due to [Defendant's] unscrupulous data collection and use, feel that they cannot currently trust the website[] with their confidential information until . . . [it] no longer use Meta's, or any other tracking software . . . ." Compl. ¶ 101. Absent an injunction prohibiting use of the Pixel on Defendant's website, Plaintiffs "ha[ve] no way of knowing," Compl. ¶ 91, whether the website is using Meta's Pixel because it "act[s] [as] an invisible add-on to a website," *id.* ¶ 152, that is "virtually undetectable," *id.* ¶ 176.

Plaintiffs have thus "adequately alleged a 'real and immediate threat of repeated injury in the future.'" *See D'Angelo*, 726 F. Supp. 3d at 1194 (allegation that "'[e]ach unsuspecting visitor has their conversations exhaustively analyzed in combination with a vast amount of data organized into numerous attributes that Salesforce has collected about the visitor'" were sufficient to "allege an injury from the ongoing use of their intercepted data" (record quotation omitted) (citing *Chapman*, 631 F.3d at 946; *Matera*, 2016 WL 5339806, at *19 (concluding that plaintiff has alleged a "real and immediate threat of repeated injury" from Google's ongoing analysis of data that was intercepted without the plaintiff's consent))); *see also Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1120 (9th Cir. 2020) ("combination of continuing harm plus likelihood of future harm was sufficient for Plaintiffs to have standing to seek injunctive relief" where "Facebook was actively accessing private messages—conduct that Facebook has never claimed to have ceased," "was also still using the data from these messages," and "Facebook's ongoing retention of the data collected . . . meant that there was a risk that it would resume using the data . . . resume sharing the data with third parties, or begin using the data for some other purpose"); *cf. Brown v. Google LLC*, 685 F. Supp. 3d 909, 926 (N.D. Cal. 2023) (denying "motion for summary judgment as to plaintiffs' lack of standing to seek an injunctive remedy" because "Google's conduct has not stopped" and "Plaintiffs have demonstrated that absent an injunction, Google will continue to collect users' private browsing data for its own use without users' express consent").

## II. PLAINTIFFS PLAUSIBLY STATE CLAIMS

### A. Plaintiffs Plausibly Allege Defendant Violated CIPA Section 631

CIPA prohibits both the real-time interception of the contents of a communication and the knowing facilitation of a third party's interception through aiding, abetting, or conspiring to deploy the mechanism making it possible. Here, Plaintiffs allege that Meta was the interceptor, capturing the contents of their communications with Defendant in real time, through the Pixel embedded on Defendant's website. Plaintiffs do not allege that Defendant intercepted its own communications under Section 631(a)'s first three clauses. Instead, they allege that Defendant violated CIPA under the fourth clause, by intentionally installing and maintaining the Pixel on its website, where it knows users input and submit substantive, sensitive information while seeking food-assistance services.[2] The statute presents two binary merits questions the Court can resolve from the statute and the pleaded facts: (i) Whether Meta's alleged real-time acquisition of user inputs and interactions via Pixel constitutes interception of "contents" under Section 631(a); and (ii) whether Defendant intentionally installed and maintained Pixel on those pages with knowledge that real-time contents interception would occur, thereby pleading aiding liability under the fourth clause of Section 631(a).

Plausibility governs at this stage. The Complaint alleges that users communicated information—including entered home addresses and assistance-eligibility responses submitted through website forms—reflecting the substance and purpose of their communications, not merely routing or record data. Those allegations, taken as true, plausibly plead a primary CIPA violation by Meta and CCFB's cognizable role in enabling it. Below, Plaintiffs address each question in turn: first, why the pleaded facts plausibly establish Meta's interception of "contents"; and second, why the Complaint plausibly alleges intent by Defendant to facilitate that interception with knowledge to a substantial certainty that it would result.

#### i. Plaintiffs Adequately Allege a Predicate CIPA Violation by Meta

Plaintiffs plausibly allege Meta violated CIPA Section 631(a)'s second and third clauses by using the Pixel to intercept the contents of Plaintiffs' communications with Defendants' websites in real time.

---

[2] Defendant moves to dismiss Plaintiffs' claims under CIPA Sections 632 and 635. Mot. at 11-13. Plaintiffs do not assert such claims against Defendant. The Section 635 claim is asserted solely against Meta. *See* Compl. ¶¶ 151-55. While paragraphs 146-47 of (related to Plaintiffs' Section 632 claim) reference the Food Bank Defendants, those allegations are intended only to address the confidentiality and consent elements of the Section 632 claim against Meta. The reference to the Food Bank Defendants in paragraph 150 was inadvertent.

Because, as explained below, Plaintiffs plausibly allege Meta intercepted contents in real time without consent, the predicate violation for aiding or conspiracy is satisfied.

First, Defendant argues Plaintiffs do not adequately allege "the interception of the 'contents' of their communications," Mot. at 8-9. That ignores Plaintiffs' Complaint and the relevant law. "Contents" means "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8).[3] Thus, while "contents" generally "does not include record information, such as the name, address, and subscriber number or identity of a subscriber or customer, when such information is merely generated in the course of the communication," what might otherwise be "record information may constitute 'contents' where 'the record is the subject of a communication . . . .'" *Price v. Carnival Corp.*, 2024 WL 221437, at *6 (S.D. Cal. Jan. 19, 2024) (citation modified) (record citation omitted) (quoting *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014) ["*Zynga*"]); *see also In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 137 (3d Cir. 2015) ("If an address, phone number, or URL is . . . part of the substantive information conveyed to the recipient, then by definition it is 'content.'"). Thus, for example, "detailed URLs that reveal the specific document, product, or service that a user is viewing count as contents of communications." *Eating Recovery Ctr.*, 2025 WL 2971090, at *4 (citations omitted); *see also Wiley v. Universal Music Grp., Inc.*, 2025 WL 3654085, at *7 (N.D. Cal. Dec. 17, 2025) ("the alleged tracking of 'website interactions,' 'user input data,' 'shopping behaviors,' and potentially 'referring URLs' could convey, among other things, what users were searching for or what they wanted to do on UMG's websites," which "would likely entail queries or clicks from users and as a result involve the 'contents' of users' communications with UMG's websites").

Plaintiffs allege "Meta intercepts each page a user visits, what buttons they click, as well as specific information they input into the website, and what they searched." Compl. ¶ 72. Plaintiffs further allege they "used the [Defendant's] website to access the 'Find Food' map, which included entering [their] home

[3] "According to the Ninth Circuit, the term 'contents' of a communication under CIPA has the same meaning as the parallel term in the federal Wiretap Act." *Doe v. Eating Recovery Ctr. LLC*, --- F. Supp. 3d ----, ----, 2025 WL 2971090, at *4 (N.D. Cal. Oct. 17, 2025) ["*Eating Recovery Ctr.*"] (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020) ["*Facebook Tracking Litig.*"]).

address[es],"[4] and Ms. Burciaga "used the website to help determine her eligibility for CalFresh, which included answering multiple questions to determine the severity of her financial hardship." Compl. ¶¶ 26-27. Because Plaintiffs were communicating this information directly to Defendant—it was not just stored record information "generated in the course of the communication," *see Price*, 712 F. Supp. 3d at 1360 (quoting *Zynga*, 750 F.3d at 1107), akin to "[m]etadata associated with electronic communications," *see Sys. Prods. & Sols., Inc. v. Scramlin*, 2014 WL 3894385, at *8 (E.D. Mich. Aug. 8, 2014)—the information was "contents" within the meaning of 18 U.S.C. § 2510(8); *cf. Zynga*, 750 F.3d at 1106 ("[T]he term 'contents' refers to the intended message conveyed by the communication, and does not include record information *regarding the characteristics of the message* that is *generated in the course of the communication*." (emphasis added)); *Doe v. Post Acute Med., LLC*, 2025 WL 511069, at *5 (M.D. Pa. Feb. 14, 2025) ["*Post Acute Med.*"] ("When assessing claims under wiretapping statutes, many courts distinguish between the 'contents of' a communication—i.e., the intended message conveyed by the communication—and metadata (sometimes called 'record information' or 'routing information'), which describe the characteristics of the message." (internal quotation marks and citations omitted)); *cf. Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 981 (C.D. Cal. 2023) (where a third-party device is "not merely a tool . . . akin to a tape recorder," allowing that third party to listen in makes both the third party and the facilitating party liable under Section 631(a)).

In *In re Pharmatrak, Inc.*, 329 F.3d 9 (1st Cir. 2003), for example, "the First Circuit correctly concluded that the defendant was disclosing the contents of a communication," where the allegation was that "an entity intercepted the content of the sign-up information customers provided to pharmaceutical websites, which included their 'names, addresses, telephone numbers, email addresses, dates of birth,'" and other information that might otherwise qualify as record information. *See Zynga*, 750 F.3d at 1107 ("the users had communicated with the website by entering their personal medical information into a form provided by the website" (citing *In re Pharmatrak, Inc.*, 329 F.3d at 15, 18-19)).

---

[4] If necessary, Plaintiffs could amend the Complaint to allege that the URL of Defendant's "Find Food" page, https://ccfoodbank.org/home/findfood, "reveal[s] enough information to be deemed contents of communications," *see Eating Recovery Ctr.*, 2025 WL 2971090, at *4.

In addition, "the definition broadly includes 'the communication or reception of knowledge or intelligence' that is 'relating to' 'a person's intended message to another (i.e., the "essential part" of the communication, the "meaning conveyed," and the "thing one intends to convey").'" *In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1069 (N.D. Cal. 2023) (construing "any information" in 18 U.S.C. § 2510(8) (citing *Webster's Third New International Dictionary* 470, 1160 (1981))); *cf. Application of U.S. of Am. for an Order Authorizing Use of a Pen Reg. Device*, 407 F. Supp. 398, 406 (W.D. Mo. 1976) (Noting the legislative history of § 2510(8) states:

> Paragraph (8) defines "contents" in reference to wire and oral communication to include all aspects of the communication itself. No aspect, including the identity of the parties, the substance of the communication between them, or the fact of the communication itself, is excluded. The privacy of the communication to be protected is intended to be comprehensive. (quoting 2 U.S. Code Cong. & Admin. News, 90th Cong., 2d Sess. (1968) p. 2179)).

Thus, the statute is violated—not just when a third party intercepts a communication—but also when they obtain knowledge or intelligence relates to the substance or purpose of the communication. And "[t]he context of the definition of 'content' . . . indicates that there exists an indiscriminate number of classes or varieties of 'information' that constitute 'content' so long as that 'information' 'concerns' or 'relates to' a 'person's intended message to another.'" *In re Path Network, Inc.*, 703 F. Supp. 3d at 1069.

Where, as here, Plaintiffs allege they communicated their personal information to Defendant, for example by filling out a "Find Food" form, information relating to that message—such as the nature of the form they were filling out—is also "content" within the statute. *Cf. Post Acute Med., LLC*, 2025 WL 511069, at *5 ("the line between contents and metadata is not abstract but contextual with respect to each communication," making "the 'content' inquiry a[n] inherently relative and a case-specific one," where "categories of content and non-content overlap and are not mutually exclusive," and "the acquisition of at least some 'content' may be properly inferred from a complaint . . . plausibly demonstrating a broad scheme in which defendants generally acquired and tracked the plaintiffs' internet usage." (citation modified) (quoting *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d at 137)).

**ii. Plaintiffs Adequately Allege Defendant's Scienter**

Defendant argues Plaintiffs' CIPA Section 631(a) claim fails because "their allegations are insufficient" to "allege [Defendant] had an intent to violate section 631(a)," Mot. at 10; *see also id.*

(Asserting that "[t]o state a claim . . . Plaintiffs must allege that [Defendant] had 'both knowledge of the conduct that will violate the statute and a purpose of aiding, agreeing with, or employing the third party to commit those acts.'" (quoting *Smith v. YETI Coolers, LLC*, 2024 WL 4539578, at *4 (N.D. Cal. Oct. 21, 2024) ["*YETI*"])). Although some courts have held that to violate the fourth clause of Section 631(a), a defendant need only have intended the act which enabled the privacy violation, *see James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 954 (N.D. Cal. 2023), Plaintiffs' allegations suffice under either standard.

Plaintiffs allege "Pixel is a snippet of code that Meta offers for free which is then embedded on a third-party website that tracks a user's activity in real-time as the user navigates through a website." Compl. ¶ 68. It "allows owners to track users' actions on their websites, and measure the effectiveness of advertising . . . ." *Id.* ¶ 3. "Meta offers the Pixel to companies for free because it benefits Meta." *Id.* ¶ 70. In Pixel documentation, Meta advises website operators, like Defendant, how to "track your website visitors' actions"; how to "use[ them] to analyze the effectiveness of your conversion funnel and calculate your return on ad investment," or "to define custom audiences for ad optimization"; and how to "define[] custom audiences . . . to identify Facebook users who are likely to convert and target them with your ads." *Id.* ¶ 72 (citation omitted). Moreover, "[o]nce data intercepted through the Pixel is processed, Meta makes it available" to website operators "through the 'Meta Pixel page' in Events Manager," *see id.* ¶ 78. Although "Meta has policies in place for website owners to restrict the sharing of sensitive data . . . sensitive information is nevertheless being shared with Meta," which "usually does not take enforcement actions against companies that it knows are sharing potentially sensitive information," since it is "highly valuable." *Id.* ¶ 82.

Defendant "incorporate[s] . . . Pixel . . . on [its] website[], which [it] know[s] allows Meta to contemporaneously intercept, and subsequently sell, vast quantities of users' sensitive financial and personal information . . . without their knowledge or consent." *Id.* ¶ 2. Defendant "knew that by embedding [its] website[] with the Pixel, [it was] permitting Meta to intercept and use Plaintiffs' and other Class Members' PII, including sensitive financial information." *Id.* ¶ 6; *see also id.* ¶ 30 (Defendant "allowed Meta to intercept this data, revealing [Plaintiffs'] sensitive financial conditions"). Defendant "even encourages users to . . . shar[e] their personal experience with CalFresh/SNAP programs . . . despite its knowledge that the

Pixel is contemporaneously tracking and intercepting these events and associating them with users' personal identity as they type out their stories." *Id.* ¶ 55.

Accordingly, contrary to Defendant's argument, Plaintiffs adequately allege its knowledge of Meta's conduct in using the Pixel and purpose of employing Meta to commit those acts, so as to have access to analytics and advertising tools in furtherance of its "more than $94.2 million" in annual revenue, *see id.* ¶ 46. *See Walsh v. Dollar Tree Stores, Inc.*, 2025 WL 2939229, at *17 (N.D. Cal. Oct. 16, 2025) (distinguishing *YETI* and finding allegations sufficient in similar case involving third party cookies); *Balestrieri v. SportsEdTV, Inc.*, 2025 WL 2776356, at *11 (N.D. Cal. Sep. 16, 2025) (Explaining, "[a]llegations that a defendant intended to collect and disclose information are sufficient to plead intent," and finding "alleg[ations] that Defendant 'knowingly installed the Facebook pixel on the Website' and 'knowingly caused the Facebook IDs of Plaintiff and the Class to be disclosed to Facebook'" "sufficiently pled intent." (record and case citations omitted)); *Smith v. Rack Room Shoes, Inc.*, 2025 WL 1085169, at *4 (N.D. Cal. Apr. 4, 2025) (Finding it "plausible to infer from Rack Room's alleged affirmative act of integrating the third-party code into its website that it knew Meta . . . would intercept personally identifiable information and that Rack Room had the purpose of employing Meta . . . to do so." (citing *James*, 701 F. Supp. at 954)); *M.H. Done Glob. Inc.*, 2025 WL 629613, at *2 (N.D. Cal. Feb. 26, 2025) (Intent sufficiently alleged where "[t]he Complaint alleges that Done purposefully installed these tracking technologies—which Done knew would invisibly transmit a user's website communications to third-party companies to facilitate ad retargeting—to optimize its own advertising and marketing.").

### B. Plaintiffs Plausibly Allege Defendant Violated CIPA Section 638

A pen register is "a device or process that records and decodes dialing, routing, addressing or signaling information," and a trap and trace device is "one that captures incoming electronic or other impulses to identify the originating number or other dialing, routing, addressing or signaling information reasonably likely to identify the source of a wire or electronic communication." Compl. ¶¶ 157-58 (citing Cal. Penal Code §§ 638.50(b)-(c)). Defendant argues Plaintiffs' "allegations are insufficient to establish that the Meta Pixel qualifies as a 'pen register.'" Mot. at 14. According to Defendant, because Plaintiffs allege Pixel collects the "contents of communications," as a matter of law, it cannot be a "pen register" within the meaning of Section 638.51. Mot. at 14-15. But Section 638.51 does not require that a device collect *only*

non-content information to be a pen register. Rather, recent case law holds that dual-function devices—including the Pixel—qualify as pen registers, even if they capture content, so long they records dialing, routing, addressing, or signaling information.

In *In re Meta Pixel Tax Filing Cases*, 793 F. Supp. 3d 1147 (N.D. Cal. 2025), for example, a Northern District of California court rejected the argument that content collection categorically disqualifies Pixel from pen register status.. The court reasoned that California's Legislature would not have intended to create a loophole allowing entities to escape pen register liability simply by adding content collection capabilities to their surveillance tools. *Id.* at 1153-54. The court thus interpreted a pen register to be "any device that 'records dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted,' but not a device that records *only* 'the contents of communications.'" *Id.* at 1155 (emphasis added); *see also Camplisson v. Adidas Am., Inc.*, --- F. Supp. 3d ----, ----, 2025 WL 3228949, at *7 (S.D. Cal. Nov. 18, 2025) ("most cases in this and other districts have also recognized that website-based trackers can plausibly constitute a pen register" (collecting cases)); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) (plaintiffs plausibly alleged "TikTok Software . . . embedded in the Website" was a pen register or trap and trace device).

*Khamooshi*, on which Defendant relies, is inapposite because it turned on the narrowness of the allegations, not a holding that website trackers cannot qualify as pen registers, finding that where "the only specific category of information Plaintiffs identify" as being intercepted was "IP addresses for their devices," they had not alleged a privacy invasion. *See* 786 F. Supp. 3d at 1179.

### C. Plaintiffs Plausibly Allege Claims for Violation of Their California Common Law and Constitutional Privacy Rights

Defendant argues Plaintiffs' common law invasion of privacy claims should be dismissed because the Complaint lacks allegations concerning "any reasonable expectation of privacy in data [Plaintiffs] voluntarily provided, and the absence of any highly offensive conduct by the defendant in utilizing the data voluntarily provided." Mot. at 15. That is wrong.

Defendant's first argument is wrong for the reasons already discussed. Plaintiffs and other Class Members had a reasonable expectation of privacy in information concerning their food insecurity, sensitive financial status, and need for social services, and the fact that they were "voluntarily" providing that

information to Defendant *alone*, *see* Compl. ¶ 29, did not alter their expectations. *Cf. id.* ¶ 52 (Defendant claims to go to "great lengths" to protect users' data, which "demonstrates that the type of PII its website collects, from users in vulnerable financial situations, is highly sensitive, and reinforces Plaintiffs' . . . reasonable expectations and belief that their data related to their personal and sensitive financial information would remain confidential.").

In addition, "[c]ourts have held that plaintiffs have a reasonable expectation of privacy where data is collected without their consent." *Walsh*, 2025 WL 2939229, at *14 (quoting *In re Google Location Hist. Litig.*, 514 F. Supp. 3d 1147, 1156 (N.D. Cal. 2021)); *see also Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 37 (1994) ("[T]he presence or absence of opportunities to consent voluntarily to activities impacting privacy interests obviously affects the expectations of the participant."). Here, Defendant's "website does not include a cookie consent banner, pop-up, or any other means of providing information and obtaining consent from users pertaining to the website's use of tracking cookies, including the Pixel." Compl. ¶ 48. And Defendant did not "require[] an opt-in or opt-out for the Pixel's data collection by Plaintiffs or other users before it began tracking and intercepting user data." *Id.* ¶ 90.

Defendant's second argument is also wrong. "[D]etermining offensiveness requires consideration of all the circumstances of the intrusion, including its degree and the intruder's motives and objectives." *Shulman*, 18 Cal. 4th at 236 (internal quotation omitted). "Under California law, courts must be reluctant to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is." *Gabrielli v. Haleon US Inc.*, 2025 WL 2494368, at *8 (N.D. Cal. Aug. 29, 2025) (quoting *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 797 (N.D. Cal. 2019) ["*Facebook*"]). Only if the allegations "show no reasonable expectation of privacy or an insubstantial impact on privacy interests" can the "question of [a serious or highly offensive] invasion . . . be adjudicated as a matter of law." *See Hill*, 7 Cal. 4th at 40. Allegations plausibly "showing [defendant's] cavalier disregard for ordinary citizens' rights of privacy" satisfy the "highly offensive" element. *See Shulman*, 18 Cal. 4th at 236 (internal quotation omitted). Moreover, "conduct is more likely to be 'highly offensive' where the defendant 'surreptitious[ly]' collects sensitive information," *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022) (quotation omitted; alteration in original); *see also Gabrielli*, 2025 WL 2494368, at *8-9 (finding "highly offensive" invasion plausible where, "even after [Plaintiff] rejected all cookies, [defendant] continued to . .

. . permit[] the Third Parties to track and collect Plaintiff's private communications as Plaintiff browsed the websites." (record citation omitted; citation modified)).

Here, Plaintiffs allege Defendant surreptitiously collects highly-personal, sensitive, and protected information, then shares it with Meta without giving users fair notice or an opportunity to opt out. Ultimately, whether Defendant's "tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage," but "Plaintiffs have identified sufficient facts to survive a motion to dismiss." *See Facebook Tracking Litig.*, 956 F.3d at 606.

**D. Plaintiffs Plausibly Allege Defendant was Negligent**

Seeking dismissal of their Negligence claim, Defendant argues Plaintiffs "do not sufficiently allege any element" and even if they did, they "may not recover in tort for purely economic loss." Mot. at 16. "For negligence, a plaintiff must plausibly allege: (1) the defendant had a duty, or an 'obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks,' (2) the defendant breached that duty, (3) that breach proximately caused the plaintiff's injuries, and (4) damages." *In re San Francisco 49ers Data Breach Litig.*, 2024 WL 3849336, at *2 (N.D. Cal. Aug. 15, 2024) (quoting *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009)). Here, Plaintiffs allege sufficient facts to satisfy all elements, and their claims are not barred by the economic loss rule.

**i. Plaintiffs Adequately Allege Defendant Owed a Duty of Care**

Defendant first challenges the existence of a duty of care. Mot. at 17-19. "As for the [duty] element, '[a] duty of care may arise through statute or by contract,'" and "may also be based on 'the general character of the activity in which the defendant engaged.'" *Dent v. Nat'l Football League*, 902 F.3d 1109, 1118 (9th Cir. 2018) (quoting *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 803 (1979)). Here, as discussed above, CIPA itself establishes Defendant's duty not to aid another in reading, attempting to read, using, or attempting to use the contents or meaning of any communication in transit. *See* Cal. Penal Code § 631(a); *Doe v. Kaiser Found. Health Plan, Inc.*, 2024 WL 1589982, at *22-23 (N.D. Cal. Apr. 11, 2024) (denying motion to dismiss negligence claim based on violation of "state wiretapping laws"). Separately, California's Welfare and Institutions Code establishes Defendant's duty not to reveal the identity of those receiving public social services. *See* Cal. Welf. & Inst. Code § 10850; *cf. R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 897 (C.D. Cal. 2024) ["*Walgreen*"] ("a duty may arise from HIPAA and serve as the basis for a negligence claim under

California law"). Defendant further assumes and acknowledges this duty when it promises it "safeguard[s] the privacy and confidentiality of its clients," and "will not take unfair advantage," Compl. ¶ 49 (alteration in original), "will not sell or rent [users'] information to anyone," *id.* ¶ 53, and that any "sensitive information" shared via the website "is protected both online and offline," *id.* ¶ 51, and "in no way linked to any personally identifiable information on our site," *id.* ¶ 50.

The character of the activity in which Defendant is engaged—operating a website that collects highly sensitive and personally identifying location, financial and medical information to those experiencing food insecurity—also gives rise to a duty to safeguard the sensitive, highly-personal, and constitutionally-protected information it collects. *See Facebook*, 402 F. Supp. 3d at 799 ("Facebook had a responsibility to handle its users' sensitive information with care." (citing *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1038-39 (N.D. Cal. 2019) (finding plaintiff "plausibly plead[ed] duty of care" because "the information . . . was private," "plaintiff plausibly placed trust in Facebook to employ appropriate data security" and "[t]he lack of reasonable care in the handling of personal information can foreseeably harm the individuals providing the information"))); *cf. In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1017 (N.D. Cal. 2024) ["*Tax Filing Cases I*"] (Meta had a duty of care in part because the fact "[t]hat Meta not only instructs website developers not to share sensitive data, . . . but also has systems in place to monitor and filter out potentially sensitive information, . . . suggests that it is foreseeable . . . that those developers will use the tools to transmit sensitive information.").

**ii. Plaintiffs Adequately Alleged They Suffered Damages as a Result of Defendant's Breach**

Defendant argues "Plaintiffs have not alleged . . . any specific injury necessary to support a negligence claim." Mot. at 19. That is wrong. Plaintiffs allege that, as a result of Defendant's negligence, they "sustained foreseeable harm and damages in a sum to be determined at trial." Compl. ¶ 192. They back this up with allegations regarding the economic value of the information Defendant allowed Meta to steal from them. *See id.* ¶¶ 102-108. In particular, Plaintiffs allege that in the EU, where data access is more restricted, "Meta considered charging up to €192 per year for an ad-free version of Facebook and Instagram—effectively assigning a price to the cost of leveraging user data." *Id.* ¶ 105 (citation omitted). Plaintiffs further allege that "the cost of personal data for those with very low incomes . . . may be uniquely valuable, and may be uniquely

exploitable at users' detriment," *id.* ¶ 106. For example, "data-driven systems, like those fed by the data intercepted by Meta from [Defendant's] website[], might contribute to a widening of the income equality gap in the U.S. by providing a ready avenue to prey on the vulnerabilities of low-income people, or to exclude them from opportunities due to biases entrenched in algorithmic decision-making tools." *Id.* ¶ 108. The Court should find, at this juncture, that Plaintiffs have adequately pleaded damages to state a negligence claim against Defendant. *See Facebook*, 402 F. Supp. 3d at 799 (denying motion to dismiss negligence claim because "the plaintiffs have alleged present and non-speculative privacy injuries" and "that Facebook breached a duty to them"); *cf. Brown v. Google LLC*, 2021 WL 6064009, at *15-17 (N.D. Cal. Dec. 22, 2021) (finding that, by obtaining and selling plaintiffs' data to advertisers, defendants had "diminished" plaintiffs' "future property interest").

**iii. The Economic Loss Rule Does Not Bar Plaintiffs' Negligence Claim**

Plaintiffs' Negligence claim is not barred by the economic loss doctrine, as Defendant argues. Mot. at 17. "'Economic' loss in this context means an injury to 'a plaintiff's interest in *prospective* economic advantage.'" *Tax Filing Cases I*, 724 F. Supp. 3d at 1020 (quoting *J'Aire Corp.*, 24 Cal. 3d at 803 (emphasis added)). But Plaintiffs' "allegations are retrospective rather than prospective" because "[t]hey focus on 'loss of privacy,' . . . that has already occurred." *See id.* Further, Plaintiffs "have a proprietary interest in their personal data, so harms to that interest may extend beyond disappointed future expectations." *See id.* Defendant thus "fails to show that [P]laintiffs' alleged injuries are solely economic." *See id.*; *see also Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 913 (S.D. Cal. 2020) (economic loss doctrine did not bar negligence claims where plaintiffs "allege they suffered a privacy injury by having their sensitive medical information disclosed," and "noticed an increase in spam/phishing e-mails and/or calls . . . which is harm that is also not necessarily economic in nature" (record quotations and internal quotation marks omitted)).

**CONCLUSION**

The Court should deny Defendant's motion, but if the Court is inclined to grant the motion in any respect, Plaintiffs request dismissal be without prejudice and with leave to amend.

Dated: January 7, 2026

Respectfully Submitted,

/s/ Melanie R. Monroe
**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD

*jfitzgerald@fmfpc.com*
MELANIE R. MONROE
*mmonroe@fmfpc.com*
TREVOR FLYNN
*tflynn@fmfpc.com*
ALLISON FERRARO
*aferraro@fmfpc.com*
DANIEL E. SACHS
*dsachs@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741

***Counsel for Plaintiffs***