SEYFARTH SHAW LLP
Aaron Belzer (SBN 238901)
abelzer@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone: (310) 277-7200
Facsimile: (310) 201-5219

SEYFARTH SHAW LLP
Kristine R. Argentine (*pro hac vice* admitted)
kargentine@seyfarth.com
Paul Yovanic, Jr. (*pro hac vice* admitted)
pyovanic@seyfarth.com
233 S. Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

Attorneys for Defendant
LOS ANGELES REGIONAL FOOD BANK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATASSIA TIMOTHEE, TOMMY DIEP, ESPERANZA REYES, MARIAELENA BURCIAGA and STACY PENNING, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

META PLATFORMS, INC., SACRAMENTO FOOD BANK AND FAMILY SERVICES, LOS ANGELES REGIONAL FOOD BANK, CENTRAL CALIFORNIA FOOD BANK and SAN FRANCISCO FOOD BANK d/b/a SAN FRANCISCO-MARIN FOOD BANK,

Defendants.

Case No. 3:25-CV-05106-LB

**DEFENDANT LOS ANGELES REGIONAL FOOD BANK'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6) AND MOTION TO STRIKE PURSUANT TO FED. R. CIV. P. 12(F)**

Date: March 26, 2026
Time: 9:30 a.m.
Courtroom: B-15th Floor
Judge: Hon. Laurel Beeler

Date Action Filed: June 17, 2025

# TABLE OF CONTENTS


Page

I. PLAINTIFFS' ALLEGATIONS REGARDING THE LAFB WEBSITE AND DIEP, SPECIFICALLY, ARE SCARCE AND CONCLUSORY. ........ 1

II. PLAINTIFFS MAY NOT RELY ON BROAD, CONCLUSORY ALLEGATIONS OR THOSE DIRECTED AGAINST OTHER DEFENDANTS TO CHALLENGE DISMISSAL OF THEIR CLAIMS AGAINST LAFB. ........ 2

III. THE FACT THAT DIEP ENGAGED WITH LAFB'S WEBSITE DOES NOT CONSTITUTE "SENSITIVE FINANCIAL INFORMATION" AND DIEP HAS SUFFERED NO HARM TO HIS PRIVACY INTERESTS. ........ 4

IV. DIEP WAS ADVISED THAT THE LAFB WEBSITE USED TRACKING COOKIES AND HIS CONTINUED USE OF THE WEBSITE CONSTITUTES CONSENT ABSENT AN ALLEGATION THAT HE REJECTED COOKIES. ........ 6

V. PLAINTIFFS FAILED TO PLEAD A VIOLATION OF SECTION 631(A) BY LAFB. ........ 7

A. Plaintiffs Have Failed to Sufficiently Plead that Meta Learned the "Contents" of Diep's Communications. ........ 7

B. Plaintiffs Have not Plausibly Alleged that Meta Read or Attempted to Read Diep's Communications with the LAFB Website. ........ 9

VI. PLAINTIFFS HAVE FAILED TO PLEAD A VIOLATION OF SECTION 638.51 BY LAFB. ........ 10

VII. BECAUSE DIEP'S VISIT TO A PUBLIC WEBSITE IS NOT PRIVATE INFORMATION, HIS COMMON LAW AND CONSTITUTIONAL PRIVACY CLAIMS MUST FAIL. ........ 11

VIII. PLAINTIFFS ALSO FAIL TO ALLEGE THE EXISTENCE OF A DUTY NOT TO DISCLOSE DIEP'S BROWSING DATA TO META. ........ 12

IX. LAFB IS NOT ASKING THE COURT TO DECIDE WHETHER CLASS CERTIFICATION IS APPROPRIATE AT THE DISMISSAL STAGE. ........ 13

X. CONCLUSION. ........ 15

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Ahringer v. LoanDepot, Inc.*,
715 F. Supp. 3d 1274 (C.D. Cal. 2024) ....................14

*Application of U.S.*,
407 F. Supp. 398 (W.D. Mo. 1976) ....................8

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
2016 WL 3543699 (S.D. Cal. June 29, 2016)....................13

*Bonty v. Kumar*,
2017 WL 4340343 (N.D. Cal. Sept. 29, 2017) ....................4

*Byars v. Sterling Jewelers, Inc.*,
2023 WL 2996686 (C.D. Cal. April 5, 2023) ....................5

*Doe v. FullStory, Inc.*,
712 F. Supp. 3d 1244 (N.D. Cal. 2024) ....................13

*Doe v. Kaiser Foundation Health Plan, Inc.*,
2024 WL 1589982 (N.D. Cal. April 11, 2024)....................14

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ....................13

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ....................7, 12

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024)....................11

*I.C. v. Zynga, Inc.*,
600 F. Supp. 3d 1034 (N.D. Cal. 2022) ....................5

*In re iPhone App. Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....................12

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) ....................14

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023) ....................14

*Khamooshi v. Politico LLC*,
786 F. Supp. 3d 1174 (N.D. Cal. 2025) ....................5

*L.B. v. LinkedIn Corp.*,
2025 WL 2899514 (N.D. Cal. Oct. 10, 2025)....7, 9

*Lemus v. Rite Aid Corp.*,
613 F. Supp. 3d 1269 (C.D. Cal. 2022) ....13

*Love v. Ladder Fin., Inc.*,
2024 WL 2104497 (N.D. Cal. May 8, 2024) ....9

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012) ....12

*Matera v. Google*,
2016 WL 5339806 (N.D. Cal. Sep. 23, 2016) ....6

*Oman v. Delta Air Lines, Inc.*,
889 F.3d 1075 (9th Cir. 2018) ....13

*Oracle USA, Inc. v. XL Glob. Servs., Inc.*,
2009 WL 2084154 (N.D. Cal. July 13, 2009)....12

*Panzer v. United States Dep't of Hous. & Urb. Dev.*,
2015 WL 1886362 (N.D. Cal. Apr. 24, 2015) ....4

*In re Path Network, Inc.*,
703 F. Supp. 3d 1046 (N.D. Cal. 2023) ....8

*Popa v. Microsoft Corp.*,
2025 WL 2448824 (9th Cir. 2025) ....5

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. 2019) ....5

*Romero v. Securus Techs., Inc.*,
216 F. Supp. 3d 1078 (S.D. Cal. 2016)....5

*Sanders v. Apple, Inc.*,
672 F. Supp. 2d 978 (N.D. Cal. 2009) ....15

*Sandoval v. Ali*,
34 F. Supp. 3d 1031 (N.D. Cal. 2014) ....15

*Schmitt v. SN Servicing Corp.*,
2021 WL 3493754 (N.D. Cal. Aug. 9, 2021) ....13

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) ....5

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) ....................2

*Valentine v. NebuAd, Inc.*,
804 F. Supp. 2d 1022 (N.D. Cal. 2011) ....................13

*Walsh v. Dollar Tree Stores, Inc.*,
2025 WL 2939229 (N.D. Cal. Oct. 16, 2025)....................7

*Wright v. TrueCare Property Holdings, LLC*,
2025 WL 3248749 (S.D. Cal. Nov. 21, 2025) ....................7

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) ....................12

*In re Zynga Privacy Litigation*,
750 F.3d 1098 (9th Cir. 2014) ....................7, 8

**California Cases**

*Aviles v. Liveramp, Inc.*,
2025 WL 487196 (Cal. Super. Jan. 28, 2025) ....................11

*Hill v. Nat'l Collegiate Athletic Assn.*,
7 Cal. 4th 1 (1994) ....................12

*Rodriguez v. Ink America Intern. Group LLC*,
2025 WL 4034985 (Cal. Super. Dec. 10, 2025) ....................10, 11

*Shulman v. Group W Productions, Inc.*,
18 Cal. 4th 200 (1998) ....................12

*Sullivan v. Oracle Corp.*,
51 Cal. 4th 1191, 254 P.3d 237 (2011)....................13

**California Statutes**

Cal. Civ. Code
§ 1798.100, *et seq.* ....................10
§ 1798.140(v)(1)(A)&(F)....................10

Cal. Pen. Code
§ 630....................14
§ 631(a) ....................7
§ 638.51....................10, 11

Cal. Welf. & Inst. Code
§ 10051....................6

**Other Authorities**

Fed. R. Civ. P. 12(f) .......... 13

## I. PLAINTIFFS' ALLEGATIONS REGARDING THE LAFB WEBSITE AND DIEP, SPECIFICALLY, ARE SCARCE AND CONCLUSORY.

Plaintiffs' Class Action Complaint ("Complaint" or "Compl.") names four unaffiliated [1] California-based food banks (collectively the "Food Banks") and Meta Platforms, Inc. ("Meta"), and alleges that, as of the date of filing, each of the Food Banks' respective websites incorporated the Meta Tracking Pixel ("Pixel"). (Dkt. 1, ¶¶ 2, 6, 85.) The Complaint includes general allegations regarding how the Pixel *can* be configured and information that it is *capable* of collecting, but Plaintiffs make no attempt to describe how the Pixel was configured on the LAFB website, specifically, or what information the Pixel actually collected regarding Plaintiff Tommy Diep ("Diep"). All that Plaintiffs allege with respect to LAFB, in particular, is that the Pixel on its website tracks "when users browse the food bank locator interactive map or visit a food distribution location's listing" and that it transmits "sensitive information, when filling out a form to determine [] eligibility for CalFresh on the LAFB website, or when making appointments to determine program eligibility." (*Id.* ¶ 85.) Yet Plaintiffs make no specific showing through developer tools (publicly available on any browser) or otherwise that the Pixel was even there, let alone how it was configured or what specific data it actually captured with respect to Diep.

Diep is the only Plaintiff alleged to have visited LAFB's website and so it is only Diep's allegations regarding his interactions with the LAFB website that will determine whether Diep, and only Diep, has stated a claim against LAFB. Plaintiffs' allegations regarding Diep are limited only to that he "visited the [LAFB] website on many occasions and used the website to access the 'Find Food' map, which included entering his home address" (*id.* ¶ 25) and that he "made calls to the [LAFB] through its website and entered his personal information into the website in order to receive emails." (*Id.*) He does not allege that he filled out any form to determine eligibility for CalFresh, nor that he scheduled an appointment to determine CalFresh eligibility through the website. He does not allege when he visited the LAFB website, when the Pixel was first implemented on LAFB's website or that he visited the website at the same time the Pixel was used thereon. As it stands, Plaintiffs' allegations—even if one were to assume that Diep used the website while the Pixel was present—amount to nothing more than Diep alleging that he visited the LAFB

[1] The four foodbank defendants have nothing in common, other than the fact that they operate in a similar industry and all allegedly used the Pixel on their respective websites. No individual Plaintiff is alleged to have visited the website of more than one of the Food Bank Defendants.

"Find Food" webpage and typed in his address; called LAFB through the website; and signed up for emails from LAFB. But without any specific allegations about where the Pixel was placed or how it was configured, there is no plausible allegation that the Pixel captured any particular information about Diep's visit. This is not sufficient to state a claim because it is the specific information captured that will determine whether Plaintiffs have stated a claim. The use of the Pixel, alone, violates no law, so Plaintiffs must do more than allege that the Pixel was used: they must allege actual facts that, if taken as true, would meet the elements of each of the causes of action they have asserted.

## II. PLAINTIFFS MAY NOT RELY ON BROAD, CONCLUSORY ALLEGATIONS OR THOSE DIRECTED AGAINST OTHER DEFENDANTS TO CHALLENGE DISMISSAL OF THEIR CLAIMS AGAINST LAFB.

To suggest that they have stated a plausible claim, Plaintiffs cite to certain purported factual allegations in their Complaint. But these allegations—including that the Pixel "contemporaneously intercept[s] and transmit[s] users' communications on the website" (Response, Dkt. 59 ("Resp"), p. 3); that the Pixel "re-directs the contents of the user's communications to Meta while the communication between the user and website provider is still occurring" (*id.*); and that *all Defendants* (presumably including LAFB) "gave substantial assistance to Meta in violating Plaintiff['s] and other Class Members' privacy rights" (*id.*, p. 9)—merely intone the elements of Plaintiffs' claims. Plaintiffs simply conclude that "content" was intercepted or that interception occurred "in transit," but they allege no facts on which the Court could evaluate whether any actionable conduct actually occurred. Such conclusions are not entitled to a presumption of truth. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), o*pinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).

Plaintiffs further rely on allegations directed against other Defendants (or against the "Foodbank Defendants" generally) to suggest that they have pled specific facts to support their claims against LAFB when they have not. For instance, Plaintiffs cite their allegations at Paragraph 6 of the Complaint as proof that they sufficiently alleged the Meta pixel was in use on the LAFB website at the time Diep visited. (Resp., p. 10.) However, Paragraph 6 of the Complaint alleges only that "[a]ll Food Bank Defendants have incorporated the Pixel onto their websites" and that "inclusion of the undisclosed Pixel on their websites caused Plaintiffs' and other Class Members' confidential communications, PII, and sensitive financial

information to be intercepted by and sent to Meta." (Dkt. 1, ¶ 6.) This does not constitute a factual allegation related to when Diep visited the LAFB website relative to when the Pixel was installed on that website. Rather, it constitutes a conclusory statement that purports to pertain to all of the Food Bank Defendants, despite the fact that these are different websites, run by different companies, making independent decisions about the code on their websites.[2]

Further, Plaintiffs claim that "Mr. Diep has alleged what data Meta intercepted," but in support cite only Paragraphs 5, 25, and 72 of their Complaint. (Resp., p. 10.) Paragraph 5 alleges only certain examples of things that the Pixel *can* track; not what the Pixel allegedly tracked on the LAFB website. (Dkt. 1, ¶ 5: "**For example**, the Pixel **can** track and log each page a user visits, what buttons they click, and the specific information they input into the website." (emphasis added).) Paragraph 25 says nothing of what information the Pixel allegedly intercepted, but says only what actions Mr. Diep allegedly took on the LAFB website. (*Id*., ¶ 25.) And Paragraph 72 is another general allegation against *Meta* and says nothing about LAFB. (*Id*., ¶ 72, alleging generally that the Meta Pixel works by "intercept[ing] each page a user visits, what buttons they click, as well as specific information they input into the website, and what they searched."). None of these constitute specific factual allegations regarding *LAFB's website* or its liability under the claims. Later in their Response brief, Plaintiffs claim again that they specifically allege the Pixel was implemented on LAFB's website in a way that would capture information Diep typed into the website but in support of this claim they cite only to Paragraphs 4 and 5 of their Complaint (Resp., p. 12), which again are just general allegations regarding how the Meta Pixel *can* work, rather than any factual allegations specific to Diep or the LAFB website. (Dkt. 1, ¶ 4: "Through the Pixel, Meta collects information **such as** visited websites and user interactions with content."; ¶ 5: "**For example**, the Pixel ***can*** track and log each page a user visits, what buttons they click, and the specific information they input into the website." (emphasis added).) And Plaintiffs further cite to the Paragraph 166 of the Complaint to suggest that they alleged specifically what information the Meta Pixel intercepted on the LAFB website, but that is simply not true. (Dkt. 1, ¶ 166.)

[2] On several occasions in their Response, Plaintiffs deceptively alter the quotes from the Complaint to make it appear as though they are referencing a specific allegation against LAFB when in fact they are referencing a general allegations against all Food Bank Defendants. (*Compare* Resp. p. 4, with Dkt. 1, ¶ 30.)

Despite that they sued several unaffiliated Defendants in one lawsuit, Plaintiffs' claims against LAFB must stand or fall on their specific factual allegations as to LAFB. *See Bonty v. Kumar*, 2017 WL 4340343, at *3 (N.D. Cal. Sept. 29, 2017) ("Plaintiff should not refer to the defendants as a group (e.g., 'the defendants'); rather, he should identify each involved defendant by name and link each of them to his claims by explaining what each involved defendant did or failed to do that caused a violation of his rights."); *Panzer v. United States Dep't of Hous. & Urb. Dev.*, 2015 WL 1886362, at *5 (N.D. Cal. Apr. 24, 2015) ("[the plaintiff] must also identify each defendant he proposes to hold liable for each claim, and allege facts showing what each of those persons did or failed to do related to that claim."). And they may not rely on general and conclusory allegations regarding what the Pixel is ***capable of*** or ways in which it ***can*** be used. It is not reasonable for Plaintiffs to ask the Court to infer that the Pixel was used a certain way on the LAFB website merely because it was capable of being used in that way. Plaintiffs' specific allegations about LAFB fall woefully short of the pleading standard and the claims against LAFB should be dismissed.[3]

**III. THE FACT THAT DIEP ENGAGED WITH LAFB'S WEBSITE DOES NOT CONSTITUTE "SENSITIVE FINANCIAL INFORMATION" AND DIEP HAS SUFFERED NO HARM TO HIS PRIVACY INTERESTS.**

In support of Plaintiffs' various privacy-based claims against LAFB, Plaintiffs return again and again to their refrain that LAFB revealed sensitive financial information about Diep to Meta (Resp., pp. 10, 13) but they have failed to address—or even acknowledge—the insurmountable problem with this theory on which their entire claim is staked: the mere fact that Diep visited a publicly-available website of a food bank; that he called a food bank; or that he signed up to receive a newsletter from a food bank, does not indicate to Meta that Diep experiences food insecurity. There are many reasons one might engage with their local food bank website, only one of which is to seek services. Donors and volunteers may visit the website, call the food bank, or sign up for an email newsletter, or one may visit the website to locate information for a friend, family member, or neighbor in need of services or simply to research services available in the area. The mere fact that Diep visited the "find food" page on the website says nothing of

[3] It is significant that Plaintiffs had an opportunity to amend their pleadings after having received each of Defendants' motions to dismiss in order to address some or all of these pleadings deficiencies. Plaintiffs choose to stand on their original pleading.

his own personal circumstances, needs, or finances. The Ninth Circuit, again, has firmly rejected similar arguments that searching publicly available information about healthcare conditions on a healthcare provider's website somehow indicates something personal about the health of the user. *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) ("These pages contain general health information that is accessible to the public at large. The same pages are available to every computer, tablet, smartphone, or automated crawler that sends GET requests to these URLs."). Plaintiffs have failed to address or distinguish this precedent.

When the false claims regarding "sensitive financial information" are stripped away, Diep cannot claim to have an expectation of privacy in his basic browsing data, or even in his basic contact information (even assuming such information was captured by the Pixel at all). *See Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, *3 (N.D. Cal. 2019) (collecting cases standing for the proposition that there is a "presumption that Internet communications do not reasonably give rise to" an expectation of confidentiality); *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1049 (N.D. Cal. 2022) ("basic contact information, including one's email address, phone number, or Facebook or Zynga username" is not private information). Therefore, even if Plaintiffs' speculative allegations are taken as true, Diep has not suffered any privacy injury for purposes of stating a claim or for establishing Article III standing.

Although a CIPA violation *can* constitute a concrete harm sufficient to confer standing under Article III under circumstances implicating an actual harm to one's privacy interest, a CIPA violation does not automatically confer standing where there is a claimed technical violation of the statute without any actual privacy harm. *See Popa v. Microsoft Corp.*, 2025 WL 2448824, *4 (9th Cir. 2025) (dismissing claim for lack of standing); *Khamooshi v. Politico LLC*, 786 F. Supp. 3d 1174, 1179 (N.D. Cal. 2025) (same); *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d at 1049 (same); *Byars v. Sterling Jewelers, Inc.*, 2023 WL 2996686, at *1 (C.D. Cal. April 5, 2023) (same). Plaintiffs here suggest that a CIPA violation always constitutes a concrete harm (Resp., p. 6), but the cases on which they rely are not so categorical. *See Romero v. Securus Techs., Inc.*, 216 F. Supp. 3d 1078, 1089 (S.D. Cal. 2016) ("The alleged harm to all Plaintiffs—an invasion of their privacy rights—coupled with the additional harm to Plaintiffs Romero and Tiscareno of forfeiting the protections of the attorney-client privilege, constitute a concrete and

particularized injury that is actual and imminent."); *Matera v. Google*, 2016 WL 5339806, *11 (N.D. Cal. Sep. 23, 2016) ("Here, Plaintiff asserts that Google intercepted, scanned, and analyzed Plaintiff's [email] communications . . . [S]uch unauthorized interception of communications may give rise to a legally cognizable injury."). But if an alleged CIPA violation bears no resemblance to any traditional privacy harm, then any alleged technical violation of the CIPA does not constitute a concrete harm.

Plaintiffs attempt to avoid this conclusion by citing to the California Welfare and Institutions Code to suggest the existence of some privacy harm (Resp., p. 6), but that reference is equally misplaced, firstly because LAFB, as a private not-for-profit, does not provide "public social services" as that term is defined in the Code and is not subject to its regulation. The provision on which Plaintiffs rely prohibits the publication or disclosure of "a list of persons receiving public social services," which is defined as "activities and functions <u>of state and local government</u> administered or supervised by the department or the State Department of Health Services and involved in providing aid or services or both, including health care services and medical assistance, to those people of the state who, because of their economic circumstances or social condition, are in need thereof and may benefit thereby." Cal. Welf. & Inst. Code, § 10051 (emphasis added). The cited provision applies only to providers of *public* aid and has no application to LAFB as a private not-for-profit entity. Secondly, for all the reasons already set forth, the alleged disclosure of the fact that Diep visited the LAFB website is not tantamount to publishing the fact that Diep received services of any kind from LAFB, let alone to publishing a "list of persons receiving public social services." The *Sanchez* and *Shleffar* cases on which Plaintiffs rely (Resp., p. 6) involved the specific identification of individuals either applying for or receiving public welfare benefits and are inapposite.

## IV. DIEP WAS ADVISED THAT THE LAFB WEBSITE USED TRACKING COOKIES AND HIS CONTINUED USE OF THE WEBSITE CONSTITUTES CONSENT ABSENT AN ALLEGATION THAT HE REJECTED COOKIES.

Plaintiffs specifically allege that there was a cookie banner on the LAFB website that informed users of the fact it used tracking cookies on its website, and while Diep alleges that it presented him the opportunity to decline cookies, he does not claim to have done so. (Dkt. 1, ¶ 43.) The use of such pop-up banners is sufficient to advise users that the website uses tracking cookies and, unless the user declines

them (which Diep does not allege he did), continued use of the website in the face of this knowledge constitutes assent thereto. *See L.B. v. LinkedIn Corp.*, 2025 WL 2899514, at *9 (N.D. Cal. Oct. 10, 2025) ("Cookie banners such as this can still create constructive notice if the terms are reasonably conspicuous."). LAFB's cookie banner, alone or in concert with Meta's data and cookies policies, reasonably informed Diep of Meta's practices of collecting browsing data from parties like LAFB.

And to the extent Plaintiffs suggest that the LAFB website privacy policy somehow deceived or confused users regarding the use of tracking cookies, Plaintiffs do not allege that Diep saw, let alone read, that privacy policy. (*See* Dkt. 1, ¶ 44.) Diep's consent to the use of the Pixel deprives him of standing and further defeats every one of his claims.

## V. PLAINTIFFS FAILED TO PLEAD A VIOLATION OF SECTION 631(a) BY LAFB.

### A. *Plaintiffs Have Failed to Sufficiently Plead that Meta Learned the "Contents" of Diep's Communications.*

Plaintiffs may not defeat a motion to dismiss by asking the Court to draw unwarranted inferences from their vague and conclusory allegations, such as assuming the existence and configuration of the Pixel on the LAFB website based on only general allegations about what the Pixel is capable of.

A CIPA Section 631(a) claim requires Plaintiff to allege facts that plausibly suggest Meta intercepted the "content" of a communication between Diep and LAFB. Under Ninth Circuit precedent, a basic webpage URL (reflecting only that the user visited the webpage) is not "content," but a URL could be content if it reflects that the user requested "specific information" or if the URL contains terms typed into the webpage by the user. *See In re Zynga Privacy Litigatio*n, 750 F.3d 1098, 1106-1109 (9th Cir. 2014); *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1092-93 (N.D. Cal. 2022). Therefore, at the very least, Plaintiffs would have to specifically allege that the Pixel was implemented on the LAFB website in some way that caused the transfer of *more than just the basic URL* to plausibly plead a violation of the CIPA. *See, e.g., Walsh v. Dollar Tree Stores, Inc.*, 2025 WL 2939229, at *16 (N.D. Cal. Oct. 16, 2025) ("the Court also finds that Plaintiffs' allegations as to 'user input data'. . . are insufficient because Plaintiffs only allege that such data are among the types of data tracked by cookies."); *Wright v. TrueCare Property Holdings, LLC*, 2025 WL 3248749, *2 (S.D. Cal. Nov. 21, 2025) ("Conclusory or hypothetical explanations of how the Meta Pixel could track sensitive information on a healthcare website, without

factual allegations plausibly showing that Plaintiff's own actionable PHI was tracked, are insufficient to survive a motion to dismiss where PHI is required.”). Even if Diep entered his address and other information on the website, Plaintiffs *do not allege* that the Pixel was implemented in a way that would have captured whatever he typed in. Both are required to plausibly state a claim.

Plaintiffs suggest in passing that a “pageview is contents when it conveys far more than basic identification and address information” (Resp., p. 12) but, again, Plaintiffs have failed to allege whether “pageview” information was collected at all, let alone what was “conveyed” and how it was more than “basic identification and address information.” Plaintiffs also suggest in a footnote that they could amend their Complaint to assert that the URL for the find food map (www.lafoodbank.org/find-food/pantry-locator), alone, constitutes content. (Resp., p. 11, n. 5.) But that, too, would fail to allege that the Pixel was implemented in a way that could have caused the transfer of this specific URL. Plaintiffs expend much effort establishing what data might be considered content (*id.*, pp. 10-12), but fail to allege in any plausible way that the data was actually transferred. Instead, Plaintiffs fall back on their tired refrain that, by visiting the LAFB website, Diep generally communicated his intent to seek nutritional assistance. (*Id.*, pp. 12-13.) But as discussed above, this fails to satisfy the pleading standard and is contrary to the law.

Finally, Plaintiffs put forth a novel argument that, so long as information “relat[es] to a person’s intended message to another,” it constitutes content for purposes of the CIPA. (Resp., pp. 12-13.) But this is at odds with settled law establishing that, under the CIPA, the “content” of a communication means “a person’s intended message to another” and not merely anything *related* to an intended message. *In re Zynga*, 750 F.3d at 1106. Plaintiffs rely on the case *In re Path Network, Inc.*, 703 F. Supp. 3d 1046 (N.D. Cal. 2023) for this novel theory, but that case concerned the Stored Communications Act—not the Wiretap Act or the CIPA—and the court even expressly acknowledged that its interpretation of the word “content” in the context of the Stored Communications Act *would not apply* to the Wiretap Act. *Id.* at 1071. *Application of U. S.* is similarly inapposite because it involved an application by the United States Government for an order authorizing the use of pen registers and did not discuss “content” at all. 407 F. Supp. 398, 407-408 (W.D. Mo. 1976).

**B. *Plaintiffs Have not Plausibly Alleged that Meta Read or Attempted to Read Diep's Communications with the LAFB Website.***

To support the CIPA element of "read or attempted to read," Plaintiffs rely solely on their allegations that Diep was served targeted advertisements following his use of the LAFB website to insist that the Court infer that Meta *must have* "read" the supposed contents of his "communications" with that website. (Resp., p. 13.)[4] But Plaintiffs' alleged receipt of "targeted advertisements" from some unspecified party does not suggest a "coherent story" that could give rise to the inference Plaintiffs ask the court to make. *See L.B. v. LinkedIn Corp.*, 2025 WL 2899514 at *16; *Love v. Ladder Fin., Inc.*, 2024 WL 2104497, at *2 (N.D. Cal. May 8, 2024). Plaintiffs fail to allege that Diep was served with any targeted advertisements *from Meta* following his visits to the LAFB website *relating to content he allegedly viewed on that website*. Plaintiffs misquote *LinkedIn* to suggest that the court there created a rule that "recei[pt of] <u>any</u> targeted advertising after interacting with the challenged website would strengthen the inference that [defendant] learned about Plaintiffs from reading their communication." (Response, pp. 13-14, *emphasis added*.) But in altering this quote, Plaintiffs have altered its meaning. In actuality, the *LinkedIn* court held that the plaintiffs had failed to sufficiently allege the "read or attempt to read" element because, "[f]or example, Plaintiffs do not allege that they received any targeted advertising after interacting with the challenged websites, a fact that would strengthen the inference that LinkedIn learned about Plaintiffs from reading their communications." *L.B. v. LinkedIn Corp.*, 2025 WL 2899514, at *16. Similarly here, Plaintiffs might raise an inference that *Meta* learned of the contents of their information if they alleged that Diep received an advertisement from *Meta* containing information gleaned from Diep's browsing history on the LAFB website. But Plaintiffs allege no such fact (or any other facts that might plausibly suggest Meta read Diep's communication).

---

[4] Plaintiffs claim that they allege Meta served them with targeted ads after they visited the Food Bank Defendants' websites (Resp., pp. 4, 13), but really Plaintiffs allege that "Meta . . . associated the data with Plaintiffs' Meta accounts and other personal information to target them with advertisements" and that "after visiting the Food Bank Defendants' websites, Plaintiffs received several targeted advertisements related to their sensitive financial information or status." (Dkt. 1, ¶ 30.) Nowhere do they allege the advertisements came from Meta.

## VI. PLAINTIFFS HAVE FAILED TO PLEAD A VIOLATION OF SECTION 638.51 BY LAFB.

In response to LAFB's argument that it could not have violated CIPA Section 638.51 because it obtained Diep's consent to the use of tracking cookies, Plaintiffs have taken the position that LAFB is not a "provider of electronic or wire communication services" and so cannot avail itself of Section 638.51's consent defense. (Resp., p. 14.) But if the Pixel and other similar tracking technologies are, in fact, illegal pen registers and/or trap-and-trace devices and if it is, in fact, the case that only "provider[s] of electronic or wire communication services"—and not individual website operators—can avoid criminal liability by seeking consent to the use of these ubiquitous online tracking technologies, then Plaintiffs' position is that, in every instance, it is strictly illegal for website operators to use the Pixel and similar technologies to track traffic on their websites. But this position is untenable in light of the fact that the California Legislature has passed the California Consumer Privacy Act of 2018 (CCPA)—a comprehensive online data protection law that specifically regulates (but does not forbid) the collection of online user data using exactly the kinds of technologies at issue in the present case. Cal. Civ. Code § 1798.100, *et seq*.[5] There would be no need to regulate the collection of user data by these means if it were, in fact, illegal for website operators to use them at all. *See Rodriguez v. Ink America Intern. Group LLC*, 2025 WL 4034985, *4-5 (Cal. Super. Dec. 10, 2025) (holding that Section 638.51 does not apply to "website tracking tools," noting that "Plaintiff's expansive reading of CIPA, criminalizing web based analytical tools, would seemingly render CCPA void.").

Section 638.51 cannot be interpreted to apply to tracking pixels for the additional reason that they do not fit the definition of a pen register or a trap-and-trace device, which record outgoing or incoming numbers *dialed from or received by a third-party's device* (not the numbers of incoming calls received by one's own device—in that case, caller ID would be illegal). At least one California state trial court has observed:

> Historically, courts recognized that "[a] pen register is a mechanical device which records the numbers dialed from a telephone[.]" . . . While the statutory definition of a pen register

[5] The CCPA's definition of "personal information" expressly includes "online identifier[s], Internet Protocol address[es]" and "Internet or other electronic network activity information, including, but not limited to, browsing history, search history, and information regarding a consumer's interaction with an internet website application, or advertisement," among other kinds of information. Cal. Civ. Code § 1798.140(v)(1)(A)&(F).

> now includes electronic communications in mediums other than simply telephone communications, Plaintiff has not provided authority showing that the category of information collected by pen registers as defined by the statute has been expanded. The analog of the number dialed by a telephone here is the IP address and related information of a website accessed by a computer . . . . Plaintiff does not allege that the Beacon—or any other software installed on users' devices by the Website—collects the outgoing addressing information from visitors' devices or browsers. Plaintiff therefore has not alleged the use of a pen register.
>
> Nor has Plaintiff alleged the use of a trap and trace device. Plaintiff at most alleges that Defendant's Website collects the IP addresses and other information of visitors incoming to the website—the equivalent of if Defendant had used a trap and trace device on its own website, rather than on Plaintiff's device.

*Aviles v. Liveramp, Inc.*, 2025 WL 487196 (Cal. Super. Jan. 28, 2025); *see also Rodriguez*, 2025 WL 4034985 at *4-5 (granting demurrer to Section 638.51 claim on grounds that website analytics tools are not pen registers or trap and trace devices). Similarly here, Plaintiffs do not allege that LAFB installed any tracking technologies on *Diep's device* or *his browser*: Plaintiffs allege that LAFB installed a tracking pixel on its own website that recorded the equivalent of incoming calls (like a caller ID function). (Dkt. 1, ¶ 68.) Section 638.51 does not apply to this technology.

## VII. BECAUSE DIEP'S VISIT TO A PUBLIC WEBSITE IS NOT PRIVATE INFORMATION, HIS COMMON LAW AND CONSTITUTIONAL PRIVACY CLAIMS MUST FAIL.

The entirety of Plaintiffs' intrusion upon seclusion and constitutional right to privacy claims against LAFB are based on the mistaken premise that browsing a publicly-available website is somehow private information. For the reasons discussed in greater detail above, Diep's use of the LAFB website reveals nothing with respect to his need for food assistance or anything else about his financial condition. And absent the sharing of some class of private or sensitive information, one can have no reasonable expectation of privacy in one's internet browsing data or basic contact information. *See, e.g.*, *Hubbard v. Google LLC*, 2024 WL 3302066, *7 (N.D. Cal. July 1, 2024). And as discussed above, Plaintiffs' reliance on provisions of the Welfare and Institutions Code to suggest that Plaintiff had some expectation of privacy in this information is entirely misplaced, given that LAFB does not provide "public social services."

Plaintiffs further cannot claim that they had a reasonable expectation of privacy in their routine browsing data simply because LAFB allegedly represented in its online privacy policy that it would not "trade, share, rent, or sell any information, personal or otherwise, collected on [its] website or through any other means." (Dkt. 1, ¶ 44.) First, Diep never alleges that he saw, let alone read or relied on, LAFB's

website data policy. (*Id.*) But more importantly, even assuming that Diep had read and relied on the privacy policy, that fact does not make LAFB's sharing of routine metadata "highly offensive." The cases on which Plaintiffs rely involved serious privacy invasions, including the recording of an accident victim's ambulance ride to the hospital by a journalist in *Shulman v. Group W Productions, Inc.*, 18 Cal. 4th 200 (1998), or the "[d]irect observation of urination by a monitor" in *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 43 (1994). Contrarily, routine browsing data is not inherently private. *See, e.g., Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1086 (C.D. Cal. 2021); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1016 (N.D. Cal. 2012); *In re iPhone App. Litig.*, 844 F. Supp. 2d 1040, 1048-50 (N.D. Cal. 2012). Courts have dismissed claims under similar circumstances where the plaintiffs failed to plead a "highly offensive intrusion." *See Hammerling*, 615 F. Supp. 3d at 1090–91 (finding that while Google's representation in its Privacy Policy was ambiguous, its data collection was not blatantly deceitful and Plaintiffs did not allege that the data allegedly collected by Google was sufficiently specific or personal, and its collection sufficiently harmful, to be highly offensive).

## VIII. PLAINTIFFS ALSO FAIL TO ALLEGE THE EXISTENCE OF A DUTY NOT TO DISCLOSE DIEP'S BROWSING DATA TO META.

Plaintiffs also failed to adequately address their failure to plead a duty on LAFB's part not to disclose routine browsing data to Meta or their failure to plead damages supporting their negligence claim.

For reasons already discussed *supra*, Plaintiffs cannot rely on the Welfare and Institutions Code to establish such a duty because this Code does not apply to LAFB and Diep's alleged receipt of services from LAFB (which is not in fact pled) does not meet the definition of "public social services."

Plaintiff further cannot rely on LAFB's privacy policy to supply a duty of care for several reasons. First, Diep does not claim to have read the policy. (Dkt. 1, ¶ 44.) Second, Plaintiffs cannot claim that LAFB ever promised not to use tracking cookies when they admit that the LAFB website had a cookie banner disclosing the use of such tracking cookies. (Dkt. 1, ¶ 43.) And third, an alleged breach of duty that arises only from a claimed contractual obligation does not give rise to tort liability. *See Oracle USA, Inc. v. XL Glob. Servs., Inc.*, 2009 WL 2084154, at *4 (N.D. Cal. July 13, 2009) ("the fundamental rule in California is that no tort cause of action will lie where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement.").

Finally, Plaintiffs have failed entirely to address that fact that they have not pled any actual damages as a result of LAFB's alleged conduct. Because damages is a necessary element of a negligence claim, Plaintiffs negligence claim must be dismissed.

## IX. LAFB IS NOT ASKING THE COURT TO DECIDE WHETHER CLASS CERTIFICATION IS APPROPRIATE AT THE DISMISSAL STAGE.

Despite Plaintiffs' insistence otherwise, LAFB is not asking the court to make a decision regarding predominance and the presence of individualized issues at the present stage: LAFB is asking the Court only to strike Plaintiffs' class allegations where "the issues are plain enough from the pleadings to determine whether the interests of absent parties are fairly encompassed within the named plaintiff's claim"—i.e., whether Plaintiffs' class is facially overbroad. *Lemus v. Rite Aid Corp.*, 613 F. Supp. 3d 1269, 1277 (C.D. Cal. 2022). Rule 12(f) of the Federal Rules of Civil Procedure provide for such relief.

Plaintiffs cannot bring CIPA claims on behalf of a nationwide class because only California residents or those who were in California at the time the alleged CIPA violation occurred may bring claims for alleged violations of the CIPA. Those cases on which Plaintiffs rely to suggest otherwise are distinguishable. (*See* Resp., p. 18.) Several cases involved statutes other than the CIPA and so are inapposite. *See Oman v. Delta Air Lines, Inc.*, 889 F.3d 1075 (9th Cir. 2018); *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 254 P.3d 237 (2011); *Schmitt v. SN Servicing Corp.*, 2021 WL 3493754, at *11 (N.D. Cal. Aug. 9, 2021). Other cases are factually distinguishable because they involved plaintiffs with some connection to California. *See Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022 (N.D. Cal. 2011) (out-of-state plaintiffs were paying customers of the California-based defendant internet service provider); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 2016 WL 3543699, at *5 (S.D. Cal. June 29, 2016) (even though the counter-plaintiff was an "out-of-state corporation," it had offices in California and one of the employees that was allegedly recorded was a California resident). And *Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 1257 (N.D. Cal. 2024) is also factually distinguishable because "the conduct at issue [there], in terms of the design and marketing of the Meta Pixel technology and development and implementation of Meta's Terms of Service, occurred in California," even though the Plaintiff lived in Arkansas. *See also Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1079 (N.D. Cal. 2023) (same).

The California legislature clearly expressed its intent that, in passing the CIPA, it "intend[ed] to protect the right of privacy of the people of this state." Cal. Pen. Code § 630 (emphasis added); *see also Doe v. Kaiser Foundation Health Plan, Inc.*, 2024 WL 1589982, *13 (N.D. Cal. April 11, 2024) ("the wiretapping law that applies turns on the residence of the [defendant's] plan member. That means that only a California Plaintiff can bring a CIPA claim."); *Ahringer v. LoanDepot, Inc.*, 715 F. Supp. 3d 1274, 1284–85 (C.D. Cal. 2024) (striking nationwide class allegations in CIPA claim); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 964 (N.D. Cal. 2023) (same).

Regarding their constitutional invasion of privacy claims, Plaintiffs do not even attempt to dispute that only California residents or those with some connection to California enjoy a right to privacy under the California Constitution.

And with respect to Plaintiffs' claims for common law intrusion upon seclusion and negligence, Plaintiffs seem to concede that the only way the named Plaintiffs might represent a nationwide class is if California common law were to apply to the entire class's claims. (Resp., p. 19.) But Plaintiffs have failed to show that the law of California could be applied to the claims of a nationwide class here because privacy-related claims, which are so tied to local community standards, should be decided according to the laws of the plaintiffs' states of residence:

> whether expectations about privacy are reasonable or data collection is egregious, privacy is an evolving area of law that is inherently tied to community standards. In light of this and the apparent differences in the legal framework among states, Plaintiffs have failed to show that the law of California should be applied nationwide.

*Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 948 (N.D. Cal. 2023) (dismissing nationwide class claims against a California Corporation); *see also Kaiser*, 2024 WL 1589982 at *13 ("California does not have a predominant interest simply because [the defendant] is based in California . . . . Because wiretapping statutes are designed to protect the privacy interests of individual members, the residences of the individuals are more important to the respective sovereign than the residence of the alleged wrongdoer.").

Further, the facial overbreadth of Plaintiffs' proposed class is patent enough that the Court would be justified in striking the class allegations *in their entirety* because the class includes many individuals who could not have been injured under Plaintiffs' theory of the case, which centers almost entirely around

the alleged revelation of Diep's status as someone who requires food assistance and/or the fact that he entered his address into the "find food" map. *See, e.g.*, *Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1044 (N.D. Cal. 2014); *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009). If Plaintiffs' claims against LAFB survive on the grounds Plaintiffs advocate—that their use of the LAFB website reveals the fact that they require food assistance (even though only Diep accessed the website)—then the class must logically be limited only to those website users who have sought food assistance from LAFB. A class that includes "all persons in the United States who . . . used one of the Food Bank Defendants' websites" for any purpose is patently overbroad.

## X. CONCLUSION

For these reasons, Defendant Los Angeles Regional Food Bank respectfully requests that this Court grant its Motion to Dismiss in its entirety and dismiss Counts I, III, IV, and V against Los Angeles Regional Food Bank with prejudice. In the event the Court does not dismiss all claims against Los Angeles Regional Food Bank, it requests that the Court grant its Motion to Strike all or certain aspects of Plaintiffs' class allegations.

DATED: February 17, 2026

Respectfully submitted,

SEYFARTH SHAW LLP

By: */s/ Kristine R. Argentine*
Kristine R. Argentine
Attorneys for Defendant
Los Angeles Regional Food Bank